## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, <br> 1343 W. Irving Park Rd. #13487 <br> Chicago, Illinois 60613 <br><br> NORTH CAROLINA TENANTS UNION, <br> 2025 Ephesus Church Rd. <br> Chapel Hill, North Carolina 27517-2354 <br><br> MARYLAND LEGAL AID, <br> 500 E. Lexington Street <br> Baltimore, Maryland 21202 <br><br> AND LISA A. SADLER, <br> 3218 N. Waverly Rd. <br> Lansing, Michigan 48906 <br><br>                                *Plaintiffs*, <br>             v. <br><br> UNITED STATES DEPARTMENT OF <br> HOUSING AND URBAN DEVELOPMENT <br> 451 7th Street, S.W., Washington, D.C. 20410 <br><br> and SCOTT TURNER, in His Official Capacity <br> as Secretary of the United States Department of <br> Housing and Urban Development, <br> 451 7th Street, S.W., Washington, D.C. 20410 <br><br>                                *Defendants*. | Civil Action No. _____ |

## COMPLAINT

## I.    NATURE OF THE ACTION

1.    On February 26, 2026, Defendants the United States Department of Housing and Urban Development ("HUD") and Scott Turner, Secretary of HUD ("Secretary Turner") published an Interim Final Rule ("IFR") rescinding—without notice and comment—HUD's recently promulgated Final Rule titled "30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2024 Final Rule").  The 2024 Final Rule provided that federal public housing authorities ("PHAs") and owners of properties receiving Section 8 Project-Based Rental Assistance ("PBRA") must provide written notification to tenants facing eviction for nonpayment of rent 30 days prior to filing a formal judicial eviction procedure and allow the tenant to cure the arrearage during that 30-day period.  The 2024 Final Rule also required PHAs and PBRA owners to provide an itemized ledger of rent and non-rent charges owed by month and basic information about tenants' rights in the notice.  HUD promulgated this rule after considering hundreds of comments and undertaking detailed regulatory impact analyses in a formal notice and comment rulemaking process.  The 2024 Final Rule protects millions of low-income families from unnecessary evictions and creates a vital safety net on which Plaintiffs and similarly situated HUD-subsidized tenants and organizations rely.

2.    HUD's IFR titled "Revocation of the 30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2026 IFR") rescinds the 2024 Final Rule in violation of both the Administrative Procedure Act ("APA") and HUD's own rules, which require notice and comment absent a good cause exception, for which there is no basis here.  HUD also failed to justify its abrupt policy reversal on the same factual record with no new facts or data, failed to adequately explain why those same facts now lead it to the opposite conclusion, and failed to consider alternatives to wholesale rescission, as the APA requires.

1

3.      If allowed to take effect, HUD's lawless rescission under the 2026 IFR will strip

millions of poverty-stricken individuals and families of the 2024 Final Rule's protections afforded

by the 2024 Final Rule and will cause irreparable harm to Plaintiffs—including homelessness,

loss of eligibility for HUD-subsidized housing, threats to their mental and physical health, and

impairment of their core business activities.  Plaintiffs also have a strong interest in maintaining

the 2024 Final Rule and have suffered an additional procedural injury from Defendants' failure to

provide a meaningful opportunity to influence the rulemaking process.

4.      Plaintiffs bring this action to challenge the promulgation of the 2026 IFR without

notice and comment, and in an arbitrary and capricious manner, in violation of the APA.  Plaintiffs

seek declaratory and injunctive relief to remedy Defendants' unlawful actions.

## II.    THE PARTIES

### A.    Plaintiffs

5.      Plaintiff Jane Addams Senior Caucus ("JASC") is a 501(c)(3) nonprofit

organization located in Chicago, Illinois.  Founded in 1976, JASC is a tenants' advocacy

organization with the mission of promoting economic, social, and racial justice for Section 8

PBRA tenants.  In furtherance of its mission, JASC represents Section 8 PBRA tenants in

nonpayment-of-rent disputes with housing providers.  JASC also supports individual PBRA

building tenants' unions in organizing initiatives.  JASC members Lisa Coleman ("Coleman") and

Shawnese Jones ("Jones") are tenants at Lakeside Tower Apartments in Waukegan, IL.  Over the

past several years, both tenants have received multiple notices of eviction for nonpayment of rent

due to inaccurate information on their ledgers resulting from the property's income and rent

calculation errors.  For both tenants, receiving 30 days' notice and opportunity to cure these

alleged nonpayment violations has provided them and their JASC-contracted or referred attorneys

critical time to untangle these complex ledger issues and prevent an eviction filing. However, both tenants face an ongoing threat of eviction because the property continues to erroneously claim they owe an outstanding balance, and without the 2024 Final Rule, they face a substantial risk of being unable to resolve these issues in time to avoid eviction.

6.     Plaintiff North Carolina Tenants Union ("NCTU") is a membership-based 501(c)(3) nonprofit organization that works with tenants across the state of North Carolina to build durable, democratic tenant unions in their buildings. NCTU staff directly support members that are facing eviction from public housing or PBRA housing for nonpayment of rent, including by reviewing eviction notices and ledgers, providing information about the eviction process and tenants' rights, accompanying tenants to their meetings with management, and referring them to legal and financial assistance resources. NCTU's member, Jane Doe, is a tenant at Healy Drive Towers, a Section 9 public housing property owned and managed by the Housing Authority of Winston-Salem (now known as "Aspire"). Ms. Doe faces a recurring risk of eviction because her fixed Social Security benefits are deposited on the fourth Wednesday of each month—after her rent is due. As a result, she is assessed a late fee and served with a 30-day eviction notice each month, even though she pays the full rent as soon as her benefits arrive. She depends on the 30-day notice and cure period to remain housed; without that protection, she would likely be evicted.

7.     Plaintiff Maryland Legal Aid ("MLA") is a statewide nonprofit 501(c)(3) law firm that provides free civil legal services for public housing and PBRA tenants in the state of Maryland. MLA attorneys regularly assist public housing and PBRA tenants in preventing evictions. A critical component of this assistance is thoroughly reviewing the landlord's accounting, or ledger, to ensure the alleged amount due is accurate. Accordingly, MLA attorneys frequently demand detailed ledgers from landlords and PHAs and, in cases where information is

3

not provided in accordance with the 2024 Final Rule, seek (and often successfully obtain) the dismissal of eviction proceedings.  In addition to the informational requirement, the 30-day notice gives MLA attorneys the critical time to identify errors and resolve issues before a landlord or PHA files an eviction in court.  Without the 2024 Final Rule, MLA attorneys will be forced to act on a more compressed timeline while navigating additional challenges in accessing tenant ledgers and files.  At the same time, MLA attorneys will have to devote more time to each case because fewer matters will be dismissed before eviction proceedings commence and continuances will be more likely.  This will cause MLA attorneys to take on fewer clients and make it more difficult for MLA to fulfill its mission of preserving housing subsidies and preventing evictions for low-income Marylanders.

8.      Plaintiff Lisa A. Sadler is a tenant at Waverly Place, a Section 8 PBRA residential property in Lansing, Michigan.  On two occasions within the past five years, Waverly Place issued Ms. Sadler notices of eviction for alleged nonpayment of rent.  Pursuant to the 2024 Final Rule, Waverly Place provided Ms. Sadler with 30 days' notice prior to eviction and an itemized ledger detailing rent allegedly owed.  Ms. Sadler avoided eviction in both instances by identifying and working towards resolving discrepancies between the amount claimed and the amount due.  Ms. Sadler faces eviction because Waverly Place erroneously alleges that she still owes a balance, and without the 2024 Final Rule, she faces a substantial risk of being unable to resolve these issues in time to avoid eviction.

## B.      Defendants

9.      Defendant HUD is a department of the Executive Branch of the United States Government, 42 U.S.C. § 3532(a), and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1).  Federal law requires HUD to maintain headquarters in the District of Columbia, and

HUD is currently located at 451 7th Street, S.W., Washington, D.C. 20410. *See* 42 U.S.C. § 3532(a). HUD's personnel and operations are principally located in this District, including the personnel and operations that were primarily responsible for the promulgation of the 2026 IFR.

10.     Defendant Secretary Turner is the Secretary of HUD. Secretary Turner is responsible for overseeing all HUD operations, including the promulgation of regulations, the development and implementation of programs, and compliance with and enforcement of governing statutes. Secretary Turner is sued in his official capacity.

### III.     JURISDICTION AND VENUE

11.     This Court has authority to review final agency action under the Administrative Procedure Act, 5 U.S.C. § 702, and jurisdiction over this action seeking such review under 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 702, 705, and 706, and Federal Rule of Civil Procedure 65.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because HUD is domiciled in the District of Columbia, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District. Defendants are U.S. agencies or officers sued in their official capacities.

### IV.     FACTUAL BACKGROUND

**A.     The Federal Public Housing System and Its Residents**

13.     The Housing Act of 1937 (the "Housing Act") declares it "the policy of the United States" to "assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1)(A). To advance this national policy, the Housing Act established the first

5

permanent federal public housing program in the United States and authorizes HUD to provide federal housing assistance for low-income individuals.

14.     Today, HUD carries out this mandate through various programs, including Section 9 public housing and Section 8 PBRA.  Section 9 of the Housing Act authorizes HUD to make federal financial contributions to state and local PHAs to develop and maintain public housing. 42 U.S.C. § 1437c.  Under this program, HUD enters into annual contracts with PHAs who agree to own and operate public housing properties, charge income-based rents, and comply with the relevant federal program rules in exchange for federal funding.  *Id.*; *see* Maggie McCarty, Cong. Rsch. Serv., IF12547, The Public Housing Program at 1 (Dec. 11, 2023).  Section 8 of the Housing Act authorizes HUD to subsidize the rents of low-income individuals through rental assistance contracts with private property owners.  *See* 42 U.S.C. § 1437f.  Under the terms of their contracts with HUD, private owners agree to own and operate housing units in accordance with federal program rules and charge low, income-based rents in exchange for HUD subsidies. *Id.*; *see* McCarty, *supra*.  Section 9 public housing can be converted to Section 8 PBRA housing through HUD's Rental Assistance Demonstration ("RAD") program. Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. 112-55, 125 Stat. 552, 673–674 (Nov. 18, 2011).

15.     Public housing and PBRA tenants generally pay roughly 30% of their adjusted gross income on housing costs.  42 U.S.C. §§ 1437a(a), 1437f.  They are entitled to annual reexaminations, or additional reexaminations upon request, so that rent adjustments may be made if their income changes.  42 U.S.C. § 1437a(a)(6)(A)(ii).  The remainder of the rent is subsidized.

16.    Together, these two programs provide affordable housing assistance to millions of low-income households nationwide.

| Program label | Name | # Occupied Units | Number of people: total | % very low income | % extremely low income | % female head with children | % of households with any disabled member | % 62 or more (Head or spouse) | %Black Non-Hispanic | %Black Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|
| Project Based Section 8 | U.S. Total,Project Based Section 8 | 1208945 | 2020300 | 97 | 82 | 22 | 31 | 54 | 34 | 1 |
| Public Housing | U.S. Total,Public Housing | 772585 | 1507655 | 91 | 74 | 31 | 41 | 38 | 41 | 4 |

17.    The data above was retrieved from HUD's website on March 2, 2026.  U.S. Dep't of Housing and Urban Development, Picture of Subsidized Households (search with filters "2025 Based on 2020 Census"; "U.S. Total"; "Project Based Section 8" and "Public Housing"), *available at*:  https://www.huduser.gov/portal/datasets/assthsg.html (hereinafter "HUD Picture of Subsidized Households").

18.    As HUD's data above shows, 1.5 million people in over 772,000 households live in Section 9 public housing.  Another 2 million people in 1.2 million households live in Section 8 PBRA subsidized properties.

*1.    The Vulnerability of Public Housing and PBRA Households.*

19.    Public housing and PBRA residents come from some of the most vulnerable low-income households in the country.

20.    As HUD's data above shows, the average annual household income of public housing residents is $19,743, and of Section 8 PBRA residents is $16,427, well below the 2025 federal poverty line for even a two-person household.  HUD Picture of Subsidized Households. Approximately 91% of public housing residents and 97% of PBRA residents fall into HUD's "very low income" category (below 50% of area median income).  *Id.*  74% of public housing

residents, and 82% of PBRA residents make even less money, falling into HUD's "extremely low income" category. *Id.*

21.     Additionally, many public housing tenants and PBRA residents are single mothers, senior citizens, and disabled individuals that face additional challenging circumstances. Approximately 38% of public housing households and 54% of PBRA households are headed by seniors (age 62+), and approximately 41% of public housing households and 31% of PBRA households include a member with a disability. *Id.* In addition, about 31% of public housing households and 22% of PBRA households are female-headed households with children. *Id.*

22.     Public housing and PBRA tenants are also disproportionately Black. Approximately 45% of public housing tenants and 35% of PBRA tenants are Black, while just 13.7% of the national population is Black. *Id.*; United States Census, QuickFacts, *available at*: https://www.census.gov/quickfacts/fact/table/US/PST045224 (last visited Mar. 1, 2026).

23.     Here, the plaintiffs and organizational plaintiff members are representative of the public housing and PBRA tenant population. Ms. Sadler, Ms. Coleman, and Ms. Jones are Black women. Ms. Sadler and Ms. Jones' households are both female-headed households with either minors or people with disabilities. Ms. Coleman is a person with a disability, and Ms. Doe is a senior. All of them fall within the extremely-low-income bracket because of their limited fixed income or low-wage employment.

**2.     *Public Housing and PBRA Assistance Is a Scarce but Essential Lifeline for Vulnerable Low-Income Households.***

24.     For these vulnerable and low-income households, access to federally subsidized housing is an essential lifeline, providing the stable, safe, and affordable home that makes it possible to keep a job, keep up with medical appointments, attend school, and meet basic needs in a rental market that is otherwise out of reach.

25.    Indeed, without a rental subsidy, rent in most parts of the country is unaffordable to working families and families of color.  14 of the 20 most common occupations in the United States, including home health aides (like Ms. Jones), retail sales workers, food service workers, and construction workers, pay a median wage lower than that necessary to afford a one- or two-bedroom rental home on the private market.  Black, Latino, and Native American workers are more likely than White workers to be employed in sectors with lower median wages, and to receive lower median earnings than White workers in the same occupations.  *See* National Low Income Housing Coalition, Out of Reach (2024) at 5, *available at*:

https://nlihc.org/sites/default/files/2024_OOR.pdf.

26.    Federally subsidized housing, however, is scarce.  Due to funding limits and severe shortages, approximately two in three eligible low-income renter households do not receive any federal rental assistance at all.  *See* National Low Income Housing Coalition, The GAP:  A Shortage of Affordable Homes, March 2025, at 6−8, *available at*:

https://nlihc.org/gap?utm_source=NLIHC+All+Subscribers&utm_campaign=9b96f4c7b4-report_042122&utm_medium=email&utm_term=0_e090383b5e-9b96f4c7b4-293444466&ct=t(report_042122) (finding that the lowest-income renters face a nationwide shortage of roughly 7.1 million affordable and available rental homes, leaving only about 35 affordable and available units for every 100 extremely low-income renter households).  As a result, the limited supply of federally assisted units is matched by long waiting lists that are frequently closed to new applicants.  A national tracker of public housing waiting lists reports that as of February 2026, only 619 waiting lists are open across 3,517 housing authorities, meaning thousands of authorities are either not accepting applications or not operating open lists at all.  *See*

HUD Housing Network – "Public Housing Waiting Lists" (Updated Mar. 2, 2026) *available at*:

https://hudhousingnetwork.com/public-housing-waiting-lists.

27.    Even after securing federally subsidized housing assistance, this scarce benefit can be lost with startling ease and speed.  PHAs and PBRA owners often readily pursue eviction, while tenants—often unrepresented—fail to effectively navigate complex and resource-intensive administrative procedures to contest, cure, or avert displacement.

28.    Aggressive eviction filing patterns are common and well documented in public housing and PBRA buildings.  Under HUD's regulations, PHAs may terminate a public housing tenancy for "[s]erious or repeated violation of material terms of the lease, such as . . . [f]ailure to make payments due under the lease."  24 C.F.R. § 966.4 (l)(2)(i)(a).  Similarly, PBRA owners may terminate for "[m]aterial noncompliance with the rental agreement" which includes nonpayment of rent.  24 C.F.R. § 247.3(a)(1), (c)(4); HUD Handbook 4350.3:  Occupancy Requirements of Subsidized Multifamily Housing Programs, at 8-13 (Nov. 2013).  In addition, PHAs and PBRA owners have no economic incentive to allow a cure or postpone evictions because the chronic shortages and waiting lists effectively guarantee that the property will not remain vacant.  *See, e.g.*, Sonya Acosta and Brianna Guerrero, Long Waitlists for Housing Vouchers Show Pressing Unmet Need for Assistance Center on Budget and Policy Priorities (Oct. 6, 2021).  As a result, across the country, public housing and PBRA tenants face higher rates of serial eviction filings than unsubsidized tenants.  *See* Lillian Leung, Peter Hepburn, James Hendrickson, and Matthew Desmond, No Safe Harbor:  Eviction Filing in Public Housing, Social Service Review, Vol. 97, Issue 3, at 473−474 (Sept. 2023), *available at*:

https://www.journals.uchicago.edu/doi/epdf/10.1086/725777 (the first national-level study to estimate the prevalence and dynamics of eviction in public housing units).

29.     To make matters worse, existing local, state, and federal regulations governing nonpayment of rent often provide tenants with limited notice and opportunity to cure.  Because there was no federal mandatory cure period for public housing or PBRA tenants, depending on the relevant local law, even a tenant who was one day late with paying rent could be evicted.  As HUD notes, at least nine states have laws that permit a landlord to terminate a tenancy with an "unconditional quit notice" with no opportunity to cure before the landlord can file an eviction proceeding in court; and at least 10 other states offer only three days to cure nonpayment.  *Id.* at 21–24.  Further, public housing tenants were entitled to only 14 days' notice before eviction for nonpayment of rent under HUD regulations, and PBRA housing tenants were entitled to minimum notice under state law.  *See* 24 C.F.R. § 966.4(l)(3)(i)(A) (2019); 24 C.F.R. § 247.4(c) (2019).  State and local laws vary significantly in terms of the mandatory notice, with some states requiring as little as three days' notice, or no notice at all, to vacate before eviction.  *See, e.g.*, Iowa Code § 648.3 (2026) (three days); Ga. Code Ann. § 44-7-50(c) (2025) (three days); Mo. Rev. Stat. § 535.020 (2025) (no notice required); La. Code Civ. Proc. Ann. art. 4701 (2025) (five-day eviction notice is waivable).

30.     In addition, many evictions that could be avoided nevertheless proceed because tenants often cannot effectively navigate the legal system, lack access to counsel, and are unaware of their rights and available remedies—particularly with respect to errors or defenses in rent and income calculations.

31.     The overwhelming majority of tenants face the eviction process without legal assistance.  National analyses show that, in courts, fewer than 10% of residential tenants are represented by attorneys, while upwards of 90% of landlords have attorneys.  *See* Kathryn

Ramsey Mason, *Housing Injustice and the Summary Eviction Process:  Beyond Lindsey v. Normet*, 74 Okla. L. Rev. 391, 416–17 (2022).

32.     This representation imbalance is especially consequential in public and PBRA housing, where rent obligations—and defenses to alleged arrears—are governed by a complex web of technical federal rules that tenants must affirmatively invoke and that eviction courts are often unfamiliar with.  For example, HUD regulations permit PHAs to impose a minimum rent of up to $50, 42 U.S.C. § 1437a(a)(3)(A), but also require PHAs to grant a hardship exemption and, in defined circumstances, suspend the minimum rent and defer enforcement while a hardship request is evaluated.  42 U.S.C. § 1437a(a)(3)(B).  HUD's rules likewise set out how tenant rent must be calculated based on income and provide for rent adjustments when a household's circumstances change.  In some cases, legal requirements vary between HUD programs. *Compare* 24 C.F.R. § 247.4(b) (requiring service of eviction notice by first class mail *and* hand delivery for certain PBRA programs) *with* 24 C.F.R. § 966.4(k)(1)(i) (requiring service of eviction notice by first class mail *or* hand delivery for public housing).  Without counsel, tenants often do not know these protections exist—or how to trigger them—so arrears premised on an unadjusted rent or unapplied hardship exemption can quickly turn into situations where tenants find themselves facing eviction.  In fact, in recent years, multiple lawsuits have been filed against PHAs for failing to notify tenants of their right to the minimum-rent hardship exemption, resulting in evictions of tenants who likely would have qualified for the exemption had they known to request it. *See, e.g.*, *Bush v. Omaha Housing Authority*, 8:24-cv-00260 (D. Neb. 2024) (pending); *Coleman v. Richmond Redevelopment Housing Authority*, 3:25-cv-00133 (E.D. Va. 2025) (pending).

### 3.    *The Harms of Eviction and Housing Instability.*

33.    The harms of eviction and housing instability are well established and documented.  Social science research now treats eviction not only as a symptom but also a cause of deepening poverty.  Studies have found that eviction is associated with: (*i*) job loss and difficulty maintaining employment; (*ii*) significant material hardship (food insecurity, utility shut-offs); (*iii*) moves to more disadvantaged, higher-crime neighborhoods; and (*iv*) increased depression, anxiety, and suicidal ideation in youth.  *See* Gabriel L Schwartz, Nigel Walsh Harriman, Bruce Ramphal, Natalie Slopen,  "*Eviction, inability to pay rent, and youth mental health:  a fixed effects study*," 194 Am. J. Epidemiology, 3501–3509 (2025).

34.    Eviction also has major consequences for a family's future housing options. Because public and PBRA housing are both project-based subsidies, eviction results in more than just loss of the roof over a family's head—it extinguishes the family's desperately needed housing subsidy.  Losing that assistance ejects a family back into a rental market where there are far fewer units than extremely low-income households, and where most low-income renters already face severe cost burdens.  Compounding the harm, many PHAs and PBRA owners refuse to admit applicants who owe rent to a prior PHA or PBRA property owner, or who have been evicted from any federally assisted housing within the last five years. 24 C.F.R. § 982.552(c)(ii) (PHA may deny admission to the Section 8 voucher program if any member of the family has been evicted from federally assisted housing in the last five years); HUD Handbook 4350.3:  Occupancy Requirements of Subsidized Multifamily Housing Programs, at 4-58 (Nov. 2013) (PBRA owner may screen for "previous evictions for lease violations").  In effect, an eviction from a subsidized property locks residents out of affordable housing for the near foreseeable future.

35.     The impact of eviction on low- and extremely low-income renters in subsidized

housing is especially severe.  *See* Danya E. Keene et al., "Rental Assistance and Adult Self-Rated

Health," *J Health Care Poor Underserved* (Feb. 2020), *available at*:

https://pmc.ncbi.nlm.nih.gov/articles/PMC8969280/ (finding that individuals with unmet needs

for subsidized housing report worse health outcomes, and reviewing relevant literature on housing

stability as a determinant of health).  And data shows that evictions disproportionately impact

Black renters, and Black women renters specifically, as well as children.  *See* Nick Gratez et al.,

"A comprehensive demographic profile of the U.S. evicted population," *PNAS* (Oct. 2, 2023),

*available at*:  https://www.pnas.org/doi/10.1073/pnas.2305860120; *see also, e.g.*, Matthew

Desmond et al., "Eviction from public housing in the United States" (Aug. 2022), *available at*:

https://www.sciencedirect.com/science/article/pii/S0264275122001883?via%3Dihu (finding that

housing authorities with a higher percentage of Black residents have significantly higher eviction

filing rates).

**B.     The 30-Day Pre-Eviction Notice Rule and Its Rescission**

       *1.     The 2021 Interim Final Rule.*

36.     On September 4, 2020, during the height of the COVID-19 pandemic, the Center

for Disease Control and Prevention (the "CDC") issued an order, "Temporary Halt in Residential

Evictions To Prevent the Further Spread of COVID-19," in recognition of the risk of eviction due

to loss of income in the general population and increased risk of infection for homeless

individuals.  85 Fed. Reg. 55,292 (2020).  The Supreme Court vacated this moratorium on August

26, 2021.  *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) (per

curiam).

37.     On October 7, 2021, HUD published an IFR titled "Extension of Time and Required Disclosures for Notification of Nonpayment of Rent," 86 Fed. Reg. 55,693 (Oct. 7, 2021) ("2021 IFR"), "to support families impacted financially by the COVID-19 pandemic and at risk of losing their housing." *Id.* at 55,695.  HUD explained that this IFR was necessary due to the abrupt end of the CDC eviction moratorium, the high number of households at risk of eviction due to pandemic-related income loss, the availability of billions of dollars of rental assistance, and delays in the implementation of Emergency Rental Assistance ("ERA") programs and distribution of funds.  At the time, approximately $46 billion in federal ERA was available to state and local jurisdictions.  HUD decided to take emergency action "to prevent a wave of preventable evictions that will interfere with the orderly operation of HUD's programs and the accomplishment of HUD's mission." *Id.* at 55,696.  HUD further cited the slow rollout of pandemic relief rental assistance funding as grounds for the IFR.  *Id.*

38.     The 2021 IFR required PHAs and PBRA owners to provide tenants with notice of the availability of ERA funds prior to commencing an eviction action.  *Id.* at 55,697.  The 2021 IFR also provided tenants with the opportunity to obtain these funds and required PHAs and PBRA owners to provide an additional 30 days following the notification of the availability of funds before proceeding with an eviction.  *Id.*

39.     Because largely preventable mass evictions would intensify the pandemic's spread and severity, HUD invoked the "good cause exception" for advance notice and comment.  *Id.* at 55,698.  The IFR's purpose was to provide immediate assistance to people facing pandemic-related evictions following the lifting of the CDC eviction moratorium.  *Id.*  Delaying the promulgation of the rule for an extensive notice and comment period would have undermined that purpose.  *Id.* at 55,699.

15

40.     Instead, HUD held a 30-day comment period after the IFR's publication from October 7, 2021, through November 8, 2021. *Id.* at 55,694. During this period, HUD received 44 comments from interested parties including housing advocates, individuals, and a coalition of state attorneys general. *See* HUD-2021-0061, https://www.regulations.gov/docket/HUD-2021-0061.

41.     Many of these comments "applaud[ed] the HUD Secretary for adopting this Rule," while urging HUD to expand the rule in many ways. *See, e.g.*, Letitia James, Comments from State Attorneys General in Support of HUD Interim Final Rule: "Extension of Time and Required Disclosures for Notification of Nonpayment of Rent," Dkt. No. HUD-2021-0061-0043 (Nov. 8, 2021).

### 2.     *The December 2023 Proposed Final Rule.*

42.     In light of the positive comments supporting the IFR and in response to the commenters' calls to expand these protections beyond the pandemic, HUD proposed to adopt the IFR's provisions on a permanent basis through notice-and-comment rulemaking. 30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent, 88 Fed. Reg. 83,877, 83,879 (proposed Dec. 1, 2023).

43.     On December 1, 2023, HUD published for public comment a proposed rule that would formally amend its regulations governing public and PBRA housing to require at least 30 days' written notice before initiating an eviction for nonpayment of rent ("2023 Proposed Rule"). 88 Fed. Reg. at 83,877.

44.     The 2023 Proposed Rule imposed two fundamental requirements:

(1)  requiring tenants in public housing and PBRA housing to receive a minimum 30-day notice before termination of the lease for nonpayment of rent, with the termination notice effective no earlier than 30 days after the tenant receives it; and

(2) requiring that the notice include the following:

> (a) instructions on how the tenant can cure the nonpayment, including an itemized statement of alleged rent owed and other permissible arrearages by month;

> (b) information on how the tenant can recertify income, request a minimum-rent hardship exemption, and (for public housing) switch from flat rent to income-based rent; and

> (c) in the event of a Presidentially declared national emergency, any additional information the Secretary requires to help tenants avoid eviction.

45.     The 2023 Proposed Rule also required PHAs and owners to amend their lease agreements to reflect these new requirements.

46.     In explaining the basis for its proposal, HUD explained that the 2023 Proposed Rule "would curtail preventable and unnecessary evictions by providing tenants with time and information to help cure nonpayment violations" while resulting in minimal corresponding costs to landlords.  88 Fed. Reg. at 83,877.  According to its regulatory impact analysis, HUD noted that the rate of move-outs due to nonpayment of rent in PBRA housing decreased from an average of 0.82% in 2018 and 2019 to 0.67% in 2023 after the implementation of the 2021 IFR—a 15% reduction—indicating that the 30-day notice period reduced housing turnover and homelessness. HUD, FR-6387-F-01, Final Rule Regulatory Impact Analysis (2024), https://www.regulations.gov/document/HUD-2023-0098-0322, at 4 (hereinafter, "2024 RIA"). Likely, this is in part because tenants had the ability to cure within 30 days.  *Id.* at 6.

47.     HUD's analysis also showed that the 2021 IFR did not cause significant hardship to PHAs and PBRA owners.  A conservative estimate of lost revenue in 2023 resulting from the 30-day notice requirement was $1.82 per occupied unit per year for PBRA housing and only $0.72 per occupied unit per year for public housing.  *Id*. at 12–13.  HUD further observed that the 2021 IFR as well as other comparable legislative and regulatory rules demonstrated PHA's and

PBRA owners' "capacity to comply with the 30 day notice requirements." 88 Fed. Reg. at 83,883.

48.    HUD further acknowledged the support expressed by many commenters for the 2021 IFR and for adequate notice prior to eviction, *id.* at 83,879, as well as the suggestion that the 30-day notice requirement extend to "situations outside of a national emergency." *Id.*

### 3.    *The Notice and Comment Process.*

49.    The public comment period began on December 1, 2023, and lasted 60 days, until January 30, 2024.  HUD specifically welcomed comments from "owners and PHAs [who] have had experience implementing the interim final rule."  *Id.* at 83,879.

50.    The notice and comment period yielded 316 comments from a wide variety of stakeholders.  This included:  "individuals, landlords, tenants, property owners ('owners'), housing authorities, housing cooperatives, non-profit housing organizations, non-profit organizations representing seniors or individuals with disabilities, housing associations, case managers for individuals experiencing homelessness, churches, [and] law firms."  30-Day Notification Requirement Prior To Termination of Lease for Nonpayment of Rent, 89 Fed. Reg. 101,270, 101,272 (Dec. 13, 2024) (hereinafter, "2024 Final Rule").

51.    The notice and comment period also provided a broad range of substantive contributions that reflected deep public engagement on the issue.  Commenters supported their positions on the 2023 Proposed Rule using (*1*) empirical data and statistical evidence, (*2*) narratives recounting lived experiences, (*3*) legal and policy interpretations, and (*4*) proposals to amend the rule.  *See, e.g.*, *id.* at 101,272–277.

52.    HUD also conducted a detailed regulatory impact analysis that showed that the proposed rule "would curtail preventable and unnecessary evictions by providing tenants with

time and information to help cure nonpayment violations" while resulting in minimal

corresponding costs to landlords.  *Id*. at 101,301; *see also* 2024 RIA.

### 4.     *The 2024 Final Rule.*

53.     After weighing the numerous comments from various stakeholders, HUD

published the 2024 Final Rule on December 13, 2024.  The 2024 Final Rule requires 30 days'

notice of eviction for nonpayment of rent from public housing and PBRA housing.  The Final

Rule requires that the notice include:  (*1*) instructions on how the tenant can cure lease violations

for nonpayment of rent violation, (*2*) information on how the tenant can recertify their income or

request a minimum hardship exemption pursuant to 24 C.F.R. § 5.630(b), (*3*) an itemized ledger

of rent and non-rent charges owed by month, and (*4*) in the event of a presidential declaration of a

national emergency, such information as required by the Secretary.  *Id*. at 101,302–304.  The final

rule also provides that tenants may cure the alleged violation by paying the rent owed before

expiration of the 30 days.  *Id*.

54.     HUD's 2024 Final Rule reflected a thorough assessment of the comments received

during the notice and comment period.  It analyzed both the benefits and the drawbacks of the

2023 Proposed Rule that the comments identified and weighed these considerations against each

other.  Beyond simply acknowledging commenters' concerns, HUD meticulously contextualized

these concerns and provided responses about the Final Rule's practical effects based on its own

research, implementation data, and regulatory impact analysis.

55.     Indeed, HUD's Final Rule contained several notable additions that were added in

response to the comments, including the requirement to provide an itemized ledger and mandating

the ability to cure the violation during the 30-day period.

56.     HUD acknowledged the numerous comments expressing general support for the rule and emphasizing its positive impact for lower-income families, seniors, and people with disabilities. *Id.* at 101,274. Others highlighted the detrimental effects of evictions. *Id.* at 101,273. HUD also agreed with commenters "that providing tenants with additional time will help to cure nonpayment of rent violations, preventing unnecessary eviction filings and evictions." *Id.* at 101,276. Moreover, HUD noted, PHAs and PBRA owners had already demonstrated compliance with these requirements based on prior regulations, including the 2021 IFR. *Id.* at 101,277.

57.     But HUD did not indiscriminately accept every single comment in favor of the 2023 Proposed Rule. In fact, HUD considered, and ultimately rejected, several suggestions that the rule go farther, requiring a notice period longer than 30 days, adding additional content requirements, applying to evictions for reasons other than non-payment, and applying to other HUD programs, namely the voucher programs. *Id.* at 101,292-299.

58.     Conversely, HUD also considered and addressed comments opposing the proposed rule. *Id.* at 101,277. For example, HUD addressed concerns that the rule would:

   a.  Financially burden PHAs and PBRA owners and result in higher rent arrearages or Tenant Accounts Receivables ("TARs") for PHAs. HUD responded noting that while it "understands the fiscal impacts of nonpayment of rent to a PHA's or owner's operating budget," nevertheless, "HUD believes that a 30-day notification period strikes the appropriate balance that provides enough time for the tenant to cure the lease violation and does not overly burden the PHA and owner." *Id.* at 101,278. HUD also "disagree[d] with the assumption underlying many of these

comments" that the rule will necessarily lead to the tenant accruing more outstanding rent due, that will then not be paid to the landlord. *Id.* at 101,279.

b. Negatively impact PHAs' and PBRA owners' operational budgets. *Id.* at 101,279-80. In response, HUD candidly acknowledged "the growing cost of operating housing" and offered concrete solutions, noting that PHAs may be eligible to receive shortfall funding from HUD, and emphasizing that compliance with recertification requirements could help PHAs and owners fully realize the subsidy support available to them. *Id.* at 101,280.

c. Negatively affect their Public Housing Assessment System ("PHAS") score because of higher TARs, which would in turn trigger increased HUD oversight and remedies. *Id.* at 101,282. In response, HUD "agreed that PHAs should not be penalized as a result of compliance with this rule" and noted that it "has provided relief to PHAs for PHAS scoring of TARS for 2022 and 2023 PHAs scores and is evaluating further extensions at this time based on available data." *Id.*

d. Minimize the amount of available housing units. *Id.* at 101,286. In response, HUD explained that "long waitlists throughout the country are a testament to the need for greater resources, and not an opportunity to forgo taking steps to protect the tenure of current residents." *Id.*

e. Create administrative burdens on PHAs having to revise leases and notices in accordance with the 2023 Proposed Rule's notice and informational requirements. *Id.* at 101,297-98. Recognizing that PHAs would require "adequate time to modify their policies," HUD specified that public housing providers would have 18 months from the Final Rule's effective date to update their leases, and PBRA

providers would have 14 months from the date HUD publishes an updated model lease.

59.     Importantly, HUD did not address the various comments to the 2023 Proposed Rule in a vacuum.  HUD also conducted its assessment based on its own empirical data from its regulatory impact analysis.  For example, HUD examined administrative data from its PBRA inventory to conclude that between 1,100 and 3,500 nonpayment-related moveouts from public housing and PBRA would be prevented each year by the rule.  This would save between $6.3 million and $37.7 million in societal costs related to emergency shelter, hospital services, child welfare and juvenile offense services.  2024 RIA, Exhibit 3.  HUD further found that the cost of compliance would be $4.8 million, far less than the $6.3 to $37.7 million in societal costs saved. *Id.* at 10, 16.

60.     Ultimately, HUD weighed competing considerations based both on the submitted comments and its own research and data, clearly explaining why potential benefits outweighed potential harms.  In particular, HUD emphasized that the Final Rule "strikes a balance between potentially increasing some of the financial impacts on PHAs and owners, and supporting families who need additional time to address financial issues that result in nonpayment of rent."  *Id.* at 101,277.  HUD also reasoned that PHAs and owners would save money on unnecessary, costly eviction proceedings, which counterbalances the financial impact from tenants' nonpayment of rent. *Id.* at 101,278.

### *5.     HUD Rescinded the Rule Without Adequate Reasoning or Notice and Comment.*

61.     On February 26, 2026, HUD released a new interim final rule that "revokes the 2021 interim final rule and 2024 final rule" including "requirements from the 2021 and 2024 rules related to information in termination notices."  According to HUD, the "[r]egulatory requirements

for notice of termination for nonpayment of rent will return to pre-2021 requirements, which range from 5 days to 30 days for HUD programs and depend on state and local laws."  Revocation of the 30-Day Notification Requirement Prior To Termination of Lease for Nonpayment of Rent, 91 Fed. Reg. 9,449, 9,449 (Feb. 26, 2026) (hereinafter, "2026 IFR").

62.     HUD's cursory statement is misleading and minimizes the severe impact of the rescission.  Rescission of the 2024 Final Rule and 2021 IFR will return public housing tenants to 14 days' notice of eviction for nonpayment of rent.  *Id*. at 9,450, 9,453.  PBRA tenants will revert to state law notice and cure periods.  *Id*.  Nonpayment of rent does not constitute "other good cause" for which 30 days' notice to PBRA tenants is required under HUD's regulations.  24 C.F.R. § 247.4(c).  Some states require as little as three days' notice and offer no statutory cure period.  *See* 2024 RIA at 22–24.  Neither public housing nor PBRA tenants will have entitlement to an itemized ledger with their eviction notice, or information about how to obtain a rent decrease, unless required by state law.  In states where there is minimal or no statutory cure period, public housing and PBRA tenants will be at risk of losing their housing, and their subsidy, for paying rent as little as *one day late*.

63.     In justifying the rescission, HUD argued that on balance, rescinding the rule financially benefits PHAs and property owners while minimizing harm to tenants.  In reaching this conclusion, HUD takes the exact opposite stance it took just over one year ago in passing the 2024 Final Rule, when it stated that "HUD believes that this rule strikes a balance between potentially increasing some of the financial impacts on PHAs and owners, and supporting families who need additional time to address financial issues that result in nonpayment of rent."  2024 Final Rule at 101,277.  HUD also raised two justifications, both of which had already been considered and addressed in 2024, namely that "PHAs and owners continue to see significant

financial impacts from nonpayment of rent," and that rescinding this rule will benefit the long waitlist of people waiting for available public housing units.  2026 IFR at 9,450–51.

64.    In conjunction with the 2026 IFR, HUD conducted a new regulatory impact analysis on "the impacts of removing the 30-day notification requirement."  HUD, FR-6529-I-01, Interim Final Rule Regulatory Impact Analysis (2026), https://www.regulations.gov/document/HUD-2026-0265-0002, at 1 (hereinafter, "2026 RIA").  In this analysis, HUD acknowledges that, because of a "lack of data," HUD "is uncertain which would be greater: the external costs from worsened housing instability among nonpaying assisted tenants or the external cost savings from otherwise unassisted households gaining assistance." 2026 RIA at 7.  HUD nevertheless concludes that while the 2026 IFR will "cause an increase in housing instability in some instances, which will impose costs on society in general . . . these costs will be offset by the improved housing outcomes of households moving into the vacated units."  *Id*. at 8.  HUD's flawed reasoning also improperly equates the enduring, long-term harm to evicted tenants—who lose their subsidies and carry an eviction on their record—with the incremental, temporary burden on unsubsidized households that may face modestly longer wait times.

65.    HUD failed to provide advance notice and comment for this IFR.  Rather, HUD sought to invoke the "good cause" exception, which allows agencies to bypass notice and comment when it would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).  2026 IFR at 9,541.

66.    HUD claimed that "[a]dvance public notice and comment is unnecessary and does not serve the public interest in this case."  *Id.*  HUD provided the explanation that "because HUD has already received extensive public comment on this matter from a wide range of stakeholders

including individuals, landlords, tenants, owners, housing agencies, housing cooperatives, non-profit housing organizations, non-profit organizations representing seniors or individuals with disabilities, housing associations, case managers for individuals experiencing homelessness, churches, law firms, and others . . . HUD does not expect comments submitted in response to this interim final rule to raise any new information which HUD has not recently considered. Additional further comment is therefore unnecessary." *Id.*

67.    The 2026 IFR will cause irreparable harm to millions of HUD-subsidized tenants. As the Plaintiffs' experiences illustrate, many evictions for nonpayment of rent from public housing and PBRA are unnecessary and avoidable. *See infra* ¶¶ 68–145. The 2024 Final Rule's protections, such as a mandatory notice period, opportunity to cure, and information requirements for notices, have helped to mitigate such unnecessary and avoidable evictions.  The removal of these protections increases the likelihood that a family who receives an eviction notice will, in fact, be evicted.  Evictions, in turn, increase the risk of homelessness and housing instability, which have well-established long-term harms that disproportionately impact vulnerable populations, including people with disabilities, seniors, and people of color.  *See supra* ¶¶ 33–35.

**C.    The Plaintiffs and Their Harm**

   ***1.    Jane Addams Senior Caucus***

68.    Jane Addams Senior Caucus, JASC, is a membership-based 501(c)(3) nonprofit organization that supports the leadership of Chicago-area seniors and tenant families to transform their housing and communities.

69.    JASC has 250 members in 3 cities across Illinois.  JASC's members are primarily tenants in buildings with Section 8 PBRA contracts with HUD.

70.     JASC's mission is to support its members who are organizing building-based tenant unions for the purpose of improving building conditions and management practices.

71.     A core part of JASC's work is helping HUD tenants resolve alleged nonpayment issues to prevent eviction.  The JASC team frequently sees miscalculated rent and inaccurate ledgers and spends a significant amount of time documenting and contesting these improper tenant-rent balances.

72.     It would be impracticable and very challenging for tenants to identify and resolve the broad range of inaccuracies and miscalculations that JASC has encountered in tenants' ledgers without the assistance of experienced specialists.  These complex errors can involve, for example, income recertifications that are submitted late or never processed, improper calculation of tenant income that should have been excluded under HUD rules, inexplicable charges that did not match the tenant's rent portion, improperly charged late fees, tenants being charged the HUD subsidy portion of rent, failure to credit rent payments to tenants' accounts, and failure to properly calculate utility allowances and required deductions.

73.     To train and support its own staff in this process, JASC developed a formal guide that sets out a detailed eight-step process for reviewing ledgers, and six-step process for calculating rent.  These processes critically rely on tenant rights and protections guaranteed under the 2024 Final Rule, including the right to an itemized ledger and the right to notice and opportunity to cure within 30 days.

74.     JASC's support and advocacy has eliminated back rents and prevented countless evictions.  In one case in 2024, for example, JASC successfully secured the removal of over $25,000 in unlawful back rents from the ledgers of six PBRA tenants.  In another case in February 2025, JASC systematically reviewed and contested inaccurate eviction notices that were issued to

26

over a dozen tenants in one HUD PBRA property, documenting and reporting substantial errors in every ledger to management.  Only three tenants ended up going to court.

75.     JASC's success would not have been possible without the 2024 Final Rule.  The default rule, under Illinois state law, would only allow for a five-day notice-and-cure period—far too short to go through the complicated and time-consuming process to obtain the ledger, identify inaccuracies, and resolve them with management.

76.     JASC would like to submit information to HUD about its experience advocating for PBRA tenants and the importance of the 2024 Final Rule in stopping evictions and correcting ledger errors, because it might influence HUD's decision to rescind the rule.  Much of JASC's relevant experience came in late 2024 and 2025, so JASC could not have submitted this information in response to the Notice of Proposed Rulemaking issued in 2023.

77.     Lisa Coleman and Shawnese Jones are tenants at Lakeside Tower Apartments in Waukegan, IL.  Lakeside Tower Apartments has a tenants' union, Lakeside Tower Tenant Union, that JASC supports.  Participants in the Lakeside Tower Tenant Union, like Ms. Coleman and Ms. Jones, are also members of JASC.

78.     Ms. Coleman is disabled and lives with her live-in aide.  Her sole income is just over $1,200 in Retirement, Survivors, and Disability Insurance.  She cannot afford rent on the private market with this limited income.

79.     Ms. Jones is a single mother supporting four minor children, one of whom has asthma.  She is employed as a caregiver for seniors and receives a biweekly paycheck of about $500.  She cannot afford rent on the private market with this limited income.

80.     Because Ms. Jones' paycheck amount fluctuates, and she receives her monthly income over the course of two paychecks, she has in the past had months where she struggled to pay her full portion of rent at the beginning of the month.

81.     Lakeside Tower Apartments has a Section 8 PBRA subsidy through HUD's Property Disposition program.

82.     The 2024 Final Rule currently applies to the property.

83.     The property seems prepared to immediately revert back to its old notice requirements once the rule is revoked.  Several months ago, Ms. Coleman received a notice threatening to take her to eviction court if she did not pay an alleged balance in five days.  Ms. Coleman's experience with the property reflects a pattern of aggressive eviction practices.  If management has the opportunity to provide fewer days' notice before eviction, they will.

84.     Without the 2024 Final Rule, Lakeside Tower will only be required to provide five days' notice to pay or vacate for nonpayment of rent under state law.  24 C.F.R. § 886.128; 24 C.F.R. § 247.4 (where the termination notice is based on material noncompliance with the rental agreement the time of service shall be in accord with the rental agreement and state law); 735 Ill. Comp. Stat. § 5/9–209.

85.     Over the past several years, both Ms. Coleman and Ms. Jones have each received multiple notices of eviction for nonpayment of rent due to inaccurate information on their ledgers resulting from income and rent calculation errors on the part of the property.  For both tenants, receiving 30 days' notice and opportunity to cure these alleged nonpayment violations, as well as an itemized ledger of rent and non-rent arrearages, has provided them and JASC critical time to untangle these complex ledger issues and prevent an eviction filing.

86.     However, both tenants face an ongoing threat of eviction because the property continues to erroneously claim they owe a balance.

87.     If evicted, Ms. Coleman cannot afford rent on the private market, and with an eviction on her record she is unlikely to find new housing.  She will become homeless. Homelessness would interfere with her disability-related medical treatment and cause her severe emotional distress.

88.     If evicted, Ms. Jones will have nowhere to go with her children and would become homeless or have to split up her family.  This would cause severe emotional distress for her and her children.  It would also have health and academic impacts for her children and make it more difficult for her to maintain employment.

89.     Ms. Coleman and Ms. Jones attend regular meetings of the Lakeside Tower Tenant Union, where they have learned that many of their neighbors are experiencing similar issues as them.

90.     Ms. Coleman and Ms. Jones would like to share information about their experiences and the experiences of their neighbors with HUD because it could influence HUD's decision to rescind the rule.

### 2.     *North Carolina Tenants Union*

91.     Plaintiff North Carolina Tenants Union, NCTU, is a membership-based 501(c)(3) nonprofit organization that works with tenants across the state of North Carolina to build durable, democratic tenant unions in their buildings.

92.     NCTU has 208 members in four North Carolina metropolitan areas.  Many of NCTU's members are tenants in Section 9 public housing and Section 8 PBRA buildings.

93.     NCTU's mission is to realize housing as a human right for every North Carolinian and build a housing system that prioritizes people over profit.

94.     NCTU's director and organizing staff actively communicate with NCTU members and closely track issues they are experiencing with their buildings and management.

95.     A core part of NCTU's work involves supporting members facing eviction from public housing or PBRA housing.  NCTU staff regularly helps members review their eviction notices and rent ledgers, and provides members with information on the eviction process, tenants' rights, and HUD rules.  In some cases, NCTU staff will accompany members to meetings with building management to review paperwork and negotiate resolutions.  NCTU also connects its members facing eviction with community partners that provide legal representation or financial assistance.

96.      When assisting its public housing and PBRA members at risk of eviction, NCTU often encounters inaccurately calculated rent balances.  Properties frequently assess improper late fees or fail to process income recertifications in a timely or accurate manner.  As a result, NCTU members regularly receive eviction notices predicated on alleged nonpayment amounts that exceed their true rent liability.

97.     It takes NCTU and its members time to resolve these issues with management. Between the time it takes to access legal aid attorneys, review ledgers, understand rent balance inaccuracies, and actually meet with management, it often takes weeks to resolve inaccurate rent balances.  In NCTU and its organizing staff's experience, building management can be unresponsive and inaccessible, which makes it particularly difficult to resolve these issues expediently.

98.    If there is a legitimate balance remaining after untangling a tenant's ledger, it takes additional time to access the resources necessary to cure this balance. Churches, charities, nonprofits, and mutual aid organizations have helped NCTU members cure balances by providing rental assistance, but the process can take weeks. These community partners are short-staffed, and sometimes obtaining this rental assistance requires the cooperation of PHAs or building management. In one case, a member's PHA failed to provide a charity with documentation that the charity requested, and when the PHA finally did send the information, it was riddled with errors. The entire process of obtaining rental assistance ultimately took several weeks.

99.    Sometimes, tenants will, outside of their roles as NCTU members, organize crowd-funded rental assistance for a neighbor. For example, tenants were able to do this for Ms. Doe and helped her cure a nonpayment violation and avoid eviction. But this process typically takes around at least two weeks.

100.    In NCTU's experience, the 2024 Final rule has been instrumental in preventing unnecessary evictions. Without the 30-day notice requirement and right to an itemized ledger, it would be extremely difficult, if not impossible, to identify errors, remedy them, and obtain any needed rental assistance in 10 days, which is the notice period provided under North Carolina law.

101.    NCTU would like to submit information to HUD about its experience advocating for public housing and PBRA tenants and the importance of the 2024 Final Rule in stopping evictions, correcting rent balance errors, and acquiring rental assistance, because it might influence HUD's decision to rescind the rule. Much of NCTU's relevant experience came in late 2024 and 2025, so NCTU could not have submitted this information in response to the Notice of Proposed Rulemaking issued in 2023.

102.    NCTU's member, who is going by the pseudonymous name Jane Doe, is a tenant at Healy Drive Towers, a Section 9 public housing property owned and managed by the Housing Authority of Winston-Salem (now known as "Aspire").

103.    Ms. Doe is a 71-year old retired county employee.

104.    Ms. Doe is at risk of eviction because she receives her fixed income from the Social Security Administration on the fourth Wednesday of each month.  Each month she receives a 30-day eviction notice and is charged late fee because she cannot pay her rent on time based on when her income arrives.

105.    She relies on the 2024 Final Rule because she is always able to pay her rent within the 30-day notice period.  Without the rule she would likely be evicted.

106.    The 30-day notice period also allowed Ms. Doe to avoid eviction after her service dog became critically ill, causing her to accrue roughly $1,000 out-of-pocket veterinary expenses and fall behind on rent.  With additional time she was able to access rental assistance and pay off her balance.

107.    If evicted, Ms. Doe will have nowhere to go and will likely have to stay in a homeless shelter because she cannot afford rent on the private market with her fixed income.  This would have severe impacts on her physical and mental health.

108.    Ms. Doe would like to share information about her experiences and the experiences of her neighbors because it could influence HUD's decision to rescind the rule.

### 3.    *Maryland Legal Aid*

109.    Maryland Legal Aid, MLA, is statewide nonprofit 501(c)(3) law firm that provides free civil legal services to Maryland residents experiencing poverty to help them preserve access to safe and affordable housing.

110.     As a legal services organization, MLA has unique expertise on the impact of the 2024 Final Rule, and its rescission, on low-income tenants in Maryland.  According to the Legal Services Corporation's 2024 report, housing cases comprised the largest proportion of cases handled by legal services organizations nationwide for the fourth year in a row.  Legal Services Corporation, *By the Numbers: The Data Underlying Legal Aid Programs* (2024), *available at*: https://www.lsc.gov/our-impact/publications/numbers

111.     A core part of MLA's work involves representing Maryland public housing and PBRA tenants in eviction proceedings.  These cases are among MLA's highest priorities as the consequences of losing one's subsidized tenancy often means the family will have no affordable options and are at high risk for homelessness.

112.     Typically, HUD-subsidized tenants apply for MLA's services after they have received a notice of termination.  If the tenant is deemed eligible for MLA's services, their case is referred to the appropriate offices where it is assigned to an attorney or other advocate.  MLA's case handlers then investigate the cases they are assigned to clarify the facts and determine the available resolutions of the legal issues.

113.     A critical component of MLA attorneys' work in these cases is a thorough review of the landlord's accounting, or ledger, to ensure the alleged amount due is accurate.  This analysis is especially important in cases where a subsidy is involved because they are more complicated and the relevant ledgers often contain income or rent calculation errors.

114.     Accordingly, MLA's standard practice in cases involving public housing or other federally subsidized units is to request to review the ledger and the tenant's entire file.  Accessing the ledger is difficult and time-consuming because PHA caseworkers often have high caseloads and can be difficult to contact, while at PBRA properties identifying the proper person and contact

information takes time due to high turnover rates, and managers are not always able to respond quickly to file requests.

115.    If MLA attorneys identify errors in tenants' ledgers, they contact the PHA or PBRA owner to remedy these errors.  If any balance is still legitimately owed, MLA attorneys help their clients resolve these issues before an eviction is filed.  This may involve negotiating a payment plan between the tenant and the PHA or landlord.

116.    Not all cases are resolved before an eviction is filed.  When a PHA or Landlord proceeds with an eviction filing against a tenant, MLA's attorneys defend their clients in court, often challenging the accuracy of the ledger or seeking dismissal based on procedural deficiencies.

117.    The 2024 Final Rule has been instrumental in MLA's defense of its clients.

118.    Because of its informational requirements, MLA's attorneys have been able to obtain the itemized accounting of rent and non-rent arrearages they need to assist their clients before an eviction is actually filed.  PHAs and landlords do not always provide such information despite being required to do so, but in these cases, eviction courts typically dismiss the eviction, and the tenant will receive a compliant notice.  MLA attorneys have successfully secured the dismissal of many eviction cases on this basis.

119.    Additionally, MLA's attorneys frequently make use of the 30-day notice requirement in the 2024 Final Rule.  This meaningful window between notice and filing allows them time to resolve these issues and prevent unnecessary court proceedings.

120.    Without the 2024 Final Rule, PHAs and landlords will not be required to provide ledgers during MLA's attorneys' crucial pre-filing investigation phase.  PHAs and Landlords will

not have an incentive to provide these ledgers prior to filing an eviction without the threat of a dismissal for failure to do so.

121.    To the extent MLA's attorneys can investigate their clients' cases before filing, they must do so without the notice and cure protections of the 2024 Final Rule.  MLA's attorneys would have to resolve recurring, complex issues in 10 days or 14 days instead of 30 days which, in many cases, is impractical.

122.    The denial of critical ledger information and accelerated eviction timeline, along with its predictable increase in eviction filings, would impede MLA attorneys' ability to resolve a matter prior to eviction filing, force them to seek continuances to review information that was not provided on a timely basis, and ultimately cause them to spend more, not less time on an individual case.

123.    Rescission of the 2024 Final Rule will make it more difficult for MLA to achieve its mission of preserving housing subsidies and preventing evictions for low-income Marylanders.

124.    MLA would like to share information about its experience utilizing the protections of the 2024 Final Rule.  It submitted a comment in 2023, and since the implementation of the 2024 Final Rule, it has gained an entirely new and valuable perspective on the informational requirements and the notice and cure protections.

125.    In particular, MLA would like to share that the 2024 Final Rule's enhanced notice and information requirements have materially improved their attorneys' ability to serve their HUD-subsidized tenant clients.  The Rule has enabled more complete review of tenant files, earlier identification of related drivers of nonpayment (including recertification issues and reasonable-accommodation needs), and more effective requests for continuances by underscoring

the importance of this information.  MLA also now has concrete data and client experiences confirming that tenants are receiving the benefits the Rule was designed to provide.

126.    This information could influence HUD's decision to rescind the 2024 Final Rule.

*4.    Lisa A. Sadler*

127.    Lisa A. Sadler is a 59-year-old tenant at Waverly Place, a Section 8 PBRA property in Lansing, Michigan.  She has lived there for eight years.

128.    She is a full-time caregiver for her severely disabled adult son who has cerebral palsy, a seizure disorder, autism, and blindness.

129.    Ms. Sadler's only household income is her son's Supplemental Security Income for his disability, and some money she receives from the state to take care of him.  She receives less than $2,000 per month.

130.    Before she obtained her apartment at Waverly Place, Ms. Sadler went through periods of homelessness because she could not afford rent on the private market with her limited income.

131.    Waverly Place is a former public housing property that was converted to Section 8 PBRA property under the RAD program.

132.    Waverly Place is owned by Lansing Housing Commission (a PHA) through a limited partnership called Mount Vernon Park Limited Dividend Housing Association Limited Partnership.  Post-RAD conversion, the property is managed by a private company, Michigan Asset Group, L.L.C.

133.    The 2024 Final Rule currently applies to the property.

134.    Lansing Housing Commission submitted a comment in opposition to the proposed 30-day notice rule in 2023.

135.    Without the 2024 Final Rule, Waverly Place will only be required to provide seven days' notice to vacate for nonpayment of rent under state law, where there is no statutory pre-filing cure period.  24 C.F.R. § 247.4 (where the termination notice is based on material noncompliance with the rental agreement the time of service shall be in accord with the rental agreement and state law);[1] Mich. Comp. Laws. § 600.5714(1)(a).

136.    In 2022, Ms. Sadler received 30 days' notice alleging she had not paid rent for a month.  In fact, there was an error on her ledger, which Ms. Sadler demonstrated to management by acquiring from her bank a copy of the cashier's check proving she had paid rent that month. Management admitted its mistake in the 30-day period and did not file an eviction.

137.    On December 8, 2025, she received a 30-day notice for nonpayment of rent saying that she owed over $500.  In response to the notice, she was able to obtain a copy of her itemized ledger, which Waverly Place was required to provide her pursuant to the 2024 Final Rule.

138.    Ms. Sadler had been legally withholding rent and escrowing it under Michigan law because her home was unlivable and undergoing mold remediation.  Her review of the ledger revealed that Waverly Place did not account for the amount of rent she had escrowed.  The ledger also included charges and late fees that she did not owe.

139.    Because she had 30 days, she was able to consult with attorneys and a tenant resource organization, who took steps to address these issues on her ledger.  Because Ms. Sadler had time to involve her attorneys, and the attorney had time to review her ledger and contact management about the errors they found, Waverly Place did not file an eviction.

---

[1]    RAD PBRA properties are required to follow 24 C.F.R. § 880.607 and 24 C.F.R part 247 as to notice of termination for nonpayment of rent (both of which incorporate the 30 day notice rule). Rental Assistance Demonstration- Final Implementation, Revision 4, Notice H-2019-09 PIH 2019-23 (HA) (September 5, 2019), https://www.hud.gov/sites/dfiles/Housing/documents/RAD_Notice_Rev4_Final_as_amended_by_Supplemental_4B_and_4C_Master_Version.pdf (Updated to reflect Supplemental Notices 4B (July 27, 2023) and 4C (Jan. 15, 2025)).

140.    However, Ms. Sadler recently reviewed her ledger, which revealed that Waverly Place still claims she owes a balance of over $700.

141.    She is worried she will receive another eviction notice for nonpayment of rent. Once the 2024 Final Rule is revoked, she will only have seven days to address and resolve any issues with her ledger.  This will not be enough time, in her experience.  Furthermore, there is no right to cure a rent debt before the eviction is filed under state law.  This means Waverly Place can take Ms. Sadler to court even if she is able to pay any balance legitimately owed after the ledger is fixed.

142.    If evicted, Ms. Sadler and her family will become homeless, and Ms. Sadler will not be able to adequately care for her disabled son and her family will experience severe emotional distress.

143.    Ms. Sadler is a community leader at Waverly Place whom many tenants come to with problems.  Since Michigan Asset Group, L.L.C. took over management, tenants at Waverly Place have experienced frequent errors with their rent and income calculations.  She has been asked to assist and accompany her neighbors to meetings with management to go over their ledgers.

144.    These errors and improper calculations take time to fix with management.  It takes more than the seven-day notice period under state law to address these problems.  The office is often closed during business hours, so it is difficult to meet with management.

145.    Ms. Sadler would like to share information about her and her neighbor's experiences with the 2024 Final Rule with HUD because it could influence their decision to rescind the rule.  She was not able to share this information in 2023 in response to HUD's Notice

of Proposed Rulemaking because many of these relevant experiences happened in 2024 after that

comment period closed, and in 2025, after the Final Rule was published.

## V.    CAUSES OF ACTION

### COUNT I

**Defendants Improperly Promulgated the 2026 IFR Absent Compliance with Notice and Comment Procedures Required for Enacting Rules**

**(Violation of 5 U.S.C. § 553(b))**

146.    Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

147.    The APA requires federal agencies to publish a "[g]eneral notice of proposed rule

making . . . [to] give interested persons an opportunity to participate in the rulemaking through

submission of written data, views, or arguments, [and] [a]fter consideration of the relevant matter

presented, the agency shall incorporate in the rules adopted a concise general statement of their

basis and purpose."  5 U.S.C. § 553(b), (c).

148.    HUD's regulations require it "to provide for public participation in rulemaking

with respect to *all* HUD programs and functions" except in the rare instance when the Secretary

determines there is "good cause" to waive these requirements.  24 C.F.R. §§ 10.1, 5.110.

149.    The APA empowers this Court to hold unlawful and set aside agency actions taken

"without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

150.    Promulgation of the 2026 IFR was "rulemaking" within the meaning of the APA,

5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

151.    Defendants promulgated the 2026 IFR without notice and without opportunity for

comment.

152.    No good cause exception to the notice and comment requirements applies.

153.    Defendants' promulgation of the 2026 IFR was in violation of, and should be vacated under, 5 U.S.C. §§ 706(2)(D) and 553(b).

154.    Plaintiffs are injured by their inability to provide important information to HUD that might influence its decision to rescind the 2024 Final Rule.

155.    Plaintiffs will experience irreparable injury should this Court not issue immediate relief in the form of postponement of the effective date of the 2026 IFR pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing the 2026 IFR's implementation.

## COUNT II

### HUD's Rescission of the 2024 Final Rule Is Arbitrary and Capricious
### (Violation of 5 U.S.C. § 706(2)(A))

156.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

157.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Further, under the APA, Section 706(2)(C), the Court may "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

158.    The APA requires that agencies' decisions be supported by a rational connection between the choice made and the facts underlying that choice, and that agencies consider the disadvantages of their policies.  It also requires that a deviation from agency policy be acknowledged and supported by a reasoned explanation or justification.  *See* 5 U.S.C. § 706(2)(A).

40

159.     HUD's rescission of the 2024 Final Rule is a final agency action.

160.     HUD has failed to adequately explain its abrupt reversal of position just over one year later based on the same factual findings and conclusions, which found that the 2024 Final Rule would help prevent many avoidable evictions, save millions of dollars in societal costs associated with eviction and homelessness, cost housing providers a fraction of that amount, and reduce the disparate impact of evictions from subsidized housing on tenants of color and families with children.

161.     HUD points to no new facts, data, or analysis, and offers no reasoned explanation for why the same evidence now purportedly supports the opposite conclusion.

162.     HUD has failed to consider any alternatives that are in the ambit of existing policy in rescinding the 2024 Final Rule.

163.     HUD's rescission of the 2024 Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in contravention of the APA, 5 U.S.C. § 706(2)(A).

164.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201–2202, Plaintiffs are entitled to a declaration that the challenged rescission violates the APA.

165.     Plaintiffs are also entitled to vacatur of the 2026 IFR pursuant to 5 U.S.C. § 706(2)(A) and a stay of the 2026 IFR pursuant to 5 U.S.C. § 705.

166.     Plaintiffs will experience irreparable injury should this Court not issue immediate relief in the form of postponement of the effective date of the 2026 IFR pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing the 2026 IFR's implementation.

## VI.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to:

167.    Declare that the 2026 IFR is a substantive and legislative rule, improperly promulgated without notice and comment in violation of the Administrative Procedure Act.  5 U.S.C. § 553(b)–(c);

168.    Declare that the rescission of the 2024 Final Rule is unlawful because it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

169.    Vacate and set aside the 2026 IFR;

170.    Grant emergency relief pending review in the form of a stay and delayed effective date of the 2026 IFR under 5 U.S.C. § 705;

171.    Grant emergency relief pending review in the form of an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to enjoin Defendants to rescind the 2026 IFR and from taking any action to further the implementation of the 2026 IFR;

172.    Order that no bond shall be required pursuant to Federal Rule of Civil Procedure 65(c);

173.    Award Plaintiffs their costs of suit and expenses, including reasonable attorneys' fees and expert witness fees; and

174.    Grant other relief as this Court may deem just and proper.


Dated:  March 2, 2026                    Respectfully submitted,

                                         **DEBEVOISE & PLIMPTON LLP**
                                         /s/ *Tim J. Cornell*
                                         Tim J. Cornell (D.C. Bar No. 994661)
                                         801 Pennsylvania Avenue, N.W.
                                         Washington, D.C. 20004
                                         Telephone: (202) 383-8000
                                         Email:  tjcornell@debevoise.com

                                         Caroline H. Wallace (N.Y. Bar No. 5958004) (*pro hac vice
                                         application forthcoming*)
                                         Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice
                                         application forthcoming*)
                                         66 Hudson Boulevard
                                         New York, NY 10001
                                         Telephone: (212) 909-6000
                                         Email:  chwallace@debevoise.com
                                                 sdgrossman@debevoise.com

                                         **NATIONAL HOUSING LAW PROJECT**
                                         Hannah D. Adams (Louisiana Bar No. 36343) (*pro hac vice
                                         application forthcoming*)
                                         90 New Montgomery St., Suite 1015
                                         San Francisco, CA 94105
                                         Telephone: (415) 636-8385
                                         Email:  hadams@nhlp.org

                                         **LEGAL AID SOCIETY OF EASTERN VIRGINIA**
                                         Brandon L. Ballard (VSB No.: 95346)
                                         (*pro hac vice application forthcoming*)
                                         125 St. Paul's Blvd., Suite 400
                                         Norfolk, VA 23510
                                         Ph: (757) 648-1241
                                         Email: brandonb@laseva.org

                                         *Attorneys for Plaintiffs*