**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>　　　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>　　　　　　　　*Defendants*. | Civil Action No. 1:26-cv-00718<br><br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MOTION FOR A STAY AND PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Local Rule 65.1(c), and 5 U.S.C.

§ 705, Plaintiffs Jane Addams Senior Caucus, North Carolina Tenants Union, Maryland

Legal Aid, and Lisa A. Sadler hereby move for: (1) a declaration that Defendant United

States Department of Housing and Urban Development's ("HUD") interim final rule

"Revocation of the 30-Day Notification Requirement Prior To Termination of Lease for

Nonpayment of Rent" ("2026 IFR") is a substantive and legislative rule, improperly

promulgated without notice and comment in violation of the Administrative Procedure

Act; (2) a declaration that the 2026 IFR is unlawful because it is "arbitrary and

capricious, an abuse of discretion, or otherwise not in accordance with law," 5. U.S.C.

§ 706(2)(A); (3) vacatur of the 2026 IFR; (4) a stay and delayed effective date of the

2026 IFR under 5 U.S.C. § 705; and (5) a preliminary injunction to enjoin Defendants

HUD and Secretary of HUD Scott Turner to rescind the 2026 IFR and from taking any action to further the implementation of the 2026 IFR, with no bond required under Federal Rule of Civil Procedure 65(c).

In support of this motion, Plaintiffs submit the accompanying (1) Plaintiffs' Memorandum of Law in Support of Motion for a Preliminary Injunction and Stay; (2) the Declaration of Noah Moskowitz and exhibits annexed thereto; (3) the Declaration of Lisa Coleman; (4) the Declaration of Shawnese Jones; (5) the Declaration of Hailey Huget; (6) the Declaration of Jane Doe; (7) the Declaration of Victoria Schultz and exhibit annexed thereto; (8) the Declaration of Lisa A. Sadler; and (9) a proposed order.

Pursuant to Local Civil Rule 65.1(d), Plaintiffs respectfully request a hearing on this motion within 21 days, in advance of the 2026 IFR taking effect on March 30, 2026. The facts making such expedition essential are set forth in the accompanying Plaintiffs' Memorandum of Law in Support of Motion for a Stay and Preliminary Injunction.

Pursuant to Local Civil Rule 7(m), at approximately 3:00 PM on March 2, 2026, undersigned counsel emailed the Chief of the Civil Division of the U.S. Attorney's Office for the District of Columbia and the Associate General Counsel for Litigation of the U.S. Department of Housing and Urban Development to notify them of Plaintiffs' intent to file this motion and to provide copies of the complaint, motion, and all associated documents. At the time of filing, Defendants' counsel have not yet responded.

Pursuant to Local Civil Rule 65.1(c), opposition papers, if any, are due within

seven days of service of this Motion.

Dated:  March 2, 2026                    Respectfully submitted,

                                         **DEBEVOISE & PLIMPTON LLP**
                                         /s/ *Timothy J. Cornell*
                                         Timothy J. Cornell (D.C. Bar No. 994661)
                                         801 Pennsylvania Avenue, N.W.
                                         Washington, D.C. 20004
                                         Telephone: (202) 383-8000
                                         Email:  tjcornell@debevoise.com

                                         Caroline H. Wallace (N.Y. Bar No. 5958004) (*pro
                                         hac vice application pending*)
                                         Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac
                                         vice application pending*)
                                         66 Hudson Boulevard
                                         New York, NY 10001
                                         Telephone: (212) 909-6000
                                         Email:  chwallace@debevoise.com
                                                 sdgrossman@debevoise.com

                                         **NATIONAL HOUSING LAW PROJECT**
                                         Hannah D. Adams (Louisiana Bar No. 36343) (*pro
                                         hac vice application pending*)
                                         90 New Montgomery St., Suite 1015
                                         San Francisco, CA 94105
                                         Telephone: (415) 636-8385
                                         Email:  hadams@nhlp.org

                                         **LEGAL AID SOCIETY OF EASTERN VIRGINIA**
                                         Brandon L. Ballard (VSB No.: 95346)
                                         (*pro hac vice application pending*)
                                         125 St. Paul's Blvd., Suite 400
                                         Norfolk, VA 23510
                                         Ph: (757) 648-1241
                                         Email: brandonb@laseva.org

                                         *Attorneys for Plaintiffs*

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, AND LISA A. SADLER, *Plaintiffs*, v. UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development, *Defendants*. | Civil Action No. 1:26-cv-00718 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY**

i

# TABLE OF CONTENTS

I.  Preliminary Statement .................................................................................................. 1

II.  Statement of Facts ...................................................................................................... 3

    A.  The Federal Public Housing Program ..................................................................... 3

    B.  HUD's 2024 Final Rule Requiring 30-Day Notice of Eviction for
        Nonpayment of Rent. ........................................................................................... 5

    C.  HUD's 2024 Final Rule Was Adopted After Weighing Views from Varied
        Stakeholders and Following Robust Notice and Comment. ................................... 6

    D.  Without Prior Notice and Comment, HUD Completely Reverses Course,
        Rescinding the 2024 Final Rule in Favor of the Opposite Policy. .......................... 9

    E.  HUD's 2026 Rescission's Likely Impact on Plaintiffs and Other Public
        and PBRA Housing Tenants .................................................................................. 10

III.  Argument .................................................................................................................... 16

    A.  Plaintiffs' APA Claims Will Likely Succeed on the Merits. ................................. 16

    B.  Plaintiffs Will Suffer Irreparable Harm Absent the Relief Requested ................. 39

    C.  The Balance of Equities and the Public Interest Support Preliminary Relief....... 43

    D.  Plaintiffs' Motion Is Not Precluded by *Trump v. CASA* ...................................... 44

    E.  The Court Should Decline to Order Plaintiffs to Post Bond................................ 45

IV.  Conclusion .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**        **Pages**

*Action on Smoking and Health v. Civil Aeronautics Bd.*, 713 F.2d 795 (D.C. Cir. 1983) ........................................................................................................................29, 30

*AFL-CIO v. N.L.R.B.*, 57 F.4th 1023 (D.C. Cir. 2023) ..............................................26

*Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291 (D.C. 2006) ...........41

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)..............................26

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) .......43

*Am. Gateways v. U.S. Dep't of Just.*, 2025 WL 2029764 (D.D.C. July 21, 2025) ...................45

*Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 22 F.4th 1018 (D.C. Cir. 2022) ...............................................................................................................................36

*Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324 (D.C. Cir. 2023) ...............................................................................................................................28

*Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998).........................19, 20

*Association of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19 (D.D.C. 2012) ......................................................................................................28

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) .........................17

*Brown v. Artery Org., Inc.*, 654 F. Supp. 1106 (D.D.C. 1987)....................................41

*Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91 (D.D.C. 2025) ................44, 45, 46

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) .....................30

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 436 F. Supp. 3d 70 (D.D.C. 2020) ...............................................................................................................................36

*City of Billings v. Transportation Sec. Admin.*, 153 F.4th 46 (D.C. Cir. 2025).........................30

*City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181 (D.C. Cir. 2007)........................17

*Coal. For Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48 (D.D.C. 2025), *appeal docketed*, No. 25-5289 (D.C. Cir. filed Aug. 25, 2025) ................................. *passim*

*Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791 (9th Cir. 2001) ...................17

*Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678 (D.C. Cir. 2004)..............................................................................................................................21

*Ctr. for Taxpayer Rts. v. IRS*, 2025 WL 3251044 (D.D.C. Nov. 21, 2025)................................20

*D.C. v. Towers*, 250 A.3d 1048 (D.C. 2021) ................................................................40

*D.C. v. United States Dep't of Agric.*, 496 F. Supp. 3d 213 (D.D.C. 2020)...............................39

*Democracy Forward Found. v. Off. of Mgmt. & Budget*, 780 F. Supp. 3d 61
    (D.D.C. 2025) .....................................................................................................17

*\*Dep't of Com. v. New York*, 588 U.S. 752 (2019)...........................................................2, 17, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .........................37, 39

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025) .....................20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................................................27, 32

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)...........................22, 26

*Food & Water Watch, Inc. v. Vilsack,* 79 F. Supp. 3d 174 (D.D.C. 2015), *aff'd*,
    808 F.3d 905 (D.C. Cir. 2015).................................................................................24

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)...................................16

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020), *amended in part*, 486 F.
    Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v.*
    *Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021)................................................43

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ...........................34

*Gulf v. Burgum*, 775 F. Supp. 3d 455 (D.D.C. 2025) ................................................................33

*\*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................................22, 23

*HIV & Hepatitis Pol'y Inst. v. U.S. Dep't of Health & Hum. Servs.*, 728 F. Supp.
    3d 1 (D.D.C. 2023) ...........................................................................................19, 24

*Humane Soc'y v. USDA*, 41 F.4th 564 (D.C. Cir. 2022) ....................................................27, 29

*Lattimore v. Nw. Co-op. Homes Ass'n*, 1990 WL 10521534 (D.D.C. Mar. 26,
    1990) ..............................................................................................................42, 44

*League of United Latin Am. Citizens v. Exec. Off. of President*, 2025 WL
    3042704 (D.D.C. Oct. 31, 2025).............................................................................13

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir.
    2016) ........................................................................................................21, 42, 43

*Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543 (D.C. Cir. 2024)...................................27

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..........................................................17

\*Mack Trucks, Inc. v. E.P.A., 682 F.3d 87 (D.C. Cir. 2012) ............................................ passim

*Make the Rd. N.Y. v. Noem*, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)
(Statement of Millett and Childs JJ.) ....................................................................45

*McChesney v. Petersen*, 275 F. Supp. 3d 1123 (D. Neb. 2016), *aff'd sub nom.*
*McChesney v. Fed. Election Comm'n*, 900 F.3d 578 (8th Cir. 2018)..................................28

*McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233 (S.D.N.Y. 1989) .......................20, 44

*Mobil Oil Corp. v. U.S. E.P.A.*, 35 F.3d 579 (D.C. Cir. 1994) ....................................29

\*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463
U.S. 29 (1983)............................................................................................31, 34, 37

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290 (D.D.C.
2025) ..............................................................................................................46

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009)................................43

*Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025)..............................................45

*New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980)....................................................43

*New York Republican State Comm. v. Sec. & Exch. Comm'n*, 927 F.3d 499
(D.C. Cir. 2019) ................................................................................................19

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................43

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) .................................................26

*Purdue Univ. v. Scalia*, 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ....................................31

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ................................................43

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d
19 (D.D.C. 2025) *appeal docketed*, No. 25-5243 (D.C. Cir. filed July 3,
2025) ..............................................................................................................22

*Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992)....................................17

*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007)....................................33

*Sierra Club v. E.P.A.*, 755 F.3d 968 (D.C. Cir. 2014) ................................................19

*Sierra Club v. United States Dep't of Transportation*, 125 F.4th 1170 (D.C. Cir.
2025) ..............................................................................................................17

*Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) ..............................................30

*Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002)......................24

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ...................................................................43

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).............................................................18

*Tenn. Gas Pipeline Co. v. FERC,* 969 F.2d 1141 (D.C. Cir. 1992)..............................................29

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................................................17

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)...................................................................................45

*United States v. Ross*, 848 F.3d 1129 (D.C. Cir. 2017) ................................................................25

*Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749 (D.C. Cir. 2001) ........................28, 31

*Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020) ......................................................41

*Watkins v. Greene Metro. Hous. Auth.*, 397 F. Supp. 3d 1103 (S.D. Ohio 2019) ......................44

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.
    Supp. 3d 1 (D.D.C. 2020) ........................................................................................................44

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ..............................................................16

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985).......................................................40

*Wisconsin Valley Improvement v. FERC*, 236 F.3d 738 (D.C. Cir. 2001) ..................................32

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)....................................24

**Statutes**

*5 U.S.C. § 553....................................................................................................... *passim*

5 U.S.C. § 702...............................................................................................................26

5 U.S.C. § 704...............................................................................................................26

*5 U.S.C. § 705....................................................................................................... *passim*

*5 U.S.C. § 706.......................................................................................................26, 31

42 U.S.C. § 1437............................................................................................................3

42 U.S.C. § 1437a........................................................................................................3, 5

42 U.S.C. § 1437c...........................................................................................................3

42 U.S.C. § 1437f ...............................................................................................3

Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. 112-
        55, 125 Stat. 552, 673–674 (Nov. 18, 2011) ...........................................3

**Other Authorities**

24 C.F.R. § 5.110 ..............................................................................................26

24 C.F.R. § 5.630(b) ...........................................................................................6

24 C.F.R. § 10.1 ................................................................................................26

24 C.F.R. § 247.3 ................................................................................................4

24 C.F.R. § 247.4(b) ...........................................................................................5

24 C.F.R. § 247.4(c) .....................................................................................11, 19

24 C.F.R. § 880.607 ..........................................................................................14

24 C.F.R. § 886 .................................................................................................12

24 C.F.R. § 966.4 ..............................................................................................19

24 C.F.R. § 966.4(k)(1)(i) ...................................................................................5

24 C.F.R. § 966.4(l)(2)(i)(a) ...............................................................................4

24 C.F.R. § 966.4(l)(3) ......................................................................................13

30-Day Notification Requirement Prior to Termination of Lease for
        Nonpayment of Rent, 88 Fed. Reg. 83,877 (proposed Dec. 1, 2023) ...........7, 8

*30-Day Notification Requirement Prior To Termination of Lease for
        Nonpayment of Rent, 89 Fed. Reg. 101,270 (Dec. 13, 2024) ("2024 Final
        Rule") ............................................................................................. *passim*

Comment of Doug Fleming, Executive Director of Lansing Housing
        Commission, on 30-Day Notification Requirement Prior to Termination of
        Lease for Nonpayment of Rent, HUD-2023-0098 (Jan. 21, 2024),
        https://www.regulations.gov/comment/HUD-2023-0098-0162 ...........................14

Comment of Lansing Housing Commission on 30-Day Notification
        Requirement Prior to Termination of Lease for Nonpayment of Rent, HUD-
        2023-0098 (Jan. 7, 2024), https://www.regulations.gov/comment/HUD-
        2023-0098-0112 .................................................................................14

Extension of Time and Required Disclosures for Notification of Nonpayment of
Rent, 86 Fed. Reg. 55,693 (Oct. 7, 2021) ...............................................................7

*HUD, FR-6387-F-01, Final Rule Regulatory Impact Analysis (2024),
https://www.regulations.gov/document/HUD-2023-0098-0322 ("2024
RIA").......................................................................................................... *passim*

*HUD, FR-6529-I-01, Interim Final Rule Regulatory Impact Analysis (2026),
https://www.regulations.gov/document/HUD-2026-0265-0002 ("2026
RIA").......................................................................................................... *passim*

HUD, Dkt. No. HUD-2021-0061, Regulations.gov,
https://www.regulations.gov/docket/HUD-2021-0061 .........................................7

Kathryn Ramsey Mason, *Housing Injustice and the Summary Eviction Process:
Beyond Lindsey v. Normet*, 74 OKLA. L. REV. 391 (2022) ...................................5

Letitia James, Comments from State Attorneys General in Support of HUD
Interim Final Rule: "Extension of Time and Required Disclosures for
Notification of Nonpayment of Rent," Dkt. No. HUD-2021-0061-0043,
(Nov. 8, 2021) ........................................................................................................7

Public Housing Evaluation and Oversight: Changes to the Public Housing
Assessment System (PHAS) and Determining and Remedying Performance
Deficiencies, 89 Fed. Reg. 87,518 (Nov. 4, 2024).............................................39

*Public Housing Waiting Lists*, HUD Housing Network (Updated Feb. 28, 2026),
https://hudhousingnetwork.com/public-housing-waiting-lists.................................4

Rental Assistance Demonstration- Final Implementation, Revision 4, Notice H-
2019-09 PIH 2019-23 (HA) (September 5, 2019),
https://www.hud.gov/sites/dfiles/Housing/documents/RAD_Notice_Rev4_F
inal_as_amended_by_Supplemental_4B_and_4C_Master_Version.pdf
(Updated to reflect Supplemental Notices 4B (July 27, 2023) and 4C (Jan.
15, 2025) .............................................................................................................14

*Revocation of the 30-Day Notification Requirement Prior To Termination of
Lease for Nonpayment of Rent, 91 Fed. Reg. 9,449 (Feb. 26, 2026) ("2026
IFR") ........................................................................................................ *passim*

Sonya Acosta and Brianna Guerrero, *Long Waitlists for Housing Vouchers
Show Pressing Unmet Need for Assistance*, Center on Budget and Policy
Priorities (Oct. 6, 2021) ........................................................................................4

## I.    PRELIMINARY STATEMENT

On February 26, 2026, Defendants the United States Department of Housing and Urban Development ("HUD") and Scott Turner, Secretary of HUD ("Secretary Turner") unlawfully published an Interim Final Rule ("IFR") that will eliminate critical eviction protections for over 3.5 million HUD-subsidized tenants if allowed to take effect (the "2026 IFR"). Plaintiffs Jane Addams Senior Caucus ("JASC"), the North Carolina Tenants Union ("NCTU"), Maryland Legal Aid ("MLA"), and Lisa A. Sadler (collectively, "Plaintiffs") are a HUD-subsidized tenant and organizations that represent HUD-subsidized tenants. Ms. Sadler, JASC and NCTU members, MLA clients and similarly situated HUD-subsidized tenants are currently protected by HUD's rule requiring certain HUD-subsidized landlords to provide written notification to tenants facing eviction for nonpayment of rent 30 days prior to filing a formal judicial eviction procedure and to allow tenants to cure the arrearage during that 30-day period (the "2024 Final Rule"). HUD promulgated this rule just over a year ago, on December 13, 2024, after weighing hundreds of comments and undertaking detailed regulatory impact analyses in a formal notice and comment rulemaking process.

The 2026 IFR, by contrast, will rescind the 2024 Final Rule's protections without the benefit of the required notice and comment process and fails to adequately explain the abrupt reversal of HUD's existing policy in violation of the Administrative Procedure Act ("APA"). Without the 2024 Final Rule, Plaintiffs will be in imminent danger of eviction and other attendant irreparable harms, including homelessness, the loss of eligibility for HUD-subsidized housing, threats to their mental and physical health, impairment to their core business activities, as well as the procedural injury caused by Defendants' failure to afford them the opportunity to meaningfully influence the rulemaking process. Plaintiffs therefore respectfully move this Court for a stay under 5 U.S.C. § 705 and a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1(c) to halt the implementation of Defendants' unlawful IFR.

Plaintiffs readily meet the requirements for a § 705 stay and a preliminary injunction. Plaintiffs' claims will likely succeed on the merits as the 2026 IFR is unlawful on multiple grounds. *First*, HUD blatantly disregarded the APA's notice and comment requirements, and its invocation of the "good cause" exception is meritless. HUD fails to demonstrate how soliciting public comment would be contrary to the public interest or how comments submitted on the 2024 Final Rule make further input "unnecessary." Accepting that rationale would effectively exempt rescissions from notice-and-comment review—an outcome foreclosed by established precedent.

*Second*, HUD's rescission of the 2024 Final Rule is arbitrary and capricious. HUD reversed its carefully considered policy position on the same factual record with no new facts or data, and without adequately explaining why those same facts now lead them to the opposite conclusion. HUD failed to properly consider the numerous comments supporting the 2024 Final Rule and its benefits to vulnerable tenants, while rehashing and inflating concerns about financial burdens on housing providers that it had already considered and addressed just over a year ago. HUD's reliance on anecdotal evidence and cherry-picked data—without any new data or analysis establishing causation—does not constitute reasoned decision-making. Moreover, HUD failed to consider alternatives to wholesale rescission, including retaining the informational requirements that impose minimal costs or leveraging available resources to alleviate financial burdens on housing authorities.

The remaining preliminary injunction factors strongly favor relief. Plaintiffs will likely suffer irreparable harm absent a stay or injunction: eviction from HUD-subsidized housing causes lasting harm to families for which there is no adequate remedy at law, and once lost, a housing subsidy is nearly impossible to regain. Plaintiffs will also be irrevocably deprived of the opportunity to meaningfully influence the rulemaking process. The balance of equities and public interest likewise favor Plaintiffs, as the government has no legitimate interest in enforcing an unlawful rule. The Court should grant Plaintiffs' motion and stay the 2026 IFR while this litigation proceeds.

II.    **STATEMENT OF FACTS**

　　A.    **The Federal Public Housing Program**

The Housing Act of 1937 (the "Housing Act") declares it "the policy of the United States" to "assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1)(A). To advance this policy, the Housing Act authorizes HUD to provide federal housing assistance for low-income individuals. Today, HUD carries out this mandate through various programs, including:

　　(1) **Section 9 Public Housing**: Section 9 of the Housing Act authorizes HUD to make federal financial contributions to state and local public housing agencies ("PHAs") to develop and maintain public housing. 42 U.S.C. § 1437c. Under this program, HUD enters into contracts with PHAs who agree to own and operate public housing properties, charge income-based rents, and comply with the relevant federal program rules in exchange for federal funding. *Id.*

　　(2) **Section 8 Project-Based Rental Assistance ("PBRA")**: Section 8 of the Housing Act authorizes HUD to subsidize low-income individuals' rents through rental assistance contracts with private multi-family property owners. 42 U.S.C. § 1437f. Under these contracts, private owners agree to own and operate housing units and charge low, income-based rents in exchange for HUD subsidies. *Id*. Section 9 public housing can be converted to Section 8 PBRA housing through HUD's Rental Assistance Demonstration ("RAD") program. Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. 112-55, 125 Stat. 552, 673–674 (Nov. 18, 2011).

　　Public housing and PBRA tenants generally pay roughly 30% of their adjusted gross income on housing costs and are entitled to an adjustment of their rent amount when their income changes. 42 U.S.C. §§ 1437a(a), 1437f; *see also* Schultz Decl. ¶ 13 (explaining these rights).

　　Together, these two programs provide affordable housing assistance to millions of low-income households nationwide—1.5 million people in over 772,000 households live in Section 9

3

public housing, while another 2 million people in 1.2 million households live in Section 8 PBRA subsidized properties. *See* Compl. ¶ 17.

Public housing and PBRA tenants are among the poorest and most vulnerable in the country. According to 2025 HUD data (based on the 2020 census), the average annual household income of public housing and Section 8 PBRA residents is $19,743 and $16,427, respectively—well below the 2025 federal poverty line for even a two-person household. *Id*. In addition, around 38% of public housing households and 54% of PBRA households are headed by seniors (age 62+), and around 41% of public housing households and 31% of PBRA households include a member with a disability. *Id*.

Accordingly, these HUD-subsidized tenants are among those least able to absorb housing disruption. Yet, their access to HUD-subsidized housing is difficult to obtain and easy to lose. The finite supply of public housing (and similarly PBRA housing) produces long—often closed—waitlists, with one national tracker reporting that as of February 2026, only 619 public-housing waitlists were open across 3,517 housing authorities. *Public Housing Waiting Lists*, HUD Housing Network (Updated Feb. 28, 2026), https://hudhousingnetwork.com/public-housing-waiting-lists; *see also* Sadler Decl. ¶ 12 (took over one year after signing on to a waitlist to obtain PBRA housing). In addition, PHAs and PBRA owners have wide discretion to evict for nonpayment, 24 C.F.R. § 966.4(l)(2)(i)(a) (public housing) and 24 C.F.R. § 247.3(a)(1), (c)(4) (PBRA), and face little pressure to keep units occupied given chronic shortages and waiting lists. *See, e.g.*, Sonya Acosta and Brianna Guerrero, *Long Waitlists for Housing Vouchers Show Pressing Unmet Need for Assistance*, Center on Budget and Policy Priorities (Oct. 6, 2021).

The fast-tracked summary eviction process, employed by all fifty states, is also difficult to navigate and procedurally burdensome for tenants, the overwhelming majority of whom are unrepresented. *See* Kathryn Ramsey Mason, *Housing Injustice and the Summary Eviction Process: Beyond Lindsey v. Normet*, 74 OKLA. L. REV. 391, 413–21 (2022). This lack of support in the

4

eviction process is especially consequential in public and PBRA housing, where rent miscalculations and administrative errors are common. It is also critical because rent obligations—and defenses to alleged arrears—are governed by a complex web of technical federal rules that tenants must affirmatively invoke and that eviction courts are often unfamiliar with. For example, federal law requires PHAs to impose a minimum rent of up to $50, 42 U.S.C. § 1437a(a)(3)(A), but also requires PHAs to grant a hardship exemption and, in defined circumstances, suspend the minimum rent and defer enforcement while a hardship request is evaluated. 42 U.S.C. § 1437a(a)(3)(B). HUD rules likewise prescribe how rent must be calculated based on income and require adjustments when household circumstances change. In some cases, legal requirements vary between HUD programs. *Compare* 24 C.F.R. § 247.4(b) (requiring service of eviction notice by first class mail *and* hand delivery for certain PBRA programs); *with* 24 C.F.R. § 966.4(k)(1)(i) (requiring service of eviction notice by first class mail *or* hand delivery for public housing). Without legal assistance, tenants often do not know these protections exist or how to trigger them. As a result, arrears driven by an improper rent calculation, a failure to adjust rent calculation after a loss of income, a failure to apply qualifying reimbursements, or a hardship exemption can quickly escalate into eviction. *See*, *e.g.*, Moskowitz Decl. ¶ 13 (describing how "miscalculated rents and inaccurate ledgers are endemic to HUD PBRA buildings" and can "lead to improper termination of [] housing subsidies").

### B.    HUD's 2024 Final Rule Requiring 30-Day Notice of Eviction for Nonpayment of Rent.

Against this backdrop, on December 13, 2024, HUD published a Final Rule titled "30-Day Notification Requirement Prior To Termination of Lease for Nonpayment of Rent." 89 Fed. Reg. 101,270, 101,270 (Dec. 13, 2024) (hereinafter, "2024 Final Rule"). The Final Rule requires that:

> [PHAs] and owners of properties receiving [PBRA] must provide written notification to tenants facing eviction for nonpayment of rent 30 days prior to filing a formal judicial eviction procedure.

*Id.* Additionally, the Final Rule requires that the notice include (*1*) instructions on how the tenant can cure lease violations for nonpayment of rent violation, (*2*) information on how the tenant can recertify their income or request a minimum hardship exemption pursuant to 24 C.F.R. § 5.630(b), (*3*) an itemized ledger of rent and non-rent charges owed by month, and (*4*) in the event of a presidential declaration of a national emergency, such information as required by the Secretary. *Id.* at 101,302–4. The Final Rule also clarifies that the 30-day notice cannot be provided earlier than the day after rent is due, and that an eviction cannot be filed if the tenant cures the rent arrearage within the 30-day period. *Id.* The Final Rule took effect on January 13, 2025. *Id.* at 101,270.

### C.    HUD's 2024 Final Rule Was Adopted After Weighing Views from Varied Stakeholders and Following Robust Notice and Comment.

The 2024 Final Rule reflected a considered policy choice informed by years of program experience and stakeholder input, including through a notice and comment process. Over the last five years, HUD observed the implementation of a prior iteration of this rule, tracked implementation data, solicited and reviewed extensive public comment to evaluate competing approaches, and undertook detailed regulatory analyses to assess the rule's expected effects. Following this multi-year process, HUD issued the 2024 Final Rule.

The 2024 Final Rule originated with an IFR that HUD issued during the COVID-19 pandemic, titled "Extension of Time and Required Disclosures for Notification of Nonpayment of Rent," 86 Fed. Reg. 55,693 (Oct. 7, 2021), "to support families impacted financially by the COVID–19 pandemic and at risk of losing their housing." 2024 Final Rule at 101,270. This rule required PHAs and PBRA owners to notify tenants of the availability of Emergency Rental Assistance ("ERA") and the opportunity to obtain these funds prior to commencing an eviction action. 86 Fed. Reg. at 55,697–98. PHAs and PBRA owners were then required to wait 30 days before continuing to an eviction. *Id.* In enacting this rule, HUD explained that the abrupt end of a Centers for Disease

Control and Prevention order temporarily halting evictions, due to judicial vacatur, required HUD "to act to prevent a wave of preventable evictions that will interfere with the orderly operation of HUD's programs and the accomplishment of HUD's mission." *Id.* at 55,696. HUD further cited the slow rollout of pandemic relief rental assistance funding as grounds for the IFR. *Id.*

Because largely preventable mass evictions would intensify the pandemic's spread and severity, HUD invoked the "good cause exception" for advance notice and comment but welcomed comments for 30 days after publishing the IFR. *Id.* at 55,698. HUD received 44 comments, including comments from housing advocates, individuals, and a coalition of state attorneys general. *See* HUD, Dkt. No. HUD-2021-0061, Regulations.gov, https://www.regulations.gov/docket/HUD-2021-0061. Many comments applauded the rule while urging HUD to expand it in various ways. *See, e.g.*, Letitia James, Comments from State Attorneys General in Support of HUD Interim Final Rule: "Extension of Time and Required Disclosures for Notification of Nonpayment of Rent," Dkt. No. HUD-2021-0061-0043, (Nov. 8, 2021).

Following the pandemic, on December 1, 2023, HUD proposed to adopt the IFR's provisions on a permanent basis and published for public comment a proposed rule that would no longer be contingent on the existence of a national emergency or the availability of emergency rental assistance. 30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent, 88 Fed. Reg. 83,877 (proposed Dec. 1, 2023). In justifying its proposed rule, HUD acknowledged the support expressed by many commenters for the 2021 IFR and for adequate notice prior to eviction, including the suggestion that the 30-day notice requirement extend to "situations outside of a national emergency." *Id.* at 83,879. HUD further observed that the IFR demonstrated PHAs' and PBRA owners' "capacity to comply with a 30-day notice requirement," *id.* at 83,883, and welcomed further comments based on these experiences, *id.* at 83,879. HUD also conducted a detailed regulatory impact analysis that showed that the proposed rule "would curtail preventable and

unnecessary evictions by providing tenants with time and information to help cure nonpayment

violations" while resulting in minimal corresponding costs to landlords. 2024 Final Rule at 101,301;

HUD, FR-6387-F-01, Final Rule Regulatory Impact Analysis (2024),

https://www.regulations.gov/document/HUD-2023-0098-0322 (hereinafter, "2024 RIA").

    After weighing the numerous comments from various stakeholders, HUD adopted the Final

Rule in 2024, with several revisions based on public comments. 2024 Final Rule at 101,270. In the

Final Rule, HUD acknowledged the numerous comments expressing general support for the rule and

emphasizing its positive impact for lower-income families, seniors, and people with disabilities. *Id.*

at 101,274. Others highlighted the detrimental effects of evictions. *Id.* at 101,273. HUD also agreed

with commenters "that providing tenants with additional time will help to cure nonpayment of rent

violations, preventing unnecessary eviction filings and evictions." *Id.* at 101,276. Moreover, HUD

noted, PHAs and PBRA owners had already demonstrated compliance with these requirements based

on prior regulations, including the 2021 IFR. *Id.* at 101,277.

    HUD also dedicated various sections in the Final Rule to addressing comments in opposition

to the proposed rule. *Id*. Various stakeholders voiced concerns that the rule would financially burden

homeowners. HUD noted that while it "understands the fiscal impacts of nonpayment of rent to a

PHA's or owner's operating budget," it "believes that a 30-day notification period strikes the

appropriate balance that provides enough time for the tenant to cure the lease violation and does not

overly burden the PHA and owner." *Id.* at 101,277–78. HUD also "disagree[d] with the assumption

underlying many of these comments," namely, that the rule will necessarily lead to tenants accruing

more outstanding rent due that will not be paid to the landlord. *Id.* at 101,279. Similarly, HUD noted

that PHAs may be eligible to receive shortfall funding from HUD if the PHA is facing financial

challenges affecting operations. *Id.* at 101,280. HUD also addressed concerns that this rule will

impact the PHA's or PBRA owner's Tenant Accounts Receivable ("TARs") scoring, stating that

"PHAs should not be penalized as a result of compliance" and pointing to measures intended to mitigate scoring impact. *Id.* at 101,281. And to concerns that the 2024 Final Rule would minimize the amount of available housing units, increasing long waitlists, HUD responded that "long waitlists throughout the country are a testament to the need for greater resources, and not an opportunity to forgo taking steps to protect the tenure of current residents." *Id.* at 101,286.

Ultimately, HUD reiterated that the Final Rule "strikes a balance between potentially increasing some of the financial impacts on PHAs and owners, and supporting families who need additional time to address financial issues that result in nonpayment of rent." *Id.* at 101,277.

**D.    Without Prior Notice and Comment, HUD Completely Reverses Course, Rescinding the 2024 Final Rule in Favor of the Opposite Policy.**

On February 26, 2026, HUD released a new interim final rule (the "2026 IFR") that "revokes the 2021 interim final rule and 2024 final rule" including "requirements from the 2021 and 2024 rules related to information in termination notices." Revocation of the 30-Day Notification Requirement Prior To Termination of Lease for Nonpayment of Rent, 91 Fed. Reg. 9,449, 9,449 (Feb. 26, 2026) (hereinafter, "2026 IFR"). According to HUD, the "[r]egulatory requirements for notice of termination for nonpayment of rent will return to pre-2021 requirements, which range from 5 days to 30 days for HUD programs and depend on state and local laws." *Id.* In justifying the rescission, HUD argued that: "PHAs and owners continue to see significant financial impacts from nonpayment of rent," noting that TARs are up 200% since 2019. *Id.* at 9,450. HUD further argued that revoking this rule will benefit the long waitlist of people waiting for available public housing units. *Id.* at 9,451. HUD also conducted a new regulatory impact analysis on "the impacts of removing the 30-day notification requirement." HUD, FR-6529-I-01, Interim Final Rule Regulatory Impact Analysis (2026), https://www.regulations.gov/document/HUD-2026-0265-0002, at 1 (hereinafter, "2026 RIA").

9

HUD failed to provide advance notice and comment for the 2026 IFR. Rather, HUD attempted to invoke the "good cause" exception, which allows agencies to bypass notice and comment when it would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). HUD asserted that "[a]dvance public notice and comment is unnecessary and does not serve the public interest in this case." 2026 IFR at 9,451.

Despite the fact that the comment period closed two years prior, HUD reasoned that "because HUD has already received extensive public comment on this matter from a wide range of stakeholders including individuals, landlords, tenants, owners, housing agencies, housing cooperatives, non-profit housing organizations, non-profit organizations representing seniors or individuals with disabilities, housing associations, case managers for individuals experiencing homelessness, churches, law firms, and others . . . HUD does not expect comments submitted in response to this interim final rule to raise any new information which HUD has not recently considered. Additional further comment is therefore unnecessary." *Id.*

### E.    HUD's 2026 Rescission's Likely Impact on Plaintiffs and Other Public and PBRA Housing Tenants

If the 2026 IFR takes effect, the rescission of the 2024 Final Rule and 2021 IFR would sharply curtail tenants' notice-and-cure protections. HUD's assertion that notice will simply "return to pre-2021 requirements" is misleading and understates the rescission's severe impact. *Id.* at 9,449.

Public housing tenants would only receive 14 days' notice of eviction for nonpayment of rent. *Id.* at 9,450, 9,453. PBRA tenants will revert to state law notice and cure periods as nonpayment of rent does not constitute "other good cause" for which 30 days' notice to PBRA tenants is required under HUD's regulations. 24 C.F.R. § 247.4(c). As HUD notes in its 2024 regulatory impact analysis, some states require as little as three days' notice and offer no statutory cure period. *See* 2024 RIA at 21–24. And at least nine states have laws that permit a landlord to

terminate a tenancy with an "unconditional quit notice" with no opportunity to cure before the landlord can file an eviction proceeding in court; and at least 10 other states offer only three days to cure nonpayment. *Id*. In states where there is minimal or no statutory cure period, public housing and PBRA tenants will be at risk of losing their housing, and their subsidy, for paying rent as little as *one day late*. Moreover, neither public housing nor PBRA tenants will have entitlement to an itemized ledger, or information about how to obtain a rent decrease, unless required by state law. Given the practical challenges of obtaining and reviewing a complete accounting history from a landlord on an abbreviated timeline, the rule-mandated itemized ledger is the critical mechanism through which tenants can identify and resolve rent-calculation errors before eviction proceedings begin.

Plaintiffs are two membership organizations and a legal aid organization representing HUD-subsidized tenants, and an individual HUD-subsidized tenant. Clients of MLA, members of JASC and NCTU, and the individual plaintiff live in public housing or PBRA properties that are currently subject to the 2024 Final Rule.

***JASC*** is a membership-based 501(c)(3) nonprofit organization with the mission of promoting economic, social, and racial justice for Section 8 PBRA tenants. Moskowitz Decl. ¶ 3. JASC currently has 250 active members across Illinois, most of whom are Section 8 PBRA tenants. *Id.* ¶ 5–6. As part of its support for tenant members, JASC regularly reviews their ledgers to confirm that rent and income have been calculated correctly and, when errors are identified, advocates with management to correct them, including through the recertification process. *Id.* ¶ 14–15, Ex. A.

Two JASC members, Lisa Coleman and Shawnese Jones, live at Lakeside Tower Apartments in Waukegan, Illinois. Moskowitz Decl. ¶¶ 7–8. Lakeside Tower receives a Section 8 PBRA subsidy through HUD's Property Disposition program. *See* 24 C.F.R. § 886.301. Tenants receiving assistance under this program are covered by the 2024 Final Rule. *See* 24 C.F.R. § 886.328. Ms. Coleman is disabled and lives on a fixed income and Ms. Jones works a low-wage job as a senior care worker.

Coleman Decl. ¶ 5; Jones Decl. ¶ 6. Both depend on their subsidized housing because they do not make enough money to afford rent on the private market. Coleman Decl. ¶ 33; Jones Decl. ¶ 41.

Both Ms. Coleman and Ms. Jones have received multiple eviction notices alleging they owe balances that they believe are inaccurate. Coleman Decl. ¶ 19 *et seq.*; Jones Decl. ¶ 18. They are substantially likely to receive another eviction notice for nonpayment of rent after the 2024 Final Rule is rescinded and expect to receive only five—instead of 30—days' notice as required under state law. Coleman Decl. ¶ 17; Jones Decl. ¶ 16. In their and others' experience, five days is not enough time to work out the ledger issues that have caused them to carry erroneous balances, a process that can take "anywhere from a couple of weeks to multiple months." Moskowitz Decl. ¶ 22; *see also id.* ¶¶ 16–33, Ex. B, Ex. C; Coleman Decl. ¶ 18; Jones Decl. ¶¶ 17, 33, 40. In addition, like many tenants, Ms. Jones does not have her full monthly income until the end of the month. Jones Decl. ¶ 7. Thus, 30 days would allow her to cure an arrearage, whereas five days would not.

If evicted because of the insufficient notice authorized by HUD's 2026 IFR, Ms. Coleman and Ms. Jones and her family are likely to experience harm to their physical and mental health, employment, and schooling. Coleman Decl. ¶¶ 33–37; Jones Decl. ¶¶ 41–45.

***NCTU*** is a 501(c)(3) non-profit organization that functions as a statewide union of local tenant unions across the state of North Carolina. Huget Decl. ¶ 3. As part of its work, NCTU staff regularly meet with HUD-subsidized tenants across North Carolina, discuss the issues they are facing in the building, review eviction paperwork to prevent displacement, and provide critical resources. *Id.* ¶ 10.

NCTU member Jane Doe[1] lives at Healy Drive Towers, a Section 9 public housing property in Winston-Salem, North Carolina that is currently covered by the 2024 Final Rule. 24 C.F.R.

---

[1]    Jane Doe submits this declaration under a pseudonym because, as a victim of stalking and domestic violence, she fears that publicly filing a declaration identifying her name and residence

§ 966.4(l)(3). Ms. Doe is a 71-year-old retired county employee who lives on a fixed Social Security income. Doe Decl. ¶ 6. Her Social Security check arrives on the fourth Wednesday of each month. *Id.* ¶ 4. She lives in subsidized housing because her fixed income is not enough money to afford an apartment on the private market. *Id.* ¶ 7. She formerly lived in a homeless shelter. *Id.* ¶ 8.

Ms. Doe receives an eviction notice each month because her Social Security check arrives after rent is due, but she consistently cures the arrearage within the current 30-day period once the check arrives. *Id.* ¶¶ 13–16. If the 2024 Final Rule is rescinded, she expects only 14 days' notice and 10 days to cure—timeframes she cannot meet given when her income is paid—making eviction likely. *Id.* ¶¶ 23–24. Eviction would likely render her homeless again and cause serious physical and mental harm. *Id.* ¶¶ 25–29. Relocation would be especially difficult because she cannot drive under her doctor's orders following a recent hospitalization for a kidney infection and high blood pressure. *Id.* ¶ 28.

**Lisa Sadler** is a HUD-subsidized tenant who lives with her disabled son and other children at a former public housing property that was converted to Section 8 PBRA housing under the RAD program in 2021. Sadler Decl. ¶¶ 1, 13. Tenants receiving assistance under this program are covered by the 2024 Final Rule.[2] The property is owned by Lansing Housing Commission, a PHA, through

---

would materially increase the risk that her abuser could locate her. Courts routinely permit non-party organizational members to submit pseudonymous declarations. *See, E.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, 2025 WL 3042704, at *16 (D.D.C. Oct. 31, 2025) ("Because the Defendants in this case do not need to know the identity of a particular member to respond to [the Plaintiffs'] claim[s] of injury in this case, . . . [the] declarations from multiple organizational leaders and pseudonymous declarations" demonstrate a substantial likelihood of standing) (citation omitted).

[2]    RAD PBRA properties are required to follow 24 C.F.R. § 880.607 and 24 C.F.R. pt. 247 as to notice of termination for nonpayment of rent (both of which incorporate the 2024 Final Rule). *See* Rental Assistance Demonstration- Final Implementation, Revision 4, Notice H-2019-09 PIH 2019-23 (HA) (September 5, 2019), https://www.hud.gov/sites/dfiles/Housing/documents/RAD_Notice_Rev4_Final_as_amended_by

an affiliated Limited Partnership. *Id.* ¶ 12. Lansing Housing Commission publicly opposed the 2024

Final Rule and submitted an opposition comment in 2023.[3]

Ms. Sadler has received multiple eviction notices due to rent balances that were inaccurately

calculated. *Id.* ¶¶ 27–34. Most recently, after receiving an eviction notice in December 2025, she

used the 30 days to address the errors on her ledger with management and avoid eviction. *Id.* ¶¶ 29–

31. However, the property still claims she owes a disputed balance. *Id.* ¶ 33. Ms. Sadler therefore

faces a substantial risk of receiving another eviction notice after the 30-day notice rule is revoked.

That new notice will likely be for seven days—as required under state law—which is not enough

time to untangle the complicated ledger and recertification errors resulting in her inaccurate balance.

If evicted because of the insufficient notice authorized by HUD's 2026 IFR, Ms. Sadler and her

children will face homelessness and negative impacts to their physical and mental health. *Id.* ¶¶ 36–

41.

**MLA** is a statewide 501(c)(3) legal aid organization that advocates with and for Marylanders

experiencing poverty to achieve equity and social justice through free civil legal services,

community collaboration, and systemic change. Schultz Decl. ¶ 3. In service of this mission, its

attorneys represent low-income tenants in evictions from public and Section 8 PBRA housing. *Id.* ¶

5. MLA's goal is to keep its clients housed in their subsidized units, keep evictions off their records,

---

_Supplemental_4B_and_4C_Master_Version.pdf (Updated to reflect Supplemental Notices 4B
(July 27, 2023) and 4C (Jan. 15, 2025)).

[3]   Comment of Lansing Housing Commission on 30-Day Notification Requirement Prior to
Termination of Lease for Nonpayment of Rent, Dkt. No. HUD-2023-0098 (Jan. 7, 2024),
https://www.regulations.gov/comment/HUD-2023-0098-0112; Comment of Doug Fleming,
Executive Director of Lansing Housing Commission, on 30-Day Notification Requirement Prior
to Termination of Lease for Nonpayment of Rent, Dkt. No. HUD-2023-0098 (Jan. 21, 2024),
https://www.regulations.gov/comment/HUD-2023-0098-0162.

and resolve their disputes with their landlords. *Id.* ¶ 6. MLA has unique expertise on the impact of the 2024 Final Rule, and its rescission, on low-income tenants in Maryland. *Id.* ¶ 10.

The 2026 IFR would critically impair MLA's ability to provide legal services to its clients. *Id.* ¶¶ 26–31. MLA requires access to its clients' itemized ledgers to identify the inaccuracies that often underlie alleged nonpayment claims. *Id.* ¶ 13. If the 2024 Final Rule is rescinded, MLA will no longer have timely access to these itemized ledgers and, in many cases, will be unable to obtain them until after a court proceeding has commenced. *Id.* ¶¶ 27–29. MLA may thus be forced to resort to costly and burdensome discovery procedures to secure information essential to its representation, increasing the number of eviction actions filed and litigated that could otherwise have been avoided. *Id.* In addition, absent a 30-day notice-and-cure period, MLA substantially less time than it would otherwise have to prepare and deliver effective representation. *Id.* ¶ 27, 30. Compressing the same workload into a drastically shorter window necessarily requires greater staffing and expense, and MLA—a nonprofit—already operates under resource constraints. *Id.* ¶ 31. As a result, the shorter notice-and-cure periods likely to apply after rescission will materially impair MLA's ability to provide its clients the quality of legal services they require and deserve. *Id.* ¶ 30.

All Plaintiffs are additionally aggrieved by being denied the ability to meaningfully influence HUD's decision to rescind the 2024 Final Rule. MLA submitted a comment in 2023 and now urgently seeks to supplement it with substantial new information based on extensive experience implementing the 2024 Final Rule—information that was not available to MLA before the closure of the comment period for the Notice of Proposed Rulemaking in 2023. *Id.* ¶¶ 32–36, Ex. A. Each of the other Plaintiffs and member-Plaintiffs also have information to share that was not available in 2023. Moskowitz Decl. ¶ 34–36; Coleman Decl. ¶ 38–41; Jones Decl. ¶ 46–50; Huget Decl. ¶ 21–23; Doe Decl. ¶ 30–33.

15

III.    ARGUMENT

The APA authorizes courts, "to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process" to "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

A party seeking a stay under § 705 must satisfy the same four-factor test as a party seeking a preliminary injunction. *Coal. For Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 71 (D.D.C. 2025), *appeal docketed*, No. 25-5289 (D.C. Cir. filed Aug. 25, 2025). Specifically, when deciding whether to grant a preliminary injunction, the Court must consider whether the plaintiffs (*1*) are likely to succeed on the merits, (*2*) are likely to suffer irreparable harm in the absence of preliminary relief, (*3*) establish that the balance of equities tips in their favor, and (*4*) establish that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

This case readily satisfies the requirements for a § 705 stay and a preliminary injunction.

### A.    Plaintiffs' APA Claims Will Likely Succeed on the Merits.

#### 1.    *Both the Individual and Organizational Plaintiffs Have Shown a Substantial Likelihood of Standing.*

A plaintiff seeking a preliminary injunction must show "a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Plaintiffs asserting standing under the APA must show (*1*) injury in fact, (*2*) that is fairly traceable to agency action, and (*3*) redressable by the court. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "An injunction may be justified where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Democracy Forward Found. v. Off. of Mgmt. & Budget*, 780 F. Supp. 3d 61, 71 (D.D.C. 2025) (citations and internal quotation marks omitted). The injury-in-fact requirement may be satisfied by allegations of future injury if there is a "substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019); *accord Sierra*

16

*Club v. United States Dep't of Transportation*, 125 F.4th 1170, 1182 (D.C. Cir. 2025). Plaintiffs

asserting a "procedural injury" need only show that the action threatens a concrete interest, and the

redressability and immediacy requirements are relaxed. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572

n.7 (1992); *accord City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1185 (D.C. Cir. 2007).

(a)      Individual Plaintiff and JASC and NCTU Members

In this case, Ms. Sadler and the members of JASC and NCTU—Ms. Coleman, Ms. Jones,

and Ms. Doe, likely meet these requirements and thus have standing to challenge the 2026 IFR.

*First*, the JASC and NCTU members and Ms. Sadler, all face a "substantial likelihood" of

eviction without the benefit of the 2024 Final Rule, demonstrating an injury in fact. *Dep't of Com.*,

588 U.S. at 767. Article III does not require that a plaintiff await consummation of the threatened

injury before seeking relief in court. *Id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442

U.S. 289, 298 (1979)). Accordingly, in this case, the threat of eviction generally satisfies the injury in

fact requirement, and a pending eviction notice is not necessary to establish such a threat. *See*

*Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 797 (9th Cir. 2001) (finding that

"[e]viction is a concrete injury . . . [and] is sufficiently imminent" where city notified tenants that it

"intends" to enforce a policy that would likely evict them); *see also Richmond Tenants Org., Inc. v.*

*Kemp*, 956 F.2d 1300, 1305 (4th Cir. 1992) (finding public housing tenants sustained "actual threat

of injury" after receiving a new eviction policy notice, even though "no actual evictions have taken

place."). Moreover, imminent injury can be established by demonstrating a history of enforcement

against the Plaintiffs. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (finding

imminent injury based on a history of enforcement against petitioners because "past enforcement

against the same conduct is good evidence that the threat of enforcement is not chimerical"

especially where "the universe of potential complainants is not restricted to state officials who are

constrained by explicit guidelines or ethical obligations." (internal quotations omitted)).

Ms. Coleman, Ms. Jones, Ms. Doe, and Ms. Sadler have each received multiple eviction notices, including within the past three months, claiming they owe a rent balance—showing their property owners have engaged in a sustained and ongoing pattern of issuing these notices. Sadler Decl. ¶¶ 27–34; Coleman Decl. ¶¶ 19–28; Jones Decl. ¶¶ 18–37; Doe Decl. ¶¶ 13–21. Although these notices are arguably no longer pending, the repeated issuance of notices to the same individuals establishes a "history of enforcement" and makes future notices likely—particularly since many of them have still been unable to resolve the miscalculated arrears underlying the prior notices despite all their efforts. Sadler Decl. ¶¶ 33–35; Jones Decl. ¶ 38–40; Coleman Decl. ¶ 32. Moreover, Ms. Doe receives a new eviction notice every month due to the timing of her social security checks. Doe Decl. ¶ 13.

If the 2026 IFR is allowed to go into effect, each of these tenants will almost certainly lose the 2024 Final Rule's protections that they have been relying on to resolve issues with their ledgers and avoid eviction. HUD acknowledges in the 2026 IFR that many PHAs and PBRA owners— including Ms. Sadler's landlord the Lansing Housing Commission—commented in opposition to the 2023 Proposed Rule, notably because of their belief that decreasing notice before eviction is economically beneficial to the property. 2026 IFR at 9,450. Further, some landlords have already demonstrated a pattern of noncompliance by issuing deficient notices, Coleman Decl. ¶ 17; Jones Decl. ¶ 16, and if they do so when HUD rules prohibit this practice, they will almost certainly issue notices with less than 30 days' when it is permitted to do so.

Under these circumstances, the court may draw an "eminently reasonable" inference that PHAs and owners will revert to the shorter permissible notice requirements under public housing leases and state law once the rule is revoked. *New York Republican State Comm. v. Sec. & Exch. Comm'n*, 927 F.3d 499, 504–05 (D.C. Cir. 2019) (finding injury based on an "eminently reasonable" and "single inference" prediction that a third party will exercise discretion in a particular way); *see*

*also Sierra Club v. E.P.A.*, 755 F.3d 968, 974–76 (D.C. Cir. 2014) (finding it "hardly-speculative . . . to predict that facilities . . . would take advantage of the [Rule] for which they lobbied"). This would mean 14 days' notice for public housing and three days or less for Section 8 PBRA housing, depending on the applicable state law. 2026 IFR at 9,450 (citing 24 C.F.R. § 966.4; 24 C.F.R. § 247.4(c)); 2024 RIA at 21–24. And in both public and Section 8 PBRA housing, this would mean no opportunity to cure unless required by state law, and no information requirements in these notices. 2026 IFR at 9,450.

*Second*, the Plaintiffs' injury—their risk of eviction with insufficient notice and information––is traceable to HUD's 2026 IFR. An injury caused by an unregulated third party can be "fairly traceable" to agency action if the agency action, as here, "authorized the conduct or established its legality." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) (internal quotations omitted).

Here, HUD's 2026 IFR authorizes Plaintiffs' landlords to provide less than sufficient notices of eviction that are substantially likely to cause injury to the Plaintiffs. *See HIV & Hepatitis Pol'y Inst. v. U.S. Dep't of Health & Hum. Servs.*, 728 F. Supp. 3d 1, 10 (D.D.C. 2023) (finding that an APA challenge to a rule permitting (but not requiring) insurance companies to use a mechanism that increased consumers' cost-sharing, the court found that even though the insurers inflicted the plaintiffs' injuries, and "[t]he agencies' authorization of the insurer's conduct satisfies the causation element . . . ."); *Animal Legal Def. Fund*, 154 F.3d at 442 ("Both the Supreme Court and this circuit have repeatedly found causation where a challenged government action *permitted* the third party conduct that allegedly caused a plaintiff injury. . . . Neither court has ever stated that the challenged law must *compel* the third party to act in the allegedly injurious way.") (emphasis in original) (collecting cases). *See also McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233, 245 (S.D.N.Y.

19

1989) (finding a "direct link between [the housing authority's] policies and practices and plaintiffs' injuries" resulting from termination of subsidy despite intervening landlord conduct.).

Furthermore, causation exists where government action alters the legal or regulatory landscape and third parties "will likely react in predictable ways" to that change, resulting in injury to plaintiffs. *Dep't of Com.*, 588 U.S. at 768. Third-party actions are considered predictable based on "commonsense economic realities" and "commonsense inferences," including that parties are likely to discontinue onerous practices once they are no longer required. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 116 (2025) (fuel producers had standing to challenge EPA rule requiring car manufacturers to produce more electric vehicles, because "commonsense economic principles" dictated that if the rule was vacated it was likely that car manufacturers would go back to producing more gas-powered vehicles). Here, a landlord's decision to issue less than 30 days' notice is a "predictable" reaction to government deregulation, and the court can reasonably infer causation.

*Third*, Plaintiffs' anticipated injury—eviction without sufficient notice and information—is also redressable by a vacatur from this Court. If this Court vacates the 2026 IFR rescinding the 2024 Final Rule, the original rule will remain in effect. And the requested interim relief staying the rule's effective date under § 705 of the APA is necessary to fully redress Plaintiffs' harm. *Ctr. for Taxpayer Rts. v. IRS*, 2025 WL 3251044, at *33 (D.D.C. Nov. 21, 2025) (granting § 705 stay in suit over IRS data sharing and finding that "[plaintiff's] injury would also be 'beyond remediation'" absent a stay because once certain deadlines pass "there can be no do over and no redress." (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). Absent this relief, the short eviction timeline would force Plaintiffs to face eviction before this Court can act, rendering their injuries irremediable. Interim relief is therefore necessary to preserve meaningful judicial review.

Based on the foregoing, the individual and member Plaintiffs have shown a substantial likelihood of standing.

20

(b)    Organizational Plaintiffs

*JASC* and *NCTU* both have associational standing to pursue the claims in this suit. For an organization to have standing,

> at least one of its members must have standing to bring the petition in his or her own right, the interests the association seeks to protect must be germane to its purpose, and the claim asserted and the relief sought must not require the individual member or members to participate directly in the suit.

*Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 684 (D.C. Cir. 2004). As stated above, JASC and NCTU each have members who have standing in their own right, *see supra* Section III(A)(1)(a), and each has hundreds of additional, non-declarant members at substantial risk of eviction without the protections of the 2024 Final Rule. Moskowitz Decl. ¶¶ 13–14; Huget Decl. ¶¶ 11–12. The purpose of JASC is to support HUD tenants in "demystifying the Department of Housing and Urban Development," and it achieves this purpose by assisting HUD tenants resolve alleged nonpayment issues to prevent eviction. Moskowitz Decl. ¶¶ 2, 8–13. Similarly, the purpose of NCTU is to support members organizing grassroots campaigns to, among other things, stop displacement and strengthen tenants' rights. Huget Decl. ¶ 4. Protecting HUD-subsidized tenants from eviction with insufficient notice thus falls squarely within—and is therefore germane to—both organizations' missions. Finally, beyond providing their declarations, there is no reason why the individual members would have to participate directly in this APA challenge and seek the 2026 IFR's vacatur, as both JASC and NCTU can adequately protect their respective members' interests.

*MLA* has organizational standing in this case and has clearly demonstrated a procedural injury that threatens its concrete interests. Like individual plaintiffs, organizations are entitled "to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982). A plaintiff must show that the defendant's actions cause "a perceptible impairment" to its core business activities, and "some attendant expenditure or loss of resources."

21

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 69 (D.D.C. 2025) *appeal docketed*, No. 25-5243 (D.C. Cir. filed July 3, 2025) (citations omitted). The Supreme Court recently cautioned against "extend[ing] the *Havens* holding beyond its context." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). But the Court's discussion of *Havens* in *Alliance for Hippocratic Medicine*—and its careful distinction between that case and *Havens*— confirms that the circumstances here align far more closely with *Havens*. *Id.*

In *Alliance for Hippocratic Medicine*, the medical association plaintiffs claimed injury from costs incurred opposing the FDA's drug actions (*e.g.*, sponsoring risk studies). *Id.* at 394. The Supreme Court held that a plaintiff "cannot spend its way into standing by expending money to gather information and advocate against the defendant's action." In contrast, the plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* at 395 (citing *Havens*, 455 U.S. at 379). And in *Havens*, the plaintiff's employees received "false information about apartment availability" that "perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.*

Here, MLA's organizational injury fits squarely within *Havens* and bears little resemblance to the advocacy-cost theory rejected in *Alliance for Hippocratic Medicine*. The 2026 IFR directly impairs MLA's ability to deliver legal assistance and support to low-income tenants— one of its core, ongoing services. *Id.* "[E]ach of the facets of the Rule are critical components to [MLA's] work on behalf of [its] clients." Schultz Decl. ¶ 20. Without the 30-day window and access to itemized ledgers, MLA's attorneys "will be forced to act on a more compressed timeline while navigating additional challenges in accessing tenant ledgers and files, which has cascading effects." *Id.* ¶ 27. It will also "complicate[] [MLA attorneys'] ability to understand the issues in time to resolve the case prior to trial and to prepare relevant defenses," and decrease their capacity to assist other tenants in need of legal assistance. *Id.* ¶¶ 27, 30. Unlike in *Alliance for Hippocratic Medicine,*

MLA is not incurring self-inflicted, discretionary expenditures undertaken to oppose the 2026 IFR. The informational nature of the injury here is also strikingly similar to that in *Havens*. Just as a housing counseling service that receives "false information about apartment availability" cannot effectively counsel clients looking for homes, MLA's employees cannot provide effective legal counsel to tenant-clients without timely access to their ledgers. *Id*. ¶ 20 (describing how the "critically needed, substantive information" the Rule mandates in eviction notices enables MLA's attorneys to "identify ledger errors and seek to correct them, negotiate payment plans, seek eviction prevention funds, and ideally prevent evictions"). The removal of the requirement to provide an itemized ledger and the abbreviated eviction timeline resulting from the rescission will require MLA to devote additional resources to combat these administrative burdens, and therefore "perceptibly impairs" MLA's core business activity of providing legal services to tenants. *Id*. ¶ 26 ("If the 2024 Final Rule is rescinded, it will be more difficult for us to achieve our mission of preserving housing subsidies and preventing evictions for low-income Marylanders").

This concrete injury is substantially likely to occur. MLA need not even predict that PHAs and PBRA landlords will change their behavior in response to the 2026 IFR, because they have already been flouting the requirements under 2024 Final Rule. *Id*. ¶¶ 22, 24–25 (describing how MLA's attorneys have successfully obtained a dismissal of several cases in which the PHAs filed non-compliant evictions).  If Maryland properties are already failing to provide itemized ledgers even when legally required, there is no reason to think they will begin doing so after the 2026 IFR eliminates that requirement. Instead, the 2026 IFR would effectively sanction the practice, leaving MLA to face the same recurring nonproduction—now without the procedural safeguard it currently relies on—and making the injury all but certain.

And as with the injuries to the other Plaintiffs, causation is satisfied because HUD has "authorized the conduct or established its legality." *HIV & Hepatitis Pol'y Inst.*, 728 F. Supp. 3d at

10. MLA also easily satisfies the relaxed redressability requirement for procedural standing, as described *infra*.

(c)    Procedural Standing

All Plaintiffs also have standing to assert a "procedural injury" based on HUD's failure to conduct notice and comment rulemaking to rescind the 2024 Final Rule. HUD-subsidized tenants have a "concrete and personal" interest in the "notice and comment rulemaking" process when it comes to rules that affect their tenure in assisted housing. *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir. 1994). Plaintiffs "need not demonstrate that any particular agency action was incorrect or that a different substantive result would have been reached had the omitted procedure taken place." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002). Rather, Plaintiffs need only show that "procedural defects meant that the agency did not receive information that *could* have affected the agency's decision to promulgate [the regulation]." *Food & Water Watch, Inc. v. Vilsack,* 79 F. Supp. 3d 174, 205 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) (emphasis added).

Here, Plaintiffs have important information to share with HUD that could influence the agency's decision to rescind the 2024 Final Rule. Much of this information post-dates the previous comment period and speaks to the impact of the 2024 Final Rule since it came into effect. For example, MLA would have shared how it secured the dismissal of 70 to 80 public housing evictions in Prince George's County based on non-compliance with the 30-day notice rule. Schultz Decl. ¶ 25. JASC would have shared how, in February 2025, after the 2024 Final Rule took effect, the 30-day notice period—and access to the tenant's itemized ledger—enabled him to stop nearly a dozen PBRA evictions by contesting erroneous balances. Moskowitz Decl. ¶¶ 27, 34–35. NCTU would have shared how, in 2025, they were able to help a public housing tenant avoid eviction by obtaining a rent adjustment due to job loss within the 30-day period. Huget Decl. ¶¶ 14, 21–23. Similarly, Ms.

24

Sadler, Ms. Coleman, Ms. Jones, and Ms. Doe have all had experiences *within the last year* where the 30 days' notice gave them sufficient time to identify and correct ledger errors with management. Sadler Decl. ¶¶ 29–31; Coleman Decl. ¶¶ 26–29; Jones Decl. ¶¶ 31–36; Doe Decl. ¶¶ 18–19. This input could have led HUD to narrow, rather than rescind, the 2024 Final Rule—for example by shortening (not eliminating) the extended notice period or at least preserving the informational requirements.

This Court has "strongly reject[ed]" agencies' claims that "challenged errors [in an IFR] are harmless simply because of the pendency of a properly-noticed final rule." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that "[w]ere that true, agencies would have no use for the APA when promulgating any interim rules."). If that were not the case, "agencies would have a perverse incentive to disregard the comments they received once they got around to allowing them." *United States v. Ross*, 848 F.3d 1129, 1133 (D.C. Cir. 2017). Plaintiffs therefore must have an opportunity to be heard before the 2026 IFR goes into effect. Once in effect, Ms. Sadler, Ms. Coleman, Ms. Jones, and Ms. Doe, among many others, will be subject to eviction with insufficient notice before the comment period even closes. A hypothetical future rule considering Plaintiffs' comments will be too little and too late.

       2.    *Plaintiffs Are Likely to Show That the 2026 IFR Should Be Set Aside under § 706 of the APA*

The APA provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A), or "without observance of procedure required by law," *id*. § 706(2)(D). Plaintiffs are likely to show that HUD's actions should be set aside under these standards.

       (a)    The 2026 IFR Was Issued in Violation of 5 U.S.C. § 553(b) and 24 C.F.R. § 10.1

The APA provides that a "[g]eneral notice of proposed rule making shall be published in the Federal Register," 5 U.S.C. § 553(b), and that an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c); *see Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (outlining procedure for notice and comment rulemaking). Failure to comply with notice and comment procedures may invalidate the resulting regulation. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014).

Not only is HUD bound by this process, but its own regulations require the agency "to provide for public participation in rulemaking with respect to *all* HUD programs and functions" except in the rare instance—which is not relevant here—when the Secretary determines there is "good cause" to waive these requirements. 24 C.F.R. §§ 10.1, 5.110 (emphasis added). An amendment of an existing rule that imposes "substantive burdens" or "alter[s] the rights or interests of parties" must go through notice and comment. *See AFL-CIO v. N.L.R.B.*, 57 F.4th 1023, 1034–35 (D.C. Cir. 2023) (internal quotations and citations omitted). In issuing the 2026 IFR, HUD failed to comply with requirements under both 5 U.S.C. § 553(b) and its own regulations.

The APA "makes no distinction ... between initial agency action and subsequent agency action undoing or revising that action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "Consequently, 'once an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing [or amending] it." *Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543, 547 (D.C. Cir. 2024) (quoting *Humane Soc'y v. USDA*, 41 F.4th 564, 569 (D.C. Cir. 2022) (alteration in original)). The APA's notice and comment requirement thus applies in full force to HUD's rescission of the 2024 Final Rule, which took effect on January 13, 2025. 5 U.S.C. § 553(c).

26

HUD does not challenge this basic tenet of administrative law and acknowledges that, "[i]n general, HUD publishes a rule for public comment before issuing a rule, in accordance with both the [APA], 5 U.S.C. § 553, and its own regulations on rulemaking, 24 CFR part 10." 2026 IFR at 9,451. Nor does HUD dispute that it did not provide an opportunity for notice and comment before adopting the 2026 IFR. *Id.*

Instead, HUD invokes the "good cause" exception. *Id.* Under the APA, the notice and comment requirement does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). According to HUD, "good cause exists to promulgate this interim final rule without prior notice and comment," because it "is unnecessary and does not serve the public interest … because HUD has already received extensive public comment on this matter." 2026 IFR at 9,451. Neither of HUD's grounds for invoking the good cause exception has merit.

Contrary to HUD's claim, notice and comment *is* necessary for the 2026 IFR.

*First*, as the D.C. Circuit explained in *Mack Trucks, Inc.*, notice and comment is "unnecessary" only in "those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." 682 F.3d at 94 (quoting *Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749, 755 (D.C. Cir. 2001)); *see also Association of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 45 (D.D.C. 2012) (ruling that it was unnecessary to provide notice and comment to a segment of a rule that did not "add any new burdens for Medicare or Medicaid providers and suppliers"); *see also McChesney v. Petersen*, 275 F. Supp. 3d 1123, 1136 (D. Neb. 2016) (finding that notice and comment was "unnecessary" for a rule that merely extended an existing administrative fines program for violations of campaign contribution reporting requirements), *aff'd sub nom. McChesney v. Fed. Election*

*Comm'n*, 900 F.3d 578 (8th Cir. 2018). Rules that are not "ministerial," *Mack Trucks, Inc.*, 682 F.3d at 94, and in "which [] the public [a]re greatly interested," however, require notice and comment. *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

The 2026 IFR is materially different from the technical and administrative rules for which courts have previously found notice and comment to be unnecessary. If adopted, the 2026 IFR would remove critical protections for over 3.5 million public housing and PBRA residents and expose them to increased risk of eviction and homelessness, both of which cause proven, significant long-term harm to individuals and the community. The fact that the December 2023 proposed rule attracted over 300 comments corroborates the significance and impact of both the rule and its rescission.

*Second*, HUD's assertion—that because it had already received extensive comments on the *adoption* of the Final Rule, it is unnecessary to solicit comments on the *rescission* of that same rule—is not only illogical but inconsistent with the narrow construction of the good cause exception. As this Court has "repeatedly made clear," the "good cause" exception is to be "narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc.,* 682 F.3d at 93 (collecting cases); *see also Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324, 1339 (D.C. Cir. 2023) (declining to apply the good cause exception even when the agency was faced with "a tight statutory, judicial, or administrative deadline" (citation omitted)). On HUD's broad interpretation of the good cause exception, all rule rescissions would effectively be exempt from the notice and comment requirement. This is contrary to clear precedent, *Humane Soc'y*, 41 F.4th at 569, and would result in the exception effectively "swallow[ing] the notice and comment rule." *Mack Trucks, Inc.*, 682 F.3d at 94 (quoting *Tenn. Gas Pipeline Co. v. FERC,* 969 F.2d 1141, 1145 (D.C. Cir. 1992)).

This interpretation of the good-cause exception is not only sensible—it is compelled by the purpose of notice and comment rulemaking. Adoption and rescission of a rule are fundamentally different agency actions, with distinct practical consequences for regulated parties and beneficiaries,

and they therefore elicit materially different input. That is particularly true here, where the 2024

Final Rule has been in effect long enough for stakeholders to develop real-world experience

implementing it—experience that is directly relevant to evaluating the costs, benefits, and feasibility

of any rescission. For example, Plaintiff MLA—who commented in 2023—was denied any chance

to comment on the 2026 IFR, even though its 2026 submission would have drawn on its concrete

experience with the 2024 Final Rule (including specific benefits and shortcomings) and thus differed

materially in content, context, and perspective from its earlier comment. Schultz Decl. ¶ 35.

Indeed, it is for the same reason that courts have long required renewed notice and comment

when repromulgating the *same rule* after a judicial vacatur. *See, e.g.*, *Action on Smoking and Health

v. Civil Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983) ("If one rulemaking proceeding has

culminated and another has begun, then new notice and comment procedures are required"); *Mobil

Oil Corp. v. U.S. E.P.A.*, 35 F.3d 579, 585 (D.C. Cir. 1994) ("New information relevant to the

agency's decisionmaking might well have come to light after the original notice and comment

proceedings and before the repromulgation of the rule.").

*Third*, "[t]he APA [] does not contemplate an agency's forgoing the statute's notice and

comment requirements based on the agency's own assumption that there is a limited need to hear

from the public in a given instance." *City of Billings v. Transportation Sec. Admin.*, 153 F.4th 46, 53

(D.C. Cir. 2025); *Action on Smoking and Health*, 713 F.2d at 800 ("Bald assertions that the agency

does not believe comments would be useful cannot create good cause to forgo notice and comment

procedures."). Thus, HUD's assertion that it "does not expect comments submitted in response to

this interim final rule to raise any new information which HUD has not recently considered," 2026

IFR at 9,451, fails to satisfy the "meticulous and demanding" good cause inquiry, *Sorenson

Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). It is also illogical, given that numerous

stakeholders are likely to have information to provide regarding the actual implementation of the final rule over the past year.

Nor is there any public interest in exempting the 2026 IFR from notice and comment. This exception applies only in the rare case where ordinary procedures—presumptively in the public interest—would instead harm it. *Mack Trucks, Inc.*, 682 F.3d at 95. "The question [therefore] is not whether *dispensing* with notice and comment would be contrary to the public interest, but whether *providing* notice and comment would be contrary to the public interest." *Id.* (emphasis in original).

HUD fails to explain how adhering to the APA's requirements would undermine the purpose of the proposed rescission or otherwise be contrary to the public interest, and this Court has declined to "find that an exception applies simply because the agency says [it] should." *Sorenson Commc'ns Inc.*, 755 F.3d at 706; *see also id.* at 707 n.4. Indeed, HUD is entitled to no deference in this determination, and even had it alleged supporting facts, it would be subject to reversal on arbitrary and capricious grounds. *Id*. at 706 n.3. Furthermore, even when agencies properly allege public interest, courts require a high level of substantiation. *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 46 (D.D.C. 2020) (rejecting bypassing notice and comment in the asylum context "unless it is adequately supported by evidence in the administrative record suggesting that this dynamic might have led to the consequences predicted by the Departments—consequences so dire as to warrant dispensing with notice and comment procedures."); *Purdue Univ. v. Scalia*, 2020 WL 7340156, at *10 (D.D.C. Dec. 14, 2020) (finding evidence to "undercut[]" the public interest assertion); *Util. Solid Waste Activities Grp.*, 236 F.3d at 755 ("[N]othing [the agency] said in promulgating the amendment suggested that it needed to forego notice and comment in order to prevent the amended rule from being evaded.").

        (b)     HUD's Rescission of the 2024 Final Rule is Arbitrary and Capricious under 5 U.S.C. § 706(2)(A).

This rescission is not a minor administrative adjustment. It is a sweeping nationwide reversal of eviction procedures in federally assisted housing, with consequences for millions of residents and the entities that administer these programs. A policy shift of that magnitude demands a reasoned, evidence-based explanation—especially where the agency is withdrawing protections it adopted only recently. Yet, HUD offers nothing but poorly substantiated and internally inconsistent justifications for the 2026 IFR that were based on the old 2024 notice-and-comment record—precisely the sort of cursory, outcome-driven decision-making the APA forbids. 5 U.S.C. § 706(2)(A).

>    (i)    HUD Reversed its Prior Position on the Same Factual Record Without Justification.

HUD's rescission of a rule it promulgated just one year ago is arbitrary and capricious in violation of § 706(2)(A) of the APA. As the Supreme Court has explained, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). When an agency changes position, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *Fox Television Stations, Inc.*, 556 U.S. at 515. If the new policy "rests upon factual findings that contradict those which underlay its prior policy," the agency must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

HUD's overarching justification for the 2026 IFR is that, on balance, rescinding the rule financially benefits PHAs and property owners while minimizing harm to tenants. 2026 IFR at 9,451 ("This rule will re-establish the pre-pandemic regulatory standards to support PHAs and owners to adequately address nonpayment of rent, and prevent the increase of rental arrearages, while also continuing to provide families with adequate notice."). In reaching this conclusion, HUD takes the

exact opposite stance it took just over one year ago in passing the 2024 Final Rule, when it stated that "HUD believes that this rule strikes a balance between potentially increasing some of the financial impacts on PHAs and owners, and supporting families who need additional time to address financial issues that result in nonpayment of rent." 2024 Final Rule at 101,277. Having previously determined that tenant protections justified any incremental financial burdens, HUD was required to explain why that balance no longer holds. It has not done so. *See Wisconsin Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001) ("[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so").

*First*, HUD relies on irrelevant data, hearsay, and speculation, and cites *no* data from after the 2024 Final Rule was adopted, to justify the 2026 IFR. That failure is particularly indefensible because HUD itself has collected and published on its website detailed housing data in 2025—information plainly available to the agency and directly relevant to the very policy judgment it purported to revisit. *Compare* Compl. ¶ 17 (showing HUD's 2025 data); *with* 2026 RIA, Exs. 1 & 2 (citing to HUD's 2024 data).

To the extent that HUD purports to rely on any evidence, it is irrelevant and outdated. Take HUD's assertion that the 2021 IFR caused an alleged 200% increase in TARs from 2019 to 2024 as an example. 2026 IFR at 9,450. Not only is 2025 data conspicuously absent, HUD ignores key intervening developments between 2019 and issuance of the 2021 IFR, including widespread pandemic-related disruptions such as extended closures of housing authorities, rental offices, and housing courts, which could have likewise contributed to any alleged TARs increase. If HUD believed the 30-day notice requirement was driving increased TARs, it needed to show that TAR levels materially worsened after the 2021 IFR (or the 2024 Final Rule). It does not. HUD instead compares 2024 to 2019 and offers no evidence of a post-2021 or post-January 2025 increase that

could support any kind of causation between the 2024 Final Rule and the financial condition it now invokes as justification for its rescission. *Gulf v. Burgum*, 775 F. Supp. 3d 455, 468 (D.D.C. 2025) ("An agency's action is arbitrary and capricious if it has failed to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (citation omitted).

HUD then notes that "PHAs relayed to HUD that some tenants interpreted the eviction moratorium and its extensions, along with available emergency rental assistance, to mean that paying rent was not required." 2026 IFR at 9,450. But HUD provides no explanation for why such hearsay would be relevant to the 2024 Final Rule, which came into effect long after the pandemic was over and is distinct from the moratorium and any related extensions. Moreover, none of the three news articles HUD cites in support of this statement—which either predate or were published just after the 2024 Final Rule—say anything about tenant intent *today* and do not attribute nonpayment to any belief that rent was unnecessary. *Id.* at 9,450 n.2. In short, HUD's statement imputes a specific tenant interpretation without evidentiary foundation and relies on sources that do not support its purported cause, which is not reflective of reasoned decision-making. *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 605, (D.C. Cir. 2007) ("As we have said many times before, an agency's unsupported assertion does not amount to substantial evidence." (internal quotations omitted)). In any event, the limited data HUD *does* cite indicates the opposite trend, namely that the incidence of rent nonpayment is decreasing. HUD's 2026 regulatory impact analysis shows that, at least until 2024, owner-initiated move-outs due to nonpayment of rent remain below pre-pandemic levels and actually decreased between 2023 and 2024. 2026 RIA, at 3–4, Ex. 2. And as HUD itself acknowledges, the "observed difference [*i.e.* decrease] in the rate of move-outs due to nonpayment in 2018-2019 versus 2022-2024 is likely attributable to the 30-day notice requirement." *Id.* at 5.

Worse still, HUD concedes that it lacked the data necessary to properly evaluate the 2026 IFR's impact, yet proceeded to promulgate the rule nonetheless. Specifically, HUD acknowledges in its 2026 regulatory impact analysis that, because of a "lack of data," it "is uncertain which would be greater: the external costs from worsened housing instability among nonpaying assisted tenants or the external cost savings from otherwise unassisted households gaining assistance." 2026 RIA at 7. HUD nevertheless concludes that while the 2026 IFR will "cause an increase in housing instability in some instances, which will impose costs on society in general . . . these costs will be offset by the improved housing outcomes of households moving into the vacated units." *Id.* at 8. An agency cannot acknowledge a dispositive evidentiary gap and then proceed without attempting to obtain or analyze the information needed to close it. See *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) (holding action arbitrary and capricious where an agency did not explain why its "uncertainty … counsels in favor of [acting] now, rather than, for example, more study" as "[o]therwise, we might as well be deferring to a coin flip." (citing *State Farm*, 463 U.S. at 52).

*Second*, even setting aside the profound deficiencies in the evidence and data HUD cites in support of the 2026 IFR, HUD's proffered justifications are internally inconsistent and unsound. For example, HUD contends that its 2024 analysis "did not take into account" a purported "mitigating factor": that the societal costs of increased evictions absent the 30-day notice would be offset by societal benefits to households currently waiting for subsidized housing. 2026 RIA at 7, n. 18. Leaving aside the fact that HUD *did* consider this factor in its 2024 regulatory impact analysis, 2024 RIA at 13, HUD's analysis creates a false equivalence between the enduring, long-term harm to evicted tenants—who lose their subsidies and have evictions on their record— and the incremental, temporary burden on unsubsidized households who may face modestly longer wait times.

HUD further claims that the 2026 IFR "will generate cost savings for housing providers who have not yet incurred all of the administrative compliance costs associated with implementing the

2024 final rule." 2026 RIA at 1. But this directly contradicts HUD's own conclusion in its 2024 regulatory impact analysis that "the burden of developing the new content of the notice and leases will be minimal since HUD will supply much of the information that providers will have to give to tenants. . . . Also, this rule will not impose new costs associated with providing the notice since PHAs and owners already have to provide written notice before taking adverse action for nonpayment of rent." 2024 RIA at 15.

HUD also repeatedly asserts that "[r]emoving the 30-day notification requirement would cause an economic transfer from assisted tenants who stop paying their rent to housing providers." 2026 RIA at 1. But that framing is unduly simplistic and is squarely contradicted by the 2024 notice-and-comment record, including MLA's own comment, which showed that many tenants face eviction not because they fail to pay rent, but despite paying on time, because landlords issue eviction notices based on procedural missteps or paperwork errors. *See*, *e.g.*, Schultz Decl., Ex. A at 3 ("[O]ur subsidized housing clients usually present with erroneously high rent balances stemming from procedural problems in the income recertification process."). Similarly, HUD acknowledged several comments explaining that tenants who fall behind on rent often do so because of unexpected life events—not an unwillingness to pay—and that, given the time, they are often able to recover the needed funds or negotiate repayment plans with property owners. 2024 Final Rule at 101,275.

This is but one example of the manner in which HUD blatantly disregards the numerous comments endorsing the 2024 Final Rule and its significant benefits. Indeed, in promulgating the 2024 Final Rule, HUD recognized that "[p]roviding assisted households with information about accessing additional rental assistance, or other emergency funding, and additional time to take advantage of these programs enhances the protections already in place and gives households a better chance to resolve their nonpayment of rent with the housing provider." 2024 Final Rule at 101,273. HUD also agreed with the comments that "providing tenants with additional time will help to cure

nonpayment of rent violations, preventing unnecessary eviction filings and evictions." *Id*. Yet, nowhere in the 2026 IFR does HUD discuss or cite a single comment in favor of the 2024 Final Rule. HUD's complete failure to grapple with these comments, which provided invaluable insight into the material benefits that informed the Rule's original adoption, underscores the arbitrariness of the HUD's action. *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 436 F. Supp. 3d 70, 81 (D.D.C. 2020) ("If the issuing agency has failed to address significant comments raised during the rulemaking, the regulation will be deemed arbitrary and capricious.") (internal quotations omitted).

The 2026 regulatory impact analysis, similarly, avoids confronting difficult data rather than offer reasoned explanations. While the analysis does acknowledge costs to tenants resulting from housing instability, 2026 RIA at 7, it does not quantify these costs, which makes it difficult to evaluate how, or if, these costs were considered by HUD. *Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022) ("Agency action is arbitrary and capricious if a reviewing court cannot discern from the record that the agency action was the product of reasoned decision making."). By contrast, the 2024 regulatory impact analysis quantified both the harms to PHAs and landlords and the benefits to tenants of the 2024 Final Rule, with clear methodologies established for both calculations. 2024 RIA at 10–11, 15–16.

        (ii)      HUD Failed to Consider Alternatives That Were Within the Ambit of the Existing Policy.

HUD failed to consider alternatives to wholesale rescission of the 2024 Final Rule that would address its concerns while mitigating tenant harm. "When an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 51 (alterations in original)). As the Supreme Court has explained, an agency that rescinds a rule in its entirety must specifically discuss and consider the alternative approach of

retaining certain portions of the existing rule. *Id.* at 30 (where rescission of an agency rule did not discuss a substantial part of the rule being rescinded, or "the option of retaining" that substantial part of the rule, "[t]hat omission alone renders [the agency's] decision arbitrary and capricious.").

For example, in *State Farm*, the National Highway Traffic Safety Administration ("NHTSA"), after concluding that automatic seatbelts would not provide adequate protection, revoked a requirement that cars be equipped with either automatic seatbelts or airbags in its entirety. *Id.* at 37–38. The Supreme Court held this rescission to be arbitrary and capricious because the NHTSA abandoned the requirement solely based on its evaluation of automatic seatbelts "without any consideration whatsoever of an airbags-only requirement." *Id.* at 51.

Here, HUD rescinded the entire 2024 Final Rule but did not engage with the informational and cure requirements of the rule in any meaningful way. Beyond a 30-day notice period, the 2024 Final Rule also requires eviction notices to include an itemized ledger of rent allegedly owed and information notifying tenants of statutory rights to recertify their income or apply for a hardship exemption. 2024 Final Rule at 101,302–304. Further, the 2024 Final Rule prohibits landlords from serving eviction notices until the day after rent is due, and allows the tenant to cure the arrearage within the notice period. *Id.* These additional requirements enable tenants and landlords alike to avoid the costs of eviction where eviction is avoidable or improper: ledgers permit tenants to rectify rent and income calculation errors, while information on income recertification and hardship exemptions ensures that tenants are aware of available legal remedies to remain housed. Requiring the PHA or owner to accept payment of the full amount of rent owed within the notice period also prevents the harms of eviction for tenants who can pay, and the costs of complying with these additional requirements are minimal for PHAs and PBRA owners.

Instead of grappling with these components of the 2024 Final Rule, HUD summarily rescinds them without any meaningful analysis. Although HUD invokes a single, generalized justification—

reducing "administrative and financial burdens on PHAs and owners"—to support wholesale repeal, it nowhere identifies, let alone substantiates, any concrete administrative or financial burden attributable to the informational safeguards it eliminates. 2026 IFR at 9,451. If HUD's unstated premise is that rescission alleviates the compliance cost of updating notices, HUD's own 2026 regulatory impact analysis is directly contradictory. 2026 RIA at 8 (finding that, because the 2024 Final Rule required immediate compliance for updating eviction notices, "HUD assumes that housing providers have already updated these notices. Therefore, the revocation of the 2024 final rule does not avoid the compliance costs of updating these notices.").

And nowhere in the 2026 IFR or 2026 regulatory impact analysis does HUD discuss why it is removing the cure requirement, even though this safeguard is analytically distinct from the length of the notice period and could readily be retained under a shorter timeframe. The prohibition on filing an eviction action when a tenant tenders the full amount allegedly owed within the notice period operates independently of whether that period is 30 days or some shorter duration. Yet, HUD eliminates this discrete protection without analysis, thereby authorizing eviction proceedings to move forward in some states even where a tenant pays within days of receiving a notice. *See supra*, Section II(E). In failing to offer any independent reasoning on these separate informational and cure provisions, HUD plainly ignores the alternative approach of revoking or reducing *only* the 30-day notice requirement, which could mitigate financial hardship to PHAs and landlords while retaining essential tenant protections. This alternative approach fits squarely "within the ambit" of existing policy and demands careful consideration as required by *Regents*, 591 U.S. at 30.

HUD also did not consider alternative regulatory approaches aside from rescission that would address the financial concerns of PHAs and landlords. For example, HUD fails to mention that it already has proposed a rule to eliminate consideration of TARs in its approach to scoring PHAs. Public Housing Evaluation and Oversight: Changes to the Public Housing Assessment System

38

(PHAS) and Determining and Remedying Performance Deficiencies, 89 Fed. Reg. 87,518, 87,521 (Nov. 4, 2024) (proposing to "remove" the "Tenant Accounts Receivable subindicator" from HUD's Public Housing Assessment System). HUD also failed to consider other approaches, including expanding resources available to PHAs experiencing financial difficulties. The availability of these resources is discussed repeatedly in the 2024 Final Rule, but is not addressed at all in the 2026 IFR. *See* 2024 Final Rule at 101,282 ("HUD reminds PHAs of the ability to receive shortfall funding if they are experiencing financial challenges."). As part of an agency's obligation to explain its reasoning for rescission, the agency must elaborate on why rescission is preferable to alternative approaches within the ambit of existing policy. *D.C. v. United States Dep't of Agric.*, 496 F. Supp. 3d 213, 239 (D.D.C. 2020). HUD has clearly not done so.

HUD treated wholesale rescission of the 2024 Final Rule as the only viable option for advancing its stated objectives, without analyzing whether alternative approaches could address those same concerns. This all-or-nothing approach underscores the arbitrary nature of HUD's decision-making.

## B.    Plaintiffs Will Suffer Irreparable Harm Absent the Relief Requested

To satisfy this factor, the movant must establish that irreparable injury will or is "'likely' to occur" absent injunctive relief," and "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted). The movant also must establish that "the alleged harm will directly result from the action which the movant seeks to enjoin." *Id*. In evaluating a plaintiff's asserted injuries, courts presume "that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Coal. for Humane Immigrant Rts.*, 805 F. Supp. 3d at 100.

Absent this Court's intervention, Plaintiffs would likely suffer irreparable harm in at least three respects. *Wisconsin Gas Co.*, 758 F.2d at 674.

*First*, once the 2026 IFR goes into effect, Ms. Sadler, Ms. Jones, Ms. Coleman, Ms. Doe, and other Plaintiff-organization members will face a substantial risk of eviction without the 2024 Final Rule's protections. HUD-subsidized tenants will very likely receive notices that provide them substantially less time to cure rent arrearages before their landlords institute an eviction action for nonpayment of rent. *See supra* Section III(A)(1)(a). They will also no longer have a right to their itemized ledgers, and the notices will also likely provide less information, both of which have, in the past, helped Plaintiffs avoid eviction. *See, e.g.*, Moskowitz Decl. ¶¶ 25, 31; Coleman Decl. ¶¶ 28–29; Jones Decl. ¶ 32.

D.C. courts have recognized that the threat of eviction constitutes irreparable injury. *E.g.*, *D.C. v. Towers*, 250 A.3d 1048, 1056–57 (D.C. 2021) (finding irreparable harm in part because tenants behind in rent would lose their "extended opportunity to cure" without a stay and, notwithstanding the eviction moratorium, some tenants may "self-evict"); *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 309 (D.C. 2006) (finding irreparable harm in part because "[a]bsent a stay, [t]he [tenant] could have been evicted under the terms of an agreement that provided that he had no right to redeem the tenancy, even if he could afford to pay the charges subsequently.").

The harms of eviction are particularly irreversible for low-income tenants like Ms. Sadler and Plaintiff-organizations' members, who cannot afford private market rent without a rental subsidy and, therefore, will "almost certainly" be homeless if they are evicted and thereby lose their subsidy. Sadler Decl. ¶¶ 28–29; Moskowitz Decl. ¶ 7 ("Most of the tenants [JASC] work[s] with cannot afford rent on the private market. If they lose their subsidies they will become homeless."). Homelessness brings with it a whole host of additional irreparable harms. Sadler Decl. ¶¶ 29–32

(articulating, among other harms, that it would be difficult for her to adequately care for her severely disabled son and that her children's academic opportunities would be affected); Jones Decl. ¶¶ 32–34 (explaining that she would be forced to split up her kids to ensure they did not end up homeless and describing the educational, medical, and emotional harms eviction would have on her children); Coleman Decl. ¶¶ 30–32 (discussing the detrimental impact an eviction would have on her physical and emotional health). Courts have found irreparable harm based on similar facts. *See Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1118 (D.D.C. 1987) (finding irreparable harm if low-income tenants were evicted, noting that among other harms, they "may wind up completely homeless.").

Further, MLA will be irreparably harmed because the 2026 IFR will impair its ability to provide legal services, drain its resources, and directly conflict with its organizational mission. The test for irreparable harm to an organization is "similar to the test for organizational standing," *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 129 (D.D.C. 2020) ("An organization faced irreparable harm where (1) the 'actions taken by [the defendant] have perceptibly impaired the [organization's] programs,' and (2) 'the defendant's actions 'directly conflict with the organization's mission.'" (quoting *League of Women Voters*, 838 F.3d at 8 (alteration in original) (internal citations omitted))). For the same reasons discussed above, *supra* Section III(A)(1)(b), the 2026 IFR would perceptibly impair MLA's core activities through its rescission of the informational and 30-day notice requirements, and directly conflict with its mission "of preserving housing subsidies and preventing evictions for low-income Marylanders" through "free civil legal services" Schultz Decl. ¶¶ 26, 3.

*Second*, the harm to Plaintiffs is imminent and irreversible once the 2026 IFR goes into effect because federal and state rules that would apply offer far less eviction protections to tenants. Thus, Ms. Sadler and several JASC and NCTU members would likely receive a notice with limited to no information or opportunity to cure, following which their landlord could proceed to formal eviction proceedings in state court. Once that occurs, even were the Court to set aside the 2026 IFR at a later

date, it would lack authority to order the rescission of a landlord's notice—or the dismissal of a state eviction proceeding initiated pursuant to a notice—that did not comport with the 2024 Final Rule. This underscores the need for this Court's intervention at an early stage. *See, e.g.*, *Lattimore v. Nw. Co-op. Homes Ass'n*, 1990 WL 10521534, at *5 (D.D.C. Mar. 26, 1990) (finding irreparable harm where landlord commenced an eviction action against tenant in D.C. Superior Court where tenant could not raise her federal housing claims, and absent an injunction in Federal Court, "this court will be unable to make plaintiff whole without evicting the new tenant.").

*Third*, unless the IFR is vacated, Plaintiffs will suffer an irreparable procedural injury of being denied the opportunity to comment prior to the 2026 IFR's promulgation in a notice and comment process. "Section 553 [of the APA] is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (cleaned up). While the 2026 IFR does not go into effect until 30 days from the date of publication, it will become effective in its current form, 2026 IFR at 1—"meaning that the [IFR] will take effect without being revised to account for any comments made by members of the public after the rule's publication[.]" *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 13 (D.D.C. 2009) (citation omitted). Permitting "the submission of views after the effective date (of a regulation) is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981).

While a procedural injury, standing alone, "is insufficient to support a finding of irreparable harm, [] it may be sufficient if it also detrimentally affects some other concrete interest of the plaintiffs." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *accord Gomez v. Trump*, 485 F. Supp. 3d 145, 171 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and*

*amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (collecting

cases). Here, Plaintiffs face the procedural deprivation of being denied the ability to share their

views with HUD before being stripped of their protections. They also face a "concrete injury" of a

threatened eviction. Plaintiffs have thus demonstrated irreparable harm.

###    C.    The Balance of Equities and the Public Interest Support Preliminary Relief

Where the government is the defendant, the final two factors—balancing the equities and the

public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The public interest is served when administrative agencies comply with their obligations

under the APA." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015); *see also League of

Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful

agency action . . . [t]o the contrary, there is a substantial public interest in having governmental

agencies abide by the federal laws that govern their existence and operations."). Thus, HUD cannot

"invoke the public interest as being in favor of its actions when it promulgated [an IFR] in disregard

of the APA's procedural mandates." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum.

Servs.*, 485 F. Supp. 3d 1, 61 (D.D.C. 2020); *see also Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d

91, 105 (D.D.C. 2025) ("the government cannot suffer harm from an injunction that merely ends an

unlawful practice") (citation and internal quotation marks omitted).

Nor can HUD articulate why—after over a year of the 2024 Final Rule being in effect—a

delay in implementation of its repeal would substantially harm public finances or impose any

substantial hardship on the housing authorities and largely corporate landlords subject to the rule.

Quite the contrary, "the threat of eviction and the prospect of homelessness to the [Plaintiffs]

outweighs the inconvenience and hardship to the landlords," if any. *McNeill*, 719 F. Supp. at 255.

On the other hand, the public has an interest in ensuring that "those in financial need are not

unreasonably terminated from public assistance benefits." *Watkins v. Greene Metro. Hous. Auth.*, 397

F. Supp. 3d 1103, 1110 (S.D. Ohio 2019) (cleaned up); *see also Lattimore*, 1990 WL 10521534, at *7 (public interest favors "protection of rights created by housing regulations"). And this Court has recently found that the public interest of "preventing the loss of housing [and other services] that plaintiffs would suffer in the absence of an injunction" outweighs any alleged harm facing the government. *See Cabrera*, 792 F. Supp. at 105.

The hardships that would befall the Plaintiffs—and the public—if the Court denies the interim relief are concrete and substantial. The balance of equities and the public interest therefore weighs in favor of a preliminary injunction and stay.

### D.    Plaintiffs' Motion Is Not Precluded by *Trump v. CASA*

Plaintiffs' motion for a § 705 stay and preliminary injunction is not precluded by the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

"*CASA* does not control the scope of relief available under Section 705." *See Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (Statement of Millett and Childs JJ.). Indeed, *CASA* explicitly declined to address the "distinct question" of relief in cases brought under the APA. *CASA*, 606 U.S. at 847 n.10; *see also id.* at 873 (Kavanaugh, J., concurring) (observing that courts are still empowered to "preliminarily set [] aside . . . an agency rule under the APA."). The § 705 authority vested by the APA is not confined to the plaintiffs before the Court. *See Cabrera*, 792 F. Supp. 3d at 106. Accordingly, this Court has granted numerous § 705 stays vacating agency actions from taking effect nationwide even after *CASA's* ruling. *See, e.g.*, *Coal. for Humane Immigrant Rts.*, 805 F. Supp. 3d at 104.

A nationwide stay is particularly appropriate where a narrower stay would not remediate irreparable harm or "is not a workable solution under the" applicable statute. *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025). The uniform federal regulatory scheme governing public housing makes geographically limited relief unworkable, as housing authorities operate under

federal mandates that apply uniformly across states. The Ninth Circuit observed that limiting relief to individual plaintiffs is inappropriate where plaintiffs challenge the rescission of an agency action, which is "a single act." *Nat'l TPS All.*, 150 F.4th at 1028. Courts cannot "rewrit[e]" an agency rule to "affect only certain individuals," as that would result in "a judicially created patchwork" fostering administrative uncertainty. *Id.*

 *CASA* acknowledged that there are "injuries for which it is all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs." *CASA*, 606 U.S. at 852 n.12. In this case, Plaintiffs' relief requires staying the 2026 IFR from taking effect entirely. *See Am. Gateways v. U.S. Dep't of Just.*, 2025 WL 2029764, at *11 (D.D.C. July 21, 2025) (setting aside "arbitrary and capricious agency action" even when the invalidated agency action was a nationwide policy) (citations and internal quotation marks omitted).

   **E.**  **The Court Should Decline to Order Plaintiffs to Post Bond.**

 Because § 705 of the APA contains no bond requirement, the Court should stay the 2026 IFR without ordering Plaintiffs to post bond. *See Cabrera*, 792 F. Supp. 3d at 107 n.3 (denying a bond because "§ 705 of the APA contains no such requirement"); *Coal. for Humane Immigrant Rts.*, 805 F. Supp. 3d at 105 (same, adding that were a bond to be imposed "the proper bond amount would be zero dollars"). And when, as here, the "government is the enjoined party and no concrete economic injury is established . . . courts routinely waive the bond requirement." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025).

**IV.** **CONCLUSION**

 For the foregoing reasons, this Court should grant Plaintiffs' motion for a stay under 5 U.S.C. § 705 and preliminary injunction, and postpone the effective date of the 2026 IFR until the resolution of Plaintiffs' present challenge under the APA.

Dated:  March 2, 2026                    Respectfully submitted,

**DEBEVOISE & PLIMPTON LLP**
*/s/ Timothy J. Cornell*
Timothy J. Cornell (D.C. Bar No. 994661)
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 383-8000
Email:  tjcornell@debevoise.com

Caroline H. Wallace (N.Y. Bar No. 5958004) (*pro hac vice application pending*)
Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice application pending*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Email:  chwallace@debevoise.com
        sdgrossman@debevoise.com

**NATIONAL HOUSING LAW PROJECT**
Hannah D. Adams (Louisiana Bar No. 36343) (*pro hac vice application pending*)
90 New Montgomery St., Suite 1015
San Francisco, CA 94105
Telephone: (415) 636-8385
Email:  hadams@nhlp.org

**LEGAL AID SOCIETY OF EASTERN VIRGINIA**
Brandon L. Ballard (VSB No.: 95346)
(*pro hac vice application pending*)
125 St. Paul's Blvd., Suite 400
Norfolk, VA 23510
Ph: (757) 648-1241
Email: brandonb@laseva.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE ADDAMS SENIOR CAUCUS, NORTH
CAROLINA TENANTS UNION, MARYLAND
LEGAL AID, and LISA A. SADLER,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and SCOTT TURNER, in His Official Capacity
as Secretary of the United States Department of
Housing and Urban Development,

*Defendants*.

Civil Action No.1:26-cv-00718

## <u>CERTIFICATE OF SERVICE</u>

I, Samuel Grossman, am associated with Debevoise & Plimpton, LLP and am an attorney for Plaintiffs.  I hereby certify that on March 2, 2026, I served the United States Department of Housing and Urban Development through Federal Express Standard Overnight mail, pursuant to FRCP 5(b)(2)(C), with the following documents: (1) Rule 26.1 Certificate; (2) Plaintiffs' Motion for a Stay and Preliminary Injunction; (3) Memorandum of Law in Support of Motion for a Stay and Preliminary Injunction; (4) the Declaration of Noah Moskowitz and exhibits annexed thereto; (5) the Declaration of Lisa Coleman; (6) the Declaration of Shawnese Jones; (7) the Declaration of Hailey Huget; (8) the Declaration of Jane Doe; (9) the Declaration of Victoria Schultz and exhibit annexed thereto; (10) the Declaration of Lisa A. Sadler; (11) a proposed order; (12) Pro Hac Vice Motion for Caroline H. Wallace and exhibits annexed thereto; (13) Pro Hac Vice Motion for Samuel Grossman and exhibits

annexed thereto; (14) Pro Hac Vice Motion for Brandon Lewis Ballard and exhibits annexed thereto; and (15) Pro Hac Vice Motion for Hannah D. Adams and exhibits annexed thereto.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated:  March 2, 2026                    Respectfully submitted,

DEBEVOISE & PLIMPTON LLP
/s/ *Samuel Grossman*
Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice application pending*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Email:  sdgrossman@debevoise.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants.* | Civil Action No. 1:26-cv-00718 |

## CERTIFICATE OF SERVICE

I, Samuel Grossman, am associated with Debevoise & Plimpton, LLP and am an attorney for Plaintiffs. I hereby certify that on March 2, 2026, I served Scott Turner, Secretary of the United States Department of Housing and Urban Development through Federal Express Standard Overnight mail, pursuant to FRCP 5(b)(2)(C), with the following documents: (1) Rule 26.1 Certificate; (2) Plaintiffs' Motion for a Stay and Preliminary Injunction; (3) Memorandum of Law in Support of Motion for a Stay and Preliminary Injunction; (4) the Declaration of Noah Moskowitz and exhibits annexed thereto; (5) the Declaration of Lisa Coleman; (6) the Declaration of Shawnese Jones; (7) the Declaration of Hailey Huget; (8) the Declaration of Jane Doe; (9) the Declaration of Victoria Schultz and exhibit annexed thereto; (10) the Declaration of Lisa A. Sadler; (11) a proposed order; (12) Pro Hac Vice Motion for Caroline H. Wallace and exhibits annexed thereto; (13) Pro Hac Vice Motion

for Samuel Grossman and exhibits annexed thereto; (14) Pro Hac Vice Motion for Brandon

Lewis Ballard and exhibits annexed thereto; and (15) Pro Hac Vice Motion for Hannah D.

Adams and exhibits annexed thereto.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing

is true and correct.

Dated:  March 2, 2026                    Respectfully submitted,

                                         DEBEVOISE & PLIMPTON LLP
                                         /s/ Samuel Grossman
                                         Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice application pending*)
                                         66 Hudson Boulevard
                                         New York, NY 10001
                                         Telephone: (212) 909-6000
                                         Email:  sdgrossman@debevoise.com

                                         *Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

## CERTIFICATE OF SERVICE

I, Samuel Grossman, am associated with Debevoise & Plimpton, LLP and am an attorney for Plaintiffs. I hereby certify that on March 2, 2026, I served the Attorney General of the United States through Federal Express Standard Overnight mail, pursuant to FRCP 5(b)(2)(C), with the following documents: (1) Rule 26.1 Certificate; (2) Plaintiffs' Motion for a Stay and Preliminary Injunction; (3) Memorandum of Law in Support of Motion for a Stay and Preliminary Injunction; (4) the Declaration of Noah Moskowitz and exhibits annexed thereto; (5) the Declaration of Lisa Coleman; (6) the Declaration of Shawnese Jones; (7) the Declaration of Hailey Huget; (8) the Declaration of Jane Doe; (9) the Declaration of Victoria Schultz and exhibit annexed thereto; (10) the Declaration of Lisa A. Sadler; (11) a proposed order; (12) Pro Hac Vice Motion for Caroline H. Wallace and exhibits annexed thereto; (13) Pro Hac Vice Motion for Samuel Grossman and exhibits annexed thereto;

(14) Pro Hac Vice Motion for Brandon Lewis Ballard and exhibits annexed thereto; and

(15) Pro Hac Vice Motion for Hannah D. Adams and exhibits annexed thereto.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated:  March 2, 2026         Respectfully submitted,

**DEBEVOISE & PLIMPTON LLP**
/s/ *Samuel Grossman*
Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice application pending*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Email:  sdgrossman@debevoise.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

<u>**CERTIFICATE OF SERVICE**</u>

I, Samuel Grossman, am associated with Debevoise & Plimpton, LLP and am an attorney for Plaintiffs. I hereby certify that on March 2, 2026, I served the United States Attorney's Office for the District of Columbia through Federal Express Standard Overnight mail, pursuant to FRCP 5(b)(2)(C), with the following documents: (1) Rule 26.1 Certificate; (2) Plaintiffs' Motion for a Stay and Preliminary Injunction; (3) Memorandum of Law in Support of Motion for a Stay and Preliminary Injunction; (4) the Declaration of Noah Moskowitz and exhibits annexed thereto; (5) the Declaration of Lisa Coleman; (6) the Declaration of Shawnese Jones; (7) the Declaration of Hailey Huget; (8) the Declaration of Jane Doe; (9) the Declaration of Victoria Schultz and exhibit annexed thereto; (10) the Declaration of Lisa A. Sadler; (11) a proposed order; (12) Pro Hac Vice Motion for Caroline H. Wallace and exhibits annexed thereto; (13) Pro Hac Vice Motion for Samuel Grossman and exhibits

annexed thereto; (14) Pro Hac Vice Motion for Brandon Lewis Ballard and exhibits annexed thereto; and (15) Pro Hac Vice Motion for Hannah D. Adams and exhibits annexed thereto.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated:  March 2, 2026                    Respectfully submitted,

DEBEVOISE & PLIMPTON LLP
/s/ *Samuel Grossman*
Samuel Grossman (N.Y. Bar No. 6231492) (*pro hac vice application pending*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Email:  sdgrossman@debevoise.com

*Attorney for Plaintiffs*