UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

## DECLARATION OF NOAH MOSKOWITZ

I, Noah Moskowitz, hereby declare as follows:

1. I submit this declaration regarding the rescission of the 2024 Final Rule titled "30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2024 Final Rule") by the United States Department of Housing and Urban Development ("HUD").

2. I am the Organizing Director of the Jane Addams Senior Caucus ("JASC").

3. JASC is a membership-based 501(c)(3) organization supporting the leadership of Chicago-area seniors and tenant families to transform their housing and communities. As part of its work, JASC provides support to members who are organizing building-based tenant unions for the purpose of improving building conditions and management practices.

1

4. JASC's purpose is to support HUD tenants in demystifying HUD, and it achieves this purpose by frequently assisting HUD tenants resolve alleged nonpayment issues to prevent eviction.

5. JASC's members are primarily tenants in buildings with Section 8 Project-Based Rental Assistance ("PBRA") contracts with HUD.

6. JASC has 250 members in three cities across Illinois.

7. Participants in the Lakeside Tower Tenant Union are members of JASC.

8. Lisa Coleman and Shawnese Jones, who are participants in the Lakeside Tower Tenant Union, are also members of JASC.

9. According to my review of data from HUD's website, 72% of HUD-subsidized households in Chicago earn $20,000 or less. My review of the website RentCafe, which we use to track rental market trends, shows that an average Chicago two-bedroom apartment is $2,445, or $29,340/year, not including utilities. That is more than most families we serve make in a year. Without their subsidized housing, these families would have nowhere to go.

10. I have been serving as JASC's Organizing Director since February 14, 2025. Before joining JASC, I worked for the Tenant Education Network ("TEN") for four years. TEN merged into JASC in February 2025. Because of this, I refer to JASC activities as inclusive of TEN activities. My job duties include educating tenants about their rights and explaining the details of HUD's regulations. I also explain to tenants how to successfully enforce those rights through effective individual and collective action.

11. In my role as JASC Organizing Director, I visit JASC members in their homes at least once a week, and I speak to JASC members by phone at least once a day to discuss problems they are dealing with in their buildings. For example, I have personally met with

Ms. Coleman and Ms. Jones at least 10 times to discuss the issues they are facing at Lakeside Tower.

12. JASC also has a contract with the non-profit organization Beyond Legal Aid, which provides one of their staff attorneys to work with our members and represent them in legal disputes. That attorney, Peter Luck, is currently representing both Ms. Coleman and Ms. Jones.

13. I have learned through my conversations with tenants and my work with our contract attorney that miscalculated rents and inaccurate ledgers are endemic to HUD PBRA buildings. PBRA tenants' rents are calculated based on their income and are not supposed to exceed 30% of their adjusted gross household income, including a utility allowance. Tenants are entitled to "annual recertifications" once a year when their income is reviewed, and they also have a right to "interim recertifications" if their income changes in the middle of the year. But property managers often fail to timely recalculate tenants' rents when their income drops, if they do at all. Annual recertifications are frequently late due to miscommunications about required documents or failure to provide requisite notice under HUD regulations, which can lead to improper termination of their housing subsidies. Utility allowances, senior deductions, and medical deductions are often not applied. Many ledgers include both the tenant's and HUD's portion of the rent and mistakenly attribute delays or errors in the HUD subsidy payment to the tenant. Finally, many tenants work overtime when they start a job, only for their hours to decrease over time. Tenants report the income loss to management, but managers do not know to ask the tenant to collect recent check stubs to verify their income loss, or tenants do not know how to access those documents. Ledger balances can quickly get out of hand. For example, I have seen tenants charged substantial late fees and/or penalties each month even though they are

paying their rent on time because their rent payments are being applied back to a disputed balance.

14. JASC and its contract attorney spend a significant amount of time documenting and contesting these improper rent balances. We spent so much time doing this that we created a formal ledger review policy and "how to" guide for our staff on or around August 2024. We most recently updated it in November 2025.

15. The ledger review policy is attached to this declaration as Exhibit A.

16. In my experience, the process of simply reviewing a ledger and identifying errors for one tenant takes a minimum of one week and can take more than two weeks. This is before we even begin to address the ledger issues with management.

17. The first step of the process outlined in the policy is to obtain a copy of the tenant's ledger. This can take as little as two days, and as much as two weeks. Often, we do not receive that ledger until an attorney or Contract Administrator compels them to release it to the tenant.

18. Steps two and three of the process involve converting the ledger to an Excel document and sorting it to categorize the different charges. These steps take about five hours.

19. Step four of the process involves reviewing the ledger for internal errors and calculating the accurate rent balance, if any. This part of the process typically takes a full eight-hour workday for one tenant. These ledgers often go back years and are riddled with inaccuracies or confusing entries. Many ledgers include entries unrelated to the tenant's rent, such as the HUD subsidies as discussed above, and must be corrected. We then analyze each entry in the ledger in the context of tenant's leases, income statements, recertification documents, income histories, and the applicable HUD regulations that govern rent calculations.

20. Steps six and seven involve scheduling a meeting with the tenant and gathering and reviewing tenant documents. It typically takes two to three days to schedule a meeting with the tenant, and up to one week to gather necessary documentation to verify rent and income calculations.

21. Finally, step eight involves drafting a letter to management about the errors, which can take up to four hours.

22. All of these steps must be completed before we even approach management to correct the issue. Once we approach management it can take anywhere from a couple of weeks to multiple months to resolve the ledger errors we have identified.

23. Sometimes at the end of our review the tenant still owes a balance, though usually less than that alleged by the property. In those cases, it is important that the tenant have the right to pay the legitimate balance owed so they can stay in their home.

24. This work is tedious and granular. Each ledger analysis takes many hours of staff time and weeks of correspondence with managers and tenants. But it yields concrete results, allowing tenants to avoid unnecessary evictions based purely on inaccurate balances.

25. In one systematic effort toward the end of 2024, I aided in removing over $25,000 in unlawful back rents from the ledgers of six Section 8 PBRA tenants in Aurora, IL. In that case, the ledger issues we identified included requested interim recertifications due to income loss that were never processed, income counted that should have been excluded under HUD rules, inexplicable charges that did not match the tenant's rent portion, and improperly charged late fees.

26. In total, it took two staff members working for five months to resolve these issues based on our process outlined herein.

27. A redacted version of the letter we wrote to the owner disputing tenant balances, and explaining in detail the various issues we identified, is attached as Exhibit B. JASC does not have consent to identify the names or addresses of the members listed in Exhibit B.

28. In another instance, over a dozen tenants in a Section 8 PBRA building in Chicago, IL received inaccurate 30-day notices in February 2025. JASC systematically reviewed and contested all of them over the course of 30 days, documenting and reporting substantial errors in every ledger to management, preventing all but three of the tenants from having to go to court to defend against their eviction notices. In this case, the ledger issues we identified included tenants being charged the HUD subsidy portion of rent, random "adjustments" improperly assessed to the tenant pursuant to interim or annual recertifications, and failure to credit rent payments to the account.

29. In total, it took four staff members 23 days working together to resolve these issues based on our process outlined herein.

30. A redacted version of the letter we wrote to the owner disputing tenant balances, and explaining in detail the various issues we identified, is attached as Exhibit C. JASC does not have consent to identify the names or addresses of the members listed in Exhibit C.

31. In my experience, many PBRA tenants are not aware of their right to a rent adjustment between annual recertifications if their income drops. This information is often buried deep in a lease agreement that the tenants signed years ago, and many property managers do not inform tenants of their right to recalculate their rent if their income drops. Most PBRA tenants I have encountered also do not know they have the right to a hardship exemption from minimum rent, and this right does not even appear in most of the lease agreements I have seen.

32.     Tenant rent balances are so notoriously inaccurate in Illinois PBRA buildings that we succeeded in getting purchasers to agree to waive all back rents owed to the seller in three transactions which occurred in July 2023 (Lakeside Tower Waukegan, IL), November 2025 (Fox Shore Apartments, Aurora IL), and January 2026 (Indian Trails Apartments, Chicago, IL). In each case, the purchaser agreed to waive back rents in part because they acknowledged that they could not prove it was accurate.

33.     The 30-day notice requirement and opportunity to cure mandated by the 2024 Final Rule has made it possible to resolve alleged nonpayment violations and stop unnecessary evictions. It would be impossible to resolve these issues under the applicable Illinois state law which provides only five days for the notice and cure period.

Procedural Injury

34.     Before HUD revokes the 2024 Final Rule, it should consider the experiences of our members who have been helped by the 2024 Final Rule and will be harmed when it is revoked.

35.     My organization's experiences working with tenants facing eviction for nonpayment from Section 8 PBRA buildings would provide valuable information and perspective for HUD to consider before they rescind the 2024 Final Rule that has so greatly benefited us. JASC would like the opportunity to share its insight into the systemic problem of inaccurate rent balances at PBRA properties, and to explain how additional time and the opportunity to cure before eviction notices are issued is crucial to resolving these issues.

36.     A lot of the information we have to share, such as our experiences working to correct tenant ledgers at PBRA buildings in Chicago and Aurora, occurred in late 2024 and in

2025. Therefore, we could not have submitted this information in response to the Notice of Proposed Rulemaking issued in 2023.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Chicago, Illinois on February 26, 2026.

_____
Noah Moskowitz