UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

## DECLARATION OF LISA N. COLEMAN

I, Lisa N. Coleman, hereby declare as follows:

1. I submit this declaration regarding the rescission of the 2024 Final Rule titled "30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2024 Final Rule") by the United States Department of Housing and Urban Development ("HUD").

2. I am a member of the Jane Addams Senior Caucus ("JASC"). I have been a member since February 14, 2025. I am comfortable with JASC representing my interests in this case.

3. I am a tenant at Lakeside Tower Apartments, a Section 8 Project-Based Rental Assistance property in Waukegan, Illinois. I have lived at Lakeside Tower Apartments since the end of 2019.

1

4.  I am a 47-year-old Black woman and reside with my live-in aide. I have been diagnosed with cellulitis and have been hospitalized on and off since 2023. The cellulitis contributed to my diagnosis of peripheral neuropathy because of damage to my nervous system from the repeated debridement required to treat the cellulitis. This causes my feet, legs, and spine to go numb or become extremely painful, sometimes with a burning sensation. These symptoms affect me all the time, and while medication can reduce the symptoms, it does so only to the point that I can tolerate it, but not enough for me to maintain a job.

5.  Because of my disability, I am unable to work, and my sole income is Retirement, Survivors, and Disability Insurance. I currently receive monthly benefits in the amount of $1,241.

6.  I have lived at Lakeside Tower Apartments since the end of 2019.

7.  Because of my fixed income, it would be difficult, if not impossible, for me to afford a home on the private market without access to federally assisted housing.

<u>Lakeside Tower Apartments</u>

8.  Lakeside Tower Apartments has a Section 8 Project-Based Rental Assistance subsidy through HUD's Property Disposition program.

9.  In addition to being a member of JASC, I am a member of my building's tenant association, the Lakeside Tower Tenant Union. The union holds meetings approximately twice a month where we discuss issues we are having with management and the building, and we agree on collective actions to solve these issues.

10. We have also met with management to address issues and delivered a petition signed by residents asking for changes.

11. JASC frequently assists the Lakeside Tower Tenant Union as part of its mission to support HUD tenants. JASC is experienced with navigating recurring, complex issues that plague Lakeside Tower residents. For example, JASC staff met and talked with me regularly about the issues I experienced at the property and helped me review my ledger on multiple occasions, informing me of applicable HUD rules. JASC ultimately referred me to a legal aid attorney.

12. I am active in the tenant union and regularly attend the meetings. As a result, I often hear about issues other tenants are having.

13. One of the most common issues I hear about is inaccurate ledger balances. Sometimes people lose income, but the property fails to recertify them and decrease their rent. Residents' rent payments are not properly tracked. Utility reimbursements are not properly distributed, which means tenants are paying out-of-pocket for utility costs that are supposed to be covered by their subsidy.

14. As my own experience below illustrates, these ledger errors take time to fix with management.

15. Part of the reason it takes a long time to fix the ledger issues is because management does not correctly apply the relevant HUD regulations. If they do acknowledge errors, they do not apply corrections comprehensively, in a timely fashion, or at all. Management and their attorneys also take a long time to respond to emails, if they do at all; do not reply comprehensively; or do not provide correct information. On our end, it takes JASC staff and myself days or even weeks to go through years of convoluted ledger entries and gather necessary documentation (sometimes from third parties) to prove certain entries are erroneous.

16. Currently, the property is required to provide 30 days' notice and opportunity to cure a nonpayment violation before eviction. Tenants are also entitled to a copy of their ledger. The 2024 Final Rule gives tenants time to resolve their ledger and income recertification issues with management.

17. I am worried that if the 2024 Final Rule is rescinded, Lakeside Tower Apartments will go back to providing only the five days' notice required under Illinois law. I worry because management continues to provide five days' notice instead of 30 days' notice on occasion. On May 23, 2024 and October 15, 2025, I received notices from management saying I was delinquent and had five days left to pay my balance. Any eviction based on these notices would probably have been thrown out because it did not comply with the 2024 Final Rule, but it goes to show that the property is eager to return to shorter notice requirements. I feel that management takes any opportunity to penalize me, whether that be increasing my rent, threatening me for failing to immediately provide recertification documents, or deferring unit maintenance. If they had the opportunity to provide fewer than 30 days' notice for eviction, I am convinced they would.

18. As described below, five days is nowhere near enough time to fix the type of ledger and recertification problems I have seen at the property. Five days is also not enough time to come up with the money to pay off a balance for someone like me that receives a fixed income once a month. For example, I receive my disability check on February 3. If I get a notice on February 15 that I owe a balance, there is no way I can pay the balance owed within five days. I can only pay it when I get my next disability check on March 3.

<u>Risk of Eviction with Insufficient Notice</u>

19. I have faced eviction for alleged nonpayment on multiple occasions.

4

20. On or about May 23, 2024, I received a notice saying I had a balance of $1,182, that I had to pay it in five days, and that my case had already been sent to management's attorneys. I contacted management and asked for help. It took me a week, until May 31, 2024, to obtain a copy of my ledger.

21. I then contacted JASC, which was at that time Tenant Education Network ("TEN"). Over the next week or so, with help from JASC staff, I determined that a $1,000 payment I made in March was not counted on my ledger. I also discovered from my ledger that, although my most recent rent notice stated that my rent was $262 per month, and I had been paying that amount, management had raised it to $314 without providing notice.

22. I returned to the management office on June 3, 2024 to try to address these issues, and management informed me that my balance was even higher—$1,982. I was afraid of being evicted, so I paid $700 to enter into a payment plan even though I disagreed with the balance. Because I entered into a payment plan, I was able to avoid eviction.

23. This whole process of obtaining my ledger, identifying certain errors, and then entering into a payment plan took 11 days. We were confident that an eviction court judge would throw out any eviction filed based on the May 23, 2024 notice because it did not comply with the 30-day notice requirement then in effect. But if it was not for that protection, I would have faced eviction because there was no way I could have obtained my ledger, sorted through all the entries, identified errors, and entered into a payment plan in only five days.

24. In June 2024, the hospital told me I would have to move to a skilled nursing facility unless I got a live-in aide. So, I got a live-in aide. The manager threatened to ban him from the building unless he was formally added to my lease. While I did not have a problem with that, she was demanding his check stubs to include in my household's income calculation. I

knew that I could not afford that and that something was wrong, but she brushed me off. I again contacted TEN, whose staff notified me that under HUD regulations, the income of a live-in aide cannot be included in the rent calculation. In consultation with TEN staff, I worked on collecting reasonable accommodation paperwork and doctor's notes to support my claim. Due to scheduling delays with my doctor, this took two months. When I finally submitted the formal request and supporting documents to the property, they corrected the error by removing my live-in aide's income and reducing my rent.

25. Even if I had not experienced scheduling delays with my doctor, it would have been impossible for me to obtain documentation from a busy doctor's office within the five-day notice period under state law. If I had only had five days, I likely would have been evicted.

26. On or about October 15, 2025, I received notice from management saying I was delinquent in the amount of $1,086.00 and had five days left to pay my balance. The notice further stated that any tenant who does not pay their rent by the fifth of the month would be sent to eviction court. I knew the balance was incorrect because I had paid my rent each month. It took me almost three weeks to address this issue. I had to contact JASC again, JASC had to review my ledger, and I had to locate all of my rent receipts from 2025 proving I had paid each month. I also met with a local non-profit about rental assistance during that period, but they were unable to assist me because my ledger did not make sense to them. The JASC organizer then emailed management on my behalf. Unfortunately, management refused to adjust my ledger and doubled down on the same balance.

27. Even though we were not able to fix the problem with my ledger at that time, it took JASC and myself 20 days to accurately and thoroughly address the issue with management. We were confident that an eviction court judge would throw out any eviction filed based on the

October 15, 2025 notice because it did not comply with the 30-day notice requirement. But if it was not for the 2024 Final Rule, I would have faced eviction because there is no way JASC and I could have fully reviewed my ledger and gathered all of the necessary evidence to address the errors on my ledger in five days.

28. On November 6, 2025, I received a 30-day notice of eviction for back rent, this time for $1,209. I requested a meeting with the manager via email to discuss the issue, but she refused. I asked for the meeting because I had a ledger from February 2025 showing they had never removed the incorrect rent charges that included my live-in aide's income, and I wanted to ensure this balance was correct.

29. Hitting a dead end, I was referred to a legal aid attorney with JASC's help. My attorney contacted management's attorney on December 5, 2025. Management did not provide an updated ledger until January 15, 2026, which confirmed the live-in aide's income had finally been removed from my balance. It took my attorney and I two months to fully address the issues with the November 2025 notice because of how long it took to get a response from management and to get an updated copy of my ledger. There is no way we could have resolved those issues in the five-day notice period under state law. If I had only had five days, I likely would have faced eviction.

30. Unfortunately, even though management removed the live-in aide income from my ledger, they did not remove the late fees that were erroneously charged during the period. I was still paying my rent on time each month, but each month I would still get charged a late fee. To date, my attorney has followed up with management's attorney twice to remove the late fees and address other issues, without response.

31. In the meantime, I have continued to pay my rent portion each month. Because they have accepted my rent, they will need to issue a new notice to vacate in order to move forward with eviction.

32. I am worried that I will receive another eviction notice for nonpayment of rent because management says I still owe a balance. Because that balance remains on the account, I am concerned that management could rely on it to issue another notice for nonpayment. Once the 2024 Final Rule is rescinded, I will only have five days to address and resolve any issues with my ledger, and pay off any balance, before management can evict me. This is not going to be enough time based on my past experiences outlined herein.

<u>Irreparable Harm If Evicted</u>

33. I cannot afford to rent a two-bedroom apartment for me and my live-in aide on the private market with my fixed income of less than $1,300 per month. I would have to use every dollar of my income just to pay for a one-bedroom apartment. Then I would have no money left to pay for any of my other expenses.

34. Even if I could afford to rent an apartment, having the eviction on my record would make it extremely difficult to find one since most places screen for eviction history.

35. If evicted, I would probably have to double up with a family member or friend. This would make it very hard for me to keep up with my medical care for my cellulitis. I have a wound-care nurse who comes to my house twice a week and a physical therapist who also comes once or twice a week. I likely would not be able to continue these treatments with any consistency if I lost my stable housing.

36. The disruption in my medical treatment will have a severe impact on my health. I have been able to effectively manage my condition with this regimented care. Without it, I will

likely experience increased, intolerable pain; more infections resulting from my cellulitis; even more limited mobility; and all the mental and psychological impacts that exposure to chronic, severe pain will cause me. This will impede my ability to function and perform daily tasks.

37. Eviction and the resulting housing instability will also cause me stress, anxiety, and emotional harm.

## Procedural Injury

38. I believe that before the government rescinds the 2024 Final Rule, it should consider the experiences of tenants like myself who have benefitted from the rule and will be harmed by its revocation.

39. I have important information to share about my neighbors' and my experiences with recertification and ledger issues at Lakeside Tower Apartments. Without 30 days' notice and opportunity to cure, and access to our ledgers, we would not have been able to resolve these issues and would likely have been evicted.

40. With only five days' notice under state law, I would not be able to fix the issues on my ledger with management or come up with the money to pay any legitimately owed balance.

41. I could not have submitted these comments in response to the 2023 Notice of Proposed Rulemaking because my issues began in May 2024, after the comment period closed. A number of the experiences I've described here occurred in 2025, after the 2024 Final Rule was in effect.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Waukegan, Illinois on February 26, 2026.

*Lisa N. Coleman*
Lisa Coleman