UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

## DECLARATION OF HAILEY HUGET

I, Hailey Huget, hereby declare as follows:

1. I submit this declaration regarding the rescission of the 2024 Final Rule titled "30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2024 Final Rule") by the United States Department of Housing and Urban Development ("HUD").

2. I am the Organizing Director of the North Carolina Tenants Union ("NCTU").

3. The NCTU is a statewide union of local tenant unions across the state of North Carolina. We formed in April 2024 and are a 501(c)(3) nonprofit organization.

4. The mission of NCTU is to realize housing as a human right for every North Carolinian and build a housing system that prioritizes people over profit. To transform the housing system, our members organize grassroots organizing campaigns led by directly affected tenants to stop displacement, win critical repairs, stop rent increases, democratically control their

1

housing, and strengthen tenants' rights. NCTU has an interest in curbing evictions because they harm our members and their families, and displacement disrupts their ability to organize for change in their buildings.

5. We have 208 members in four metropolitan areas: Winston-Salem, Asheville, Wilmington, and the Triangle (Raleigh, Durham, and Chapel Hill).

6. Many of our members are tenants living in Section 9 public housing, or Section 8 Project-Based Rental Assistance ("PBRA") buildings.

7. Jane Doe has been a dues-paying member of NCTU since August 15, 2025.

8. In my role as Organizing Director, I supervise our organizing staff, who are located across the state and work directly with members. I speak to each of my four supervisees twice a week for an hour each time. During those meetings, I hear about what is happening in the buildings where they work, and the experiences of the tenants in those buildings. I develop our statewide organizing strategy in collaboration with staff and members. I help develop new local unions outside of the places where we currently have members. I also help keep track of all of our members, their contact information, and their specific housing situations.

9. I also do direct support at buildings to establish relationships with tenant members. For example, I participate in canvasses of buildings and attend events, meetings, and actions that are put on by our building-level campaigns. Through this work, I meet and develop relationships with tenants.

10. NCTU directly supports members that are facing eviction from public housing or PBRA housing. NCTU organizing staff review the eviction notices and ledgers of members facing eviction, and provide information about the eviction process, tenants' rights, and HUD program rules. Sometimes our organizing staff accompany tenants to meetings with management

to review paperwork and negotiate a resolution. Staff and members keep updated lists of community partners that can provide legal representation and/or financial assistance to the tenant. Depending on the situation, we work with the tenant to access these resources by helping them contact them, helping them gather and understand their required paperwork, and driving them to appointments or hearings.

11. Based on information I have received from our tenant members and from NCTU organizing staff whom I supervise, our tenant members often face eviction because of rent balances that are inaccurately calculated.

12. Late fees and other fees are often assessed improperly. For example, at one public housing property where I work, the property was charging tenants for additional "junk fees" that were not in the lease agreement.

13. In addition, management often fails to process recertifications in a timely or accurate manner when tenants report losses of income. This results in the tenant not receiving their entitled rent decrease and getting behind on rent. These issues take time to untangle with management.

14. For example, during the summer of 2025, our organizers worked with one Section 9 public housing tenant member after they lost their job and received a notice of lease termination for nonpayment of rent. This tenant had proactively made attempts to have the public housing authority ("PHA") adjust their rent due to job loss, but their requests were ignored. With help from NCTU and its local member union, the tenant submitted a written request to their landlord for an informal hearing about the issue. They were ultimately able to resolve the issue and remain in their housing, but the process took several weeks. I feel confident that they would not have been able to do so with a shorter notice period.

15. My work with our tenant members and the NCTU organizing staff whom I supervise has made clear to me that the 30-day notice requirement is important in preventing evictions. It would be extremely difficult, if not impossible, for tenants to resolve their ledger and recertification errors within the 10-day notice and cure period provided under North Carolina state law—which would apply to many of our members in the absence of the current 30-day requirement. Tenants often need legal assistance to understand the applicable federal rules and use them to advocate for ledger corrections. But it can take tenants several days just to access a legal aid attorney after we refer them. Then, in NCTU organizing staff's experience, it can take another two weeks to get a meeting with management at some of these buildings. In the time it takes to understand what the problems are and begin to address them with management, management would have already filed the eviction in court if not for the 30-day notice requirement.

16. I have also learned that many tenants can cure a balance owed and avoid eviction if given extra time and resources. When tenant members receive eviction notices, they often come to our organizing staff first, who then refer them to legal aid immediately. Then we assess the details of the case. When the eviction is due to nonpayment, we will typically try to provide a local resource list of churches, nonprofits, and mutual aid organizations that offer rental assistance and try to help the individual connect with that resource. We stay in touch with the tenants while they attempt to access assistance. In our experience, it takes several weeks to access this assistance. Sometimes it takes up to a week to even get a response. The churches and organizations we work with are short-staffed and have complicated procedures that make the process of accessing rental assistance slow.

17. For example, in Asheville, a charity initially agreed to meet within a week with a public housing tenant who had received a notice of lease termination for nonpayment to discuss rental assistance. The charity later cancelled the appointment, however, because the Housing Manager in the tenant's complex failed to provide the charity with the required documents in a timely manner. When the Housing Manager finally sent the requested information to the charity, it was riddled with errors, resulting in the need for a lengthy back-and-forth between the tenant facing eviction, the PHA staff, and the charity. The entire process of obtaining rental assistance ultimately took several weeks.

18. On occasion, tenants will, outside of their roles as NCTU members, organize crowd-funded rental assistance for a neighbor. It typically takes about two weeks for them to get this set up and raise anywhere from $100 to $1500 for a tenant. For example, tenants were able to do this for Ms. Doe and helped her cure a nonpayment violation and avoid eviction.

19. Based on these experiences, I believe it is extremely difficult, and in some circumstances impossible, for a tenant to obtain rental assistance in less than two to three weeks. The 2024 Final Rule makes it possible for our members to access available financial resources to pay off legitimately owed balances. It would be very hard, if not impossible, for one of our Section 9 public housing tenant members to jump through all the hoops to get rental assistance from one of the churches or mutual aid organizations we work with, or through crowdfunding, in the 10-day notice period under state law.

20. If the 2024 Final Rule is rescinded, I believe most PHAs and PBRA landlords will go back to 14 days' notice in public housing, and 10 days' notice under state law in Section 8 Project-Based Rental Assistance housing. I think they will return to these shorter notice periods because Raleigh Housing Authority, where we have a member union and work with tenants

regularly, submitted a comment opposing the 30-day notice requirement in January 2024. Most of the PHAs and PBRA owners we interact with do what they can to get people out as quickly as possible, so they would probably give less notice if they could. PHAs and PBRA owners often complain about paperwork and so will likely pursue the path of least resistance when it comes to tenant notification if that option is available to them.

## Procedural Injury

21.  Before HUD revokes the 2024 Final Rule, it should consider the experiences of our members who have been helped by the Rule and will be harmed when it is revoked.

22.  My organization's experiences working with tenants facing eviction for nonpayment from public housing and Section 8 PBRA buildings provide valuable information and perspectives for HUD to consider before they rescind the 2024 Final Rule that has benefitted us. NCTU would like the opportunity to be heard on this issue to share its insight into the length of time it takes to access legal aid and resolve ledger issues, as well as the length of time it takes to access rental assistance to cure a balance owed.

23.  NCTU was only formed in April 2024. Therefore, I could not have submitted this information in response to the Notice of Proposed Rulemaking issued in 2023.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Winston-Salem, NC on February 27, 2026.

Hailey Huget