UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE ADDAMS SENIOR CAUCUS, NORTH CAROLINA TENANTS UNION, MARYLAND LEGAL AID, and LISA A. SADLER,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00718 |

### DECLARATION OF LISA A. SADLER

I, Lisa A. Sadler, hereby declare as follows:

1. I submit this declaration regarding the rescission of the 2024 Final Rule titled "30-Day Notification Requirement Prior to Termination of Lease for Nonpayment of Rent" ("2024 Final Rule") by the United States Department of Housing and Urban Development ("HUD").

2. I am a tenant at Waverly Place, a Section 8 Project-Based Rental Assistance property in Lansing, Michigan.

3. I am a 59-year-old Black woman, and I reside with four of my children, ages 17, 18, 22, and 34.

4. My 34-year-old son is severely disabled. He is blind and suffers from cerebral palsy, a seizure disorder, and autism.

1

5. I am a full-time caregiver for my severely disabled adult son. I assist him with moving from room to room, bathing, prepping meals, administering his medicine, and taking care of his other personal needs. I have been his full-time caregiver since 2011 when it became clear that he could no longer attend school outside of the home because of his disabilities. As a result, I am not able to take on other work.

6. I also live with my 17-year-old daughter, 18-year-old son, and 22-year-old son. My 17-year-old daughter is a full-time high school student and works part-time at a fast-food restaurant. My 22-year-old son is a full-time college student and helps me around the house with his disabled brother. It is important to me that both of my children who are students have time to focus on their studies so they can get ahead in life, become independent, and not have to rely on government programs.

7. My 18-year-old son is currently unemployed and is applying for jobs. He had to leave his previous job at a café because he was being harassed by his supervisor. It has been hard for him to find a new job because the supervisor will not give him a good reference.

8. Because I am a full-time caregiver, my only income is my disabled son's Supplemental Security Income, and a small amount of money I get from the Michigan Department of Health and Human Services to help me take care of him. This amounts to less than $2,000 per month to support my children and me.

9. I have lived at Waverly Place for eight years, since 2016.

10. Prior to getting an apartment at Waverly Place, my family experienced homelessness. I had to move us out of our last rental house because of uninhabitable conditions. I had to separate my family and send my kids to another city to live with their father temporarily. I

stayed at a homeless shelter because I could not afford decent rental housing on the private market with my limited income.

11. Being separated from my kids was very hard. I had to travel very early in the morning to where they were staying to get them ready for school and pick up my disabled son to care for him. I got a part-time job so I could try to save up for an apartment and had to rely on others to help take care of my son while I worked. Because I was homeless, I temporarily lost my income from the state to help me care for my son. I spent many sleepless nights worrying about keeping my family together.

12. It was a long process to get subsidized housing. While I was in the homeless shelter, they signed me up to the waiting list for Lansing Housing Commission. It took about three and a half months on the waiting list for me to get a call, and I had priority because I was homeless. Then I waited for nine months after submitting my paperwork, only to find out I was not going to receive the apartment I had applied for. I had to reapply for my current apartment at Waverly Place, and it took another three months for me to get in after submitting my paperwork. In total, it took me well over a year of being homeless to get my current subsidized apartment.

## Waverly Place

13. When I moved into Waverly Place in 2016, it was a public housing property owned and managed by the Lansing Housing Commission, which is Lansing, Michigan's local public housing authority.

14. Beginning in 2021, during my tenancy, Waverly Place was converted to a Section 8 Project-Based Rental Assistance property under the Rental Assistance Demonstration ("RAD") program.

15. Following the RAD conversion, Lansing Housing Commission continues to own the property through a limited partnership called Mount Vernon Park Limited Dividend Housing Association Limited Partnership ("Mount Vernon"). The Executive Director of Lansing Housing Commission is Mount Vernon's agent, and Lansing Housing Commission is a party to the RAD Use Agreement recorded against the property.

16. As part of the RAD conversion, a private company, Michigan Asset Group, L.L.C. ("MAG"), stepped in to manage Waverly Place.

17. Since MAG took over management, tenants at Waverly Place have experienced more frequent errors with their rent and income calculations.

18. For example, I have seen MAG raise rent (i) based on an improperly annualized child support lump-sum back payment; and (ii) because it improperly counted as income money received on a Cash App, Zelle, or Google Pay statement.

19. I have also seen tenants receive contradictory information about how to pay their rent, and whom to pay it to, especially in the early period after the conversion. For example, tenants would be told to pay rent to Lansing Housing Commission. They would get a money order and make it out to Lansing Housing Commission, only to be told they had to pay rent to Mount Vernon. This caused confusion and could lead to an eviction notice if the tenant did not redo the money order in time.

20. I am viewed as a community leader by other tenants at Waverly Place. I have been working to organize a tenant union at the property for several years and helped with an effort to survey tenants about their experiences. Because of this work, I have gained a lot of knowledge

about how the system works, including the rules that govern how our rent and income are calculated.

21.     Tenants often come to me with problems. In this context, I have been asked to assist and accompany my neighbors to meetings with management to go over their ledgers and address errors on about three occasions.

22.     Based on these experiences, I have learned that errors and improper rent and income calculations—which were exacerbated when MAG took over—take time to fix with management.

23.     Part of the reason it takes longer to resolve these issues is because the office is often closed during business hours, since the manager is assigned to three different buildings and is often not on site. I would estimate it can take upwards of two weeks to get a meeting with the manager to go over a ledger. Then, after you meet with the manager, she has to go through her own review process and get approval from superiors in the company to complete any ledger adjustments. That takes at least another week. Often, all of this is happening in the middle of an annual or interim income recertification. By the time the manager meets with you and gets approval to adjust your ledger, some of your paperwork may be outdated because you have to provide income paperwork that is less than 30 days old. So, you have to go back to your employer, the Social Security Administration, or your bank to get new paperwork. Sometimes, the property will not accept the paperwork from you directly. For example, once I provided bank statements to the manager as part of my annual recertification. She came back and told me that I needed to separate the checking and savings account statements. So, I had to go to the bank again and ask them to separate the statements. When I provided those, the manager told me she

actually needed the bank to fax the statements. So, I had to go back to the bank a third time to get them to do that. This example illustrates that between trying to meet with management, waiting for management to complete its review and approval process, and updating paperwork, the process of getting a ledger problem fixed can easily take 30 days.

24. Currently, the property is required to provide 30 days' notice and the opportunity to cure an arrearage before eviction for nonpayment. Tenants are also entitled to a copy of their ledger under the same rule. The 30-day notice requirement has been instrumental in allowing tenants to address recertification issues and problems with their ledgers because, as explained previously, it takes at least 30 days to meet with management and get ledger issues resolved.

25. I am worried that if the 2024 Final Rule is revoked, Waverly Place will go back to providing only the seven days' notice required under Michigan law. I think they will do this because Lansing Housing Commission commented in opposition to the proposed 30-day notice rule in 2023.

26. In my experience, seven days is not enough time to fix the type of complicated ledger and recertification problems I have seen at the property. I have never even been able to get a meeting with management in seven days.

<u>Risk of Eviction with Insufficient Notice</u>

27. I have faced eviction for nonpayment on multiple occasions.

28. In 2022, I received 30 days' notice alleging I had not paid rent for a month that I had, in fact, paid. I pay with cashier's checks, so my bank has a record of my payments. I had to go to the bank to get a copy of the cashier's check. Management ultimately admitted that there was an error on my ledger. I was able to resolve the issue in the 30-day period and management

did not file an eviction. I believe I was able to resolve the issue much faster than other tenants would have been able to, because I know how the system works and am experienced with self-advocacy.

29. Then, on December 8, 2025, I received a 30-day notice for nonpayment of rent saying that I owed over $500. In response to the notice, I was able to obtain a copy of my ledger and review it.

30. I have been legally withholding rent and escrowing it under Michigan law because my home is unlivable and undergoing mold remediation. The ledger did not account for the amount of rent I had escrowed. The ledger also contains about $150 in late fees for the months I legally escrowed my rent. The ledger also contains an $80 charge for drywall damage that I had already paid out of pocket to repair. Because of these issues, I felt that my ledger was inaccurate.

31. Because I had 30 days, I was able to contact the Mid-Michigan Tenant Resource Center for assistance and was also able to consult with some other attorneys that were assisting me with related matters. They took steps to address the issues on my ledger. Because I had time to get my attorneys involved, and they had time to review my ledger and contact management about the errors they found, Waverly Place has not filed for an eviction.

32. Since the December notice, I have completed my annual recertification with Waverly Place, which I understand reinstates my lease for another year.

33. When I went to sign my recertification paperwork, I noticed that my ledger said I had a balance of a little over $700. It is clear that Waverly Place still thinks I owe a balance and has not resolved all the issues with my ledger.

34. Because my recertification was completed after my last termination notice, I believe that Waverly Place will have to issue me a new notice if they want to evict me for the balance.

35. I am worried that I will receive another eviction notice for nonpayment of rent. Once the 2024 Final Rule is revoked, I will only have seven days to address and resolve any issues with my ledger. This is not going to be enough time in my experience.

Irreparable Harm If Evicted

36. Because of my limited income, I have experienced homelessness in the past. If evicted, my family and I have nowhere to go and cannot afford rent on the private market without a rental subsidy. We will almost certainly become homeless again.

37. If evicted, it would also be much harder for me to get into future housing, including other subsidized housing managed by private owners, because I will then have an eviction record.

38. If we become homeless again, I will have to split up my family like I did last time. I do not have family in Lansing, so my kids would likely end up farther away. My 17-year-old daughter would probably have to switch schools.

39. It would be harder for me to care for my 34-year-old disabled son and keep up with his medication and medical appointments if we were separated. Because of my son's autism, changes in routine are extremely disruptive and can trigger severe stress, anxiety, and sensory overload. I am afraid that if we are evicted and my family has to split up, this will be severely harmful for him.

40. It will be harder for my 17-year-old and 22-year-old to maintain their studies if we become homeless, and that could negatively impact their academics and future opportunities.

41. Homelessness would also cause my children and me to experience severe emotional harm, anxiety, and stress.

## Procedural Injury

42. I believe that before the government revokes the 2024 Final Rule, it should consider the experiences of tenants like me who have benefitted from the rule and will be harmed by its revocation.

43. I have important information to share about my and my neighbors' experiences with recertification and ledger issues at Waverly Place. Without 30 days' notice and opportunity to cure, and access to our ledgers, we would not have been able to resolve these issues and would likely have been evicted.

44. I was not able to share this information in 2023 in response to HUD's Notice of Proposed Rulemaking, because many of these relevant experiences happened in 2024, after that comment period closed, and in 2025, after the Final Rule was published.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in *Lansing*, *Michigan* on February 26, 2026.

*Lisa A. Sadler*
Lisa A. Sadler